**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDER CLIFFORD, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>BIBOX GROUP HOLDINGS LIMITED, BIBOX TECHNOLOGY LTD., BIBOX TECHNOLOGY OÜ, WANLIN "ARIES" WANG, JI "KEVIN" MA, and JEFFREY LEI,<br><br>    Defendants. | No. _____<br><br>**JURY DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Alexander Clifford, individually and on behalf of all others similarly situated, brings this action against Defendants Bibox Group Holdings Limited, Bibox Technology Ltd., Bibox Technology OÜ (collectively "Bibox"), Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei. Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of whitepapers of the digital tokens at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiff hereby alleges as follows:

## I.   <u>INTRODUCTION</u>

1.     On behalf of a class of investors who purchased six digital tokens that Bibox has sold through its online exchange or its ICO since approximately October 2017 (the "Class"), without registering under applicable federal and state securities laws as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling, Plaintiff and members of the Class seek to recover the consideration paid for the tokens and the fees they paid to Bibox in connection with purchases of BIX, EOS, TRX, OMG, LEND, and ELF (together, the "Tokens").

2.     A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions. Various digital assets can reside on blockchains, including cryptocurrencies, such as Bitcoin and Ethereum (both discussed in greater detail below), as well as so-called "smart contracts" that operate under a set of predetermined conditions agreed on by users. When those conditions are met, the terms of the

contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain).

3.      Certain of these digital tokens are classified as "utility tokens."  Their primary purpose is to allow the holder to use or access a particular project.  For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

4.      Other tokens are more speculative, and are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project.  Although the tokens take value from the startup behind the project, they do not give the holder actual ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and Bibox was required to register itself as an exchange with the SEC.  Neither the Issuers nor Bibox filed any such registration statements.  Instead, Bibox and the Issuers entered into contracts to list these Tokens for sale on the Bibox exchange in violation of federal and state law.  As a result, Bibox and the Issuers reaped billions of dollars in profits.

5.      The scheme worked as follows:  working to capitalize on the enthusiasm for cryptocurrencies like bitcoin, an Issuer would announce a revolutionary digital token.  This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an initial coin offering ("ICO")

to a small group of investors and then turn to Bibox to list the new token, at which point Bibox would undertake its own efforts to promote sales, and to solicit and encourage purchases, by a wide universe of investors. The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens. Bibox would profit handsomely as well by receiving a percentage of each trade and by receiving substantial payments from Issuers to have their tokens listed.

6.      The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities." But the vast majority of these new tokens turned out to be empty promises. They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace. In reality, they often had no utility at all. The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed. Indeed, all of the Tokens are now trading at a tiny fraction of their 2017–2018 highs. One of the Tokens at issue, TRX, is down more than 95 percent from its 2018 high. After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively; today, they trade at around $0.56 and $0.06 per token. The EOS token reached a high of $22.89. Today, it is worth only $2.22.

7.      Investors were provided with scant information when deciding whether to purchase a token. In fact, the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token. These whitepapers would often omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a description of key information and incentives concerning management;

4

warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow.  Instead, these ICOs were the "Wild West"—with investors left to fend for themselves.  Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

8.      In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors.  Issuers and exchanges like Bibox, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture.  In truth, these tokens were securities under federal and state securities laws.

9.      On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1]  Prior to that time, a reasonable investor would not have believed that these Tokens were securities that should have been registered with the SEC.  But the Tokens are in fact securities.  For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the relevant ICO began—the SEC completed an investigation and found that Block.one had violated the Securities Act by selling the digital token EOS, an

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS was an unregistered security applies with equal force to the other Tokens.

10.     Bibox and the Issuers wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—without registering the Tokens as securities, and without Bibox registering with the SEC as an exchange or broker-dealer.  As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

11.     Bibox participated in illegal solicitations and sales of securities for which no registration statement was in effect, and as to which no exemption from registration was available. Each ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiff and the general public in the United States.  Because these sales, as well as Bibox's underlying contracts with the Issuers that facilitated these sales, violated both the Securities Act and the Exchange Act, Plaintiff and the Class are entitled to recover the consideration paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid Bibox on such purchases.

12.     In addition, numerous Class members resided, and were present at the time they traded in the Tokens, in States that provide their own "Blue Sky" protections for investors,

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

including the State of Illinois.[3]  These States generally provide that the investors in these States who purchased these unregistered tokens are entitled to rescission or damages, as well as interest thereon, attorneys' fees, and costs.

## II.   PARTIES

### A.  Plaintiff

13.     Plaintiff Alexander Clifford is a resident of Chicago, Illinois.

14.     Plaintiff and the members of the Class purchased the Tokens on Bibox and pursuant to contracts with Bibox, from Illinois during the Class Period.

### B.  Defendants

15.     Bibox held the BIX ICO during October 2017.  The Bibox exchange was launched in November 2017.  Within a few months, it had a market capitalization of approximately $215 million.  Bibox facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Bibox taking a fee for every transaction it facilitates.

16.     Bibox's founders, Wanlin "Aries" Wang, Ji "Kevin Ma, and Jeffrey Lei, founded Bibox in China but shortly thereafter moved Bibox's operations to Estonia, in response to the Chinese government's ban on cryptocurrency trading.  Within one year, however, Bibox expanded its footprint to the U.S., Switzerland, Canada, China, South Korea, Japan, Singapore, and Vietnam.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, Illinois defines "securities" to include "investment contracts," which has been interpreted by Illinois courts at least as broadly as the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

17.     Defendant Bibox Group Holdings Limited is a British Virgin Islands company with offices located at 1120 6th Avenue, Suite 1507, New York, New York 10036.  On information and belief, Bibox Group Holdings Limited is the parent company of the group of entities doing business as Bibox.

18.     Defendant Bibox Technology Ltd. is a company incorporated in the Republic of Estonia that contributes to the operation of the Bibox exchange.

19.     Defendant Bibox Technology OÜ is a company incorporated in the Republic of Estonia that contributes to the operation of the Bibox exchange.

20.     Although it is thus unclear where Bibox is physically headquartered, it is clear, as shown below, that since its founding Bibox has regularly and intentionally engaged in numerous online securities transactions inside the United States, with United States residents, without complying with U.S. laws.  In addition, Bibox has promoted inside the United States the sale of digital assets on its exchange, has availed itself of the jurisdiction of the New York courts, and has maintained offices in New York.

21.     Defendant Wanlin "Aries" Wang is a co-founder of Bibox.  In his role, he is responsible for "picking and listing" digital assets on Bibox.  On information and belief, he resides in Long Island City, New York.

22.     Defendant Ji "Kevin" Ma is the Business Vice President of Bibox and co-founded Bibox along with Wang and Lei.  On information and belief, he resides in Beijing, China.

23.     Defendant Jeffrey Lei is the CEO of Bibox and co-founded Bibox with Wang and Ma.  On information and belief, he resides in Singapore.

### III.   JURISDICTION AND VENUE

24.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1),

77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

25.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78t, 78cc(b).

26.     This Court has jurisdiction over the statutory claims of violations under 815 Ill. Comp. Stat. Ann. 5/13 pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

27.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' offer or sale of unregistered securities and failure to register with the SEC as an exchange or broker-dealer.  This Court also has personal jurisdiction over Defendant Bibox Group Holdings Limited because it has its principal place of business in New York.  This Court also has personal jurisdiction over Defendant Wanlin "Aries" Wang because he resides in New York.

28.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where the offer or sale took place.  Bibox maintains an office and transacts business in this judicial district.  Bibox employs individuals responsible for the maintenance of its exchange business in this judicial district.  For example, Taylor Zhang is responsible for "ICO Listing at Bibox Exchange" and Meilun Li is the "Director of Operations" at Bibox Exchange.  Bibox has also availed itself of the New York state courts located within this judicial district, commencing an action in Supreme Court in New York County, *see Wang et al. v.*

*Liu*, Index No. 0655050/2018 (New York Cnty. Sup. Court), arising from business activities occurring within this judicial district.  Bibox's U.S. subsidiary, Bibox Technology LLC, opened business checking accounts within this judicial district.  And Wang has attended and announced Bibox corporate developments at blockchain conferences in New York City:



## IV.    FACTUAL ALLEGATIONS

### A.  The First Cryptocurrency: Bitcoin

29.    A cryptocurrency is a digital asset designed to work as a medium of exchange or a store of value or both.  Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

30.    Bitcoin was the world's first decentralized cryptocurrency.  It is also the largest and most popular cryptocurrency, with a market capitalization of approximately $126 billion.  Bitcoin spawned a market of other cryptocurrencies that, together with bitcoin, have a current market capitalization of approximately $192 billion.  (The term "bitcoin" can refer to both a computer

protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

31.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain.

32.     Blockchains act as the central technical commonality across most cryptocurrencies. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

33.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network. In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure. For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin. This process is colloquially referred to as "mining."

34.     Mining is one way an individual can acquire cryptocurrencies like bitcoin. A second way to acquire cryptocurrencies is to acquire them through an online "cryptocurrency exchange." Online cryptocurrency exchanges are one place to purchase Bitcoin and other cryptocurrencies. These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

35.     In April 2013, there were only seven cryptocurrencies listed on coinmartketcap.com, a popular website that tracks the cryptocurrency markets. As of this filing, the site monitors more than 2,000 cryptocurrencies.

36.     For a time, Bitcoin was the only cryptocurrency available on exchanges.   As cryptocurrencies grew in popularity, exchanges began listing other cryptocurrencies as well, and trading volumes expanded.   In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million.   By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

### B. Ethereum

37.     Ethereum is the second-most popular cryptocurrency, with a market capitalization of approximately $16 billion.   The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.   Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.   (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," i.e., the overall network of individuals using Ethereum or participating in the development of its network.   This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)

38.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.   A smart contract is a program that verifies and enforces the negotiation or performance of a contract.   Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

39.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.   They each put up $1,000 worth of ether.   They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.   The rest of the ether may or may not be worth more than it was at the beginning of the month.

40.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

41.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

42.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  This is because it allows individuals who are less technically proficient to make use of smart contract functionality.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

**C.  ERC-20 Tokens**

43.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain.  These tokens are known as "ERC-20 tokens."

44.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

45.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20

token transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

46.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D.  The Advent Of The "ICO"

47.     Between 2014 and 2016, Bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

48.     By the end of 2016, interest in cryptocurrencies began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

49.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in digital tokens were denied access to critical information before making their investment decision.

50.     Potential purchasers were reached through various cryptocurrency exchanges and social media sites that published active and upcoming ICOs.

51.     Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs was registered with the SEC.  Wang himself has recognized "that a lot of projects raised hundreds of millions of dollars, I think that this situation proved that market overheated.  It's a bubble.  I don't believe that any project, at the current stage, that they need $100 million to develop.  The most reasonable way is traditional venture capital, where they support a project based on lots of data analysis and based on the experience they have, but, in initial coin offerings, a lot of people who have no professionalism to back them, but the investment is not like a professional investment, it's not an institutional investment . . .  That makes the market not very healthy."

52.     Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.

53.     ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO, and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

54.     The whitepapers contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

55.     As a result of the lack of information, trading of tokens on exchanges such as Bibox was rife for manipulation.  In fact, Wang has admitted that "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum

aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago. When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

56.     The Issuers declined to register the Tokens with the SEC, and Bibox declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### E.  Bibox Solicited And Sold ERC-20 Tokens

57.     Bibox solicited the buying and selling of ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.  Indeed, Wang has conceded that "[k]eeping ICOs attractive in the future will be the single factor that most determines if the success of these exchanges continues."

58.     In less than a year from launching, Bibox was listed as within the top exchanges based on 24-hour trading volume.  In fact, in an interview in New York on November 29, 2019, Wang disclosed that Bibox's exchange business alone had been valued at $500 million.  In another interview, Wang stated that Bibox had 2 million registered users.  And in another interview, Wang conceded that Bibox's largest user base is in the United States.

59.     How did a company that was barely a year old generate such extraordinary growth? By building a platform that solicited the buying and selling of unregistered securities on a historically unprecedented scale.  Defendants did this by taking advantage of the market's lack of sophistication with digital tokens, particularly ERC-20 tokens, and the market excitement for

Bitcoin and Ethereum more generally.  Wang has conceded that "the creation of ERC-20 is important to the history of exchanges" and that "ERC-20 drives an increasing amount of tokens into the crypto world through ICOs."

60.    Shortly after an issuer launched an ICO, the issuer would quickly seek to have its tokens listed on cryptocurrency exchanges like Bibox, in order to give the issuer access to millions of retail investors to whom they could market the tokens.

61.    Wang stated that there are two fundamentals Bibox considers before it lists a token: the "idea" and the "team."  Wang explained:

> Firstly, we want to see that the project has a very solid idea . . .
> Secondly, we see the team as very important because we know that
> some projects have fake team members – that's really not what we
> are trying to do.

62.    In discussing an exchange's role in cryptocurrency, Wang has stated:  "Exchanges are important because they're sort of 'on top of the food chain' of the crypto economy."

63.    Shortly after Bibox agreed to list a new token on its cryptocurrency exchange, it would often advertise that listing to its user base, for example with the EOS token:



64.    As another example, on December 10, 2017, Bibox announced the listing of ETHLend (LEND) token on its website and twitter:



65.     In connection with the launch of the LEND token, Bibox also offered a "giveaway" or "reward" for purchasing LEND tokens on Bibox:



66.     Upon the listing of OMG, Bibox advertised zero transaction fees and that users would be able to "claim your rewards" for trading:



67.     Bibox would also tout the potential for returns on tokens it listed, such as per the below:



19

68.     And issuers themselves promoted the listing of their tokens on Bibox.  For example, the founder of TRON, Justin Sun, tweeted:



69.     Each of the Tokens was listed on Bibox, pursuant to agreements with the Issuers, and each was traded by members of the Class.

70.     Bibox profited handsomely from listing of new tokens on its platform.  In addition to receiving fees for each transaction performed on its exchange, Bibox received large cash payments from Issuers seeking to get their tokens listed.  As Wang has explained:

> [E]xchanges have a solid model.  They charge users trading fees and charge token sale fees related to ICOs. . . .  During the peak of the ICO market in 2017, the cost to list an ICO on a centralized exchange crept to between $1 million and $2 million on the top ten exchanges with the highest liquidity levels.  Compare that to what stock exchanges charge for an IPO.  According to NASDAQ, the initial listing fee of an IPO is usually between $125,000 and $300,000 (excluding the yearly listing fee).

71.     Bibox, however, has used both an initial listing fee and community voting to select and list ICOs.  Community voting involves exchange users paying Bibox their own Bibox-issued tokens (BIX tokens) in order to "vote" for the listing of other tokens—providing an additional way for Bibox to monetize token listing.

### F.  Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities

72.     In connection with the ICOs, from 2017 until early 2019, the Issuers and Bibox made statements that reasonably led Plaintiffs and Class members to conclude that the Tokens were not securities.

73.     <u>Issuers</u>.  Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).  As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

74.     Issuers in fact declared that the Tokens were not securities.  For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

75.     Similarly, the TRON whitepaper stated that it "is not a security," and owning

> TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform.  As an encrypted token used in TRON, TRX does not belong to any of the following categories: (a) currency of any type; (b) securities; (c) stock rights of a legal entity; (d) stocks, bonds, bills, warrants, certificates, investment contract, or other instruments affording similar rights.

76.     The TRON whitepaper also misleadingly compared TRX to Bitcoin, which is a commodity.  The TRON whitepaper asserted, for example, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin, [t]he [TRON] market is based on blockchain and trade in virtual currency."

77.     At the time of the TRX ICO, TRON took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  In the face of promises that TRX would be "similar to Bitcoin," and considering the new technology at issue and TRON's other statements, many investors were understandably unaware that TRX tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.  Many of the other Tokens likewise misleadingly compared themselves to Bitcoin or Ethereum, which are not required be registered as securities.

78.     The EOS whitepaper, for example, argued that EOS would replace Bitcoin and Ethereum.   The ELF whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."  ELF insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum.  The OMG whitepaper discussed "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for this type of assets.

79.     Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

80.     <u>Bibox</u>.  Bibox would emphasize the utility of the Tokens listed on its exchange in a way that would lead a reasonable investor to conclude that the token was not a security.  In its

description of the TRX token, for example, Bibox stated it was "building the infrastructure for a truly decentralized Internet."  LEND was billed as providing "decentralized solutions to avoid loss of capital and to make one true global lending market available."  ELF was touted as being "used to pay for resource fees used in the network, such as deployment of smart contracts, operating and upgrading of systems (transaction fees, cross-chain data transfer fees)."

81.     Exchanges like Bibox have also routinely touted their offerings as complying with the securities laws.

82.     SEC.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Complaint, are securities.  In fact, it was not until six months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

83.     Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

84.     Other Commentary.  Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of

whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

85.     In sum, before the SEC issued its Framework in April 2019, a reasonable investor would not have concluded that ERC-20 tokens were generally securities subject to the securities laws.  On the contrary, they were confronted with representations both from token issuers and from cryptocurrency discussions that would have led them reasonably to believe they were not investing in securities.

**G.  The Tokens Are Securities**

86.     Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

87.     Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given digital asset (including an ERC-20 token) is a security.  Under application of the Framework, the Tokens were securities at issuance.

88.     In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law
> have found that an "investment contract" exists when there is the
> investment of money in a common enterprise with a reasonable
> expectation of profits to be derived from the efforts of others. The
> so-called "*Howey* test" applies to any contract, scheme, or
> transaction, regardless of whether it has any of the characteristics of
> typical securities. The focus of the *Howey* analysis is not only on
> the form and terms of the instrument itself (in this case, the digital
> asset) but also on the circumstances surrounding the digital asset and
> the manner in which it is offered, sold, or resold (which includes
> secondary market sales). Therefore, issuers and other persons and
> entities engaged in the marketing, offer, sale, resale, or distribution
> of any digital asset will need to analyze the relevant transactions to
> determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers. Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on cryptocurrency exchanges such as Bibox.

### 1. Under The SEC's April 2019 Framework, The Tokens Were Securities

#### a. ERC-20 Investors Invested Money

89.   Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

90.   Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens. The Tokens were listed on Bibox, and Bibox permitted investors to purchase ICOs with bitcoin and ether.

### b. ERC-20 Investors Participated In A Common Enterprise

91.     The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

92.     The Tokens are no different.  Investors were passive participants in the Tokens' ICOs and the profits of each investor were intertwined with those of the Issuers and of other investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets.  Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

93.     For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned value for the network."  For the other Tokens as well, investors participated in a common enterprise by purchasing the Tokens.

### c. Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them

94.     As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

95.     Investors in the Tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The Tokens were sold to investors prior to a network or "ecosystem" on which they could be used being fully developed.  For pre-functional tokens, such

as the Tokens at issue in the Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

96.     Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>
>   - The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
>
>   - This also can be the case where the digital asset gives the holder rights to dividends or distributions.
>
> - The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.
>
> - Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.
>
> - The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.
>
>   - The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.  For example, it is offered and purchased in quantities

significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

28

      o  The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

97.    The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

98.    For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."

99.    The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials.

100.    The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation."  The whitepaper for the aelf Token, for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during the Token sale."  Under the SEC's April 2019 Framework, the Tokens were securities under federal and state securities laws.

       **d.  Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers**

101.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

102.    Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams.   ERC-20

investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

103.    Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

104.    On July 11, 2018, for example, the co-founder of another exchange, Binance, explained that the team behind a particular token is a fundamental factor to the success of a project and that Binance actually considers the team in determining which coins to list:  "It's kind of hard to tell if they're going to do the right thing or the wrong thing.  But a team with a good history tends to carry on."

105.    The SEC explained, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.
  - Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).  This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.
- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).
- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and

issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.  In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

31

- o  The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

- o  The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

106.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  - o  This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  - o  If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to

acquire or otherwise use those goods or services.  Relevant factors may include:

- o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

- o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

- o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

107.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

108.    This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

109.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

110.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.

    **2.    Each Token Is A Security**

        **a.    Bibox Token (BIX)**

111.    BIX was launched through use of the ERC-20 protocol in October 2017.  At launch, 500 million tokens were created through use of the ERC-20 protocol.

112.    Bibox sold 55 percent of BIX tokens to investors through its ICO, raising approximately $19 million over a three-day period.

113.    On November 20, 2017, Bibox announced and promoted the listing of BIX on its exchange.

114.    In October 2017, Bibox published the "Bibox whitepaper."   In the whitepaper, Bibox announced the "BIX Token."   Bibox promoted the BIX Token as providing a "certain amount of discount for users [to] pay their transaction fees" on the Bibox Platform.  Bibox further "promise[d] to use 25% of *seasonal net profit* [to] buyback BIX Token."

115.    The Bibox whitepaper also asserted it would use assets raised to improve the Bibox Platform:



116.    The Bibox whitepaper also included a "competition warning," which informed individuals that the success of the Bibox platform would be dependent on the efforts of Bibox:

**5.2 Competition Warning:**

We know that our exchange is a highly competitive area. There are thousands of teams planning and proceeding to develop trading platforms. The competition will be cruel, but in this era, every good concept, start-ups, or even mature companies will face the risk of such competition. But for us, this competition is the driving force for our development.

117.    At the time of the BIX ICO, Bibox took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that BIX had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all BIX

were issued by Bibox at creation at very little economic cost—and enormous potential upside—to the Bibox founders.

118.     The creation of BIX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which BIX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that BIX was something other than a security, when it *was* a security.

119.     Investors purchased BIX tokens on Bibox with the reasonable expectation that they would make a profit.

120.     BIX token holders stood to share in potential profits from the successful launch of the BIX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the BIX ecosystem.

121.     Investors' profits were to be derived from the managerial efforts of others—Bibox, its co-founders, and Bibox's development team.  Investors in BIX relied on the managerial and entrepreneurial efforts of Bibox and its executive and development team to manage and develop the Bibox software.

122.     Investors in BIX reasonably expected Bibox and Bibox's development team to provide significant managerial efforts after BIX's launch.

123.    The expertise of Bibox was critical in monitoring the operation of BIX, promoting BIX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The BIX protocol and governance structure were predetermined before the ICO was launched.

124.    Accordingly, under the SEC's Framework, the BIX token was and is a security.

### b.    EOS

125.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on Bibox since at least December 3, 2017.

126.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.   In addition to claiming EOS's technical superiority over other cryptocurrencies, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

127.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

    1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

    2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

128.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With promises that EOS would be better than other cryptocurrencies, many individuals were unaware that EOS tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all EOS tokens were issued by

Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

129.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it *was* a security.

130.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

131.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

132.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.  The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

133.    Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

134.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

135.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

136.    Accordingly, under the SEC's Framework, the EOS token was a security.

137.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

138.    The SEC's September 30, 2019 settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute

securities.  Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

139.    The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other digital tokens discussed below.

<strong>c.     TRON (TRX)</strong>

140.    Over its three-day ICO, from August 31 to September 2, 2017, TRON raised approximately $70 million in proceeds.  TRX was listed on Bibox starting on February 11, 2018.

141.    On February 10, 2018, Bibox promoted TRX on its website:



142.    In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated."  The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

143.    The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform."  The whitepaper identified potential "risks after supervisory regulations are formed."  This disclaimer merely contemplated potential *future* regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

> Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens  purchased during the ICO period  may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

144.    TRON promoted TRX as being similar to Bitcoin.  The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in

virtual currency."  By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

145.    The creation of TRX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that TRX was something other than a security, when it *was* a security.

146.    Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

147.    TRX token holders stood to share in potential profits from the successful launch of the TRX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

148.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team.  Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

149.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

150.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds.  Investors had little choice but to rely on

their expertise.  The TRX protocol and governance structure were predetermined before the ICO was launched.

151.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

### d.    OmiseGo (OMG)

152.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

153.    In June 2017, OmiseGO published the "OmiseGO whitepaper."  The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway."  As part of this system, OmiseGO announced the OMG token.  According to the whitepaper, "[o]wning OMG tokens buys the right to validate this blockchain, within its consensus rules."

154.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens. Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets.  The whitepaper provided an example of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade is now cleared on the OMG chain."

155.    On July 10, 2019, Bibox listed the OMG token:



156.    At 10:00 a.m. today, the OMG token traded at approximately 56 cents.

157.    At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that OMG had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all

OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

158.   The creation of OMG tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that OMG was something other than a security, when it *was* a security.

159.   Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

160.   OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

161.   Investors' profits were to be derived from the managerial efforts of others—OmiseGO, its co-founders, and OmiseGO development team.  Investors in OMG relied on the managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

162.   Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

45

163.    The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The OMG protocol and governance structure were predetermined before OMG was launched.

164.    Accordingly, under the SEC's Framework, the OMG token was and is a security.

### e.    ETHLend (LEND)

165.    The LEND ICO raised approximately $17 million from the sale of unregistered securities in November 2017.

166.    On December 10, 2017, Bibox listed the LEND token:

# 【News】 Bibox Lists ETHLenD (LEND)

**Service**
4 months ago · Updated

Follow

Dear Bibox users:

Bibox launches ETHLenD (LEND) and starts LEND/BTC and LEND/ETH trading on 2017-12-10 15:00 (Beijing Time). You can start depositing now.

---

What is ETHLenD?

ETHLend.io introduces decentralized lending on Ethereum network by using ERC-20 compatible tokens or Ethereum Name Service (ENS) domains as a collateral. ETHLend solves the problem on reducing the loss of loan capital on default. On healthy loan relationships the loan is paid back. ETHLend provides decentralized solutions to avoid loss of capital and to make one true global lending market available.

Official Website: https://ethlend.io/

---

Fees：

Deposit fee：
* Free

Withdrawal fee：
* Network transaction fee

Transaction fee：
* No service charge for the first month.
* Please wait the update news on Bibox website and community to see the specific date of charging.

---

Click here to deposit your account.
Deposit Guide

Risk warning：
Crytocurrency investment carries risks. Please assess the risks and invest careful.

Bibox Team
Official website： https://www.bibox.com/
Official email： service@bibox.com

12/10/2017

47

167.   In the months following the Bibox listing, the price of LEND skyrocketed from less than 8 cents to more than 37 cents per token:



168.   At 10:00 a.m. today, the LEND[4] token traded at less than 3 cents.

169.   The LEND whitepaper, released by a company called ETHLend, stated that the LEND platform "provides secured lending with the use of ERC-20 compatible tokens as a collateral.  For example, users with a token portfolio are not required to sell the tokens to receive liquidity."  ETHLend promoted the LEND token as enabling individuals to "borrow[] Ether to participate in different ICOs, buy[] dips (bear market movements) and purchas[e] tokens from the exchange for investment strategies without the need to sell tokens."

170.   The LEND whitepaper was silent as to the regulatory nature of LEND tokens. Instead, the whitepaper discussed how LEND would be used "as the medium of exchange" and "the main utility that is used for lending and borrowing within the Ethereum network."  It asserted that this would "allow all ETH and ERC20 token holders the ability to unlock billions of dollars' worth of liquidity" and that it would "do the same with Bitcoin in the near future."  Given its

---

[4] In September 2018, the LEND token was rebranded as the "Aave token."

supposed relationship to Ethereum and Bitcoin, investors reasonably understood that LEND was not subject, at issuance, to U.S. securities laws.

171.    At the time of the LEND ICO, ETHLend took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that LEND had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all LEND were issued by ETHLend at creation at very little economic cost—and enormous potential upside—to the ETHLend founders.

172.    The creation of LEND tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which LEND tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that LEND was something other than a security, when it *was* a security.

173.    Investors purchased LEND tokens with the reasonable expectation that they would make a profit.

174.    LEND token holders stood to share in potential profits from the successful launch of the LEND token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the LEND ecosystem.

175.     Investors' profits were to be derived from the managerial efforts of others—ETHLend, its co-founders, and the ETHLend development team.  Investors in LEND relied on the managerial and entrepreneurial efforts of LEND and its executive and development team to manage and develop the LEND software.

176.     Investors in LEND reasonably expected ETHLend and the ETHLend development team to provide significant managerial efforts after LEND's launch.

177.     The expertise of ETHLend was critical in monitoring the operation of LEND, promoting LEND, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The LEND protocol and governance structure were predetermined before the ICO was launched.

178.     Accordingly, under the SEC's Framework, the LEND token was and is a security.

### f.     aelf (ELF)

179.     In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

180.     In November 2017, aelf published the "aelf whitepaper."  The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community."  As part of this system, aelf announced the ELF token.  According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

181.     The aelf whitepaper was silent as to the regulatory nature of ELF tokens.  Instead, the whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum because "vital

decisions [in aelf] will be carried out through a mechanism that resembles **representative democracy**." (Emphasis added.)

182.    On December 21, 2017, Bibox listed the ELF token:



183.    In the month following the Bibox listing, the price of the ELF Token skyrocketed from less than $1 to more than $2.50 per token:



184.    At 10:00 a.m. today, the ELF token traded at approximately 6 cents.

185.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that ELF had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

186.    The creation of ELF tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ELF was something other than a security, when it *was* a security.

187.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

188.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

189.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team.  Investors in ELF relied on the managerial and entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

190.    Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

191.    The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ELF protocol and governance structure were predetermined before ELF was launched.

192.    Accordingly, under the SEC's Framework, the ELF token was and is a security.

**H.  The Class Has Suffered Significant Damages From Defendants' Actions**

193.    As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

194.    The Tokens today are worth far less than the price Plaintiff and the Class paid for them.

195.    To the extent Plaintiff still hold any Tokens, he hereby demands rescission and make any necessary tender of the Tokens.

## V.   CLASS ALLEGATIONS

196.   Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks certification of the following class (together, the "Class"):  All persons who purchased any of the following tokens on the Bibox exchange or during the Bibox ICO: BIX, EOS, TRX, OMG, LEND, and ELF, between October 1, 2017 and the present.  Accordingly, the Class Period is October 1, 2017 through the present.

197.   The Class excludes individuals subject to any enforceable arbitration clause contained in any of the purchase agreements executed in connection with the BIX ICO.  The Class includes all other individuals who purchased BIX tokens on the Bibox exchange during the Class Period.

198.   Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

199.   Plaintiff reserves the right to amend the Class definition if investigation or discovery indicates that the definition should be narrowed, expanded, or otherwise modified.

200.   The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

201.   Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

202.   Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the

laws complained of herein.  Plaintiff does not have any interest that is in conflict with the interests of the members of the Class.

203.    Plaintiff and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

204.    Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

205.    Plaintiff seeks declaratory relief for themselves and the Class, asking the Court to declare their purchase agreements with Bibox void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Bibox; and Bibox has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the class as a whole.

206.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether Bibox operated as an unregistered exchange;

- Whether Bibox operated as an unregistered broker-dealer;

- Whether Bibox offered or sold the Tokens to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to void their purchase agreements with Bibox and to recover the monies they paid thereunder.

207.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

208.   There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
**Unregistered Offer and Sale of Securities
Sections 5 and 12(a)(1) of the Securities Act
(Bibox)**

209.   Plaintiff realleges the allegations above.

210.   Section 5(a) of the Securities Act states:  "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

211.   Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior

to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  *Id.* § 77e(c).

212.    When issued, the Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1).  Bibox promoted, solicited or sold purchases of the Tokens from Plaintiff and members of the Class.  Bibox thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

213.    Section 12(a)(1) of the Securities Act provides in relevant part:  "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  *Id.* § 77*l*(a)(1).

214.    Accordingly, Bibox has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

215.    Plaintiff and the Class seek rescissory damages with respect to purchases of Tokens on Bibox within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 77m.

## SECOND CAUSE OF ACTION
### Contracts With an Unregistered Exchange
### Sections 5 and 29(b) of the Exchange Act
### (Bibox)

216.   Plaintiff realleges the allegations above.

217.   In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration."  15 U.S.C. § 78e.   An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

218.   Bibox has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because Bibox has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

219.   Bibox has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

220.   In the course of planning to operate and as operating as an unregistered exchange within the United States, Bibox has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered exchange within the United States, Bibox would make available for sale the issuers' digital tokens.  The parties to these

contracts thus reached an agreement whereby and pursuant to which Bibox would operate in violation of section 5 of the Exchange Act.

221.    In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, in the performance of its contracts with the issuers of digital tokens, which is a contract for listing a security on an exchange, and pursuant to and consistent with its Terms of Use, Bibox has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Bibox and paid Bibox fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

222.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Bibox entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Bibox would be and was operating in violation of section 5.

223.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract."  *Id.* § 78cc.

224.     Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with Bibox and to recover, as rescissory damages, the fees they have paid under those contracts.

225.     Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Bibox within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 78cc(b).

### THIRD CAUSE OF ACTION
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Bibox)**

226.     Plaintiff realleges the allegations above.

227.     In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  *Id.* § 78o(a)(1).

228.     As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, Bibox has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

229.     A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id.* § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a

securities offering.  Bibox has operated as a broker during the Class Period by facilitating the sale of digital assets as part of other entities' ICOs, including by marketing the digital assets, accepting investors' orders, accepting payment for orders, and working with issuers to transfer digital assets to investors after payment.

230.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business."  Bibox has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by having a regular turnover inventory of securities, by purchasing digital assets for accounts in Bibox's name (often at a discount to the ICO price), and by then selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

231.    In the course of planning to operate and as operating as an unregistered broker-dealer, Bibox has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered broker-dealer within the United States, Bibox would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox would operate in violation of section 15(a)(1) of the Exchange Act.

232.    In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of digital tokens, and pursuant to and consistent with its Terms of Use, Bibox has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Bibox and paid Bibox fees for the use of its exchange.

The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox was operating in violation of section 15(a)(1) of the Exchange Act.

233.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Bibox entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Bibox would be and was operating in violation of section 5.

234.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

235.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with Bibox and to recover, as rescissory damages, the fees they have paid under those contracts.

236.    Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Bibox within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id.* § 78cc(b).

## FOURTH CAUSE OF ACTION
### Control Person Liability for Violations of
### Section 20 of the Exchange Act
### (Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei)

237.    Plaintiff realleges the allegations above.

238.    This Count is asserted against Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei ("the Individual Defendants") for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

239.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

240.    The Individual Defendants have the power to direct or cause the direction of the management and policies of Bibox.

241.    The Individual Defendants, separately or together, have sufficient influence to have either caused Bibox to register as an exchange or prevented Bibox from effecting transactions of securities as an unregistered exchange.

242.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Bibox's failure to register as an exchange and Bibox's offer of securities on an unregistered exchange.

243.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## FIFTH CAUSE OF ACTION
### Control Person Liability for Violations of
### Sections 5 and 12(a)(1) of the Securities Act
### (Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei)

244.    Plaintiff realleges the allegations above.

245.    This Count is asserted against Bibox and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

246.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

247.    The Individual Defendants have the power to direct or cause the direction of the management and policies of Bibox.

248.    The Individual Defendants, separately or together, have sufficient influence to have caused Bibox to solicit transactions of securities.

249.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Bibox's solicitation of securities.

250.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## SIXTH CAUSE OF ACTION
**Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Bibox)**

251.     Plaintiff realleges the allegations above.

252.     The Illinois Securities Law of 1953 requires securities to be registered prior to their sale in Illinois.  815 Ill. Comp. Stat. Ann. 5/5.  The statute provides that any sale of an unregistered security is "voidable at the election of the purchaser," and "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale," are jointly and severally liable to each purchaser "for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold" except that, if the securities were sold, the amount is reduced by "any amounts received by the purchaser for or on account of the disposition of the securities." *Id.* 5/13(A)(1)-(2).

253.     The Tokens are securities within the meaning of 815 Ill. Comp. Stat. Ann. 5/2.1. Bibox sold or solicited purchases of the Tokens to Plaintiff and members of the Class, and was a dealer or internet portal that participated or aided in making the sale of the Tokens to Plaintiff and members of the Class.  The Tokens were neither registered as required under the Illinois Securities Law of 1953 nor subject to any exemption from registration.

254.    Sale of the Tokens occurred in the State of Illinois.

255.    Accordingly, Bibox has violated the Illinois Securities Law of 1953 through Bibox's sale of unregistered securities and because Bibox was a dealer or internet portal that participated or aided in making the sale of unregistered securities.

256.    Neither Plaintiff nor any Class member has failed, within 15 days from the date of receipt thereof, to accept an offer to repurchase any Tokens purchased by them for a price equal to the full amount paid therefor plus interest thereon and less any income thereon.

257.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of this Complaint.  Prior to filing this Complaint, Plaintiff has provided to Bibox, by certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of their election to rescind, on behalf of the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service."  *Id.* 5/13(B).

258.    Plaintiff and Class members who currently own the Tokens seek the full amount paid for any Tokens purchased on Bibox, and for any Tokens which Bibox as a dealer or internet portal participated or aided in the sale to Plaintiff and members of the Class, in the last three years, together with interest from the date of payment for the Tokens at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

259.     Plaintiff and Class members who no longer own the Tokens seek equivalent rescissory damages for any Tokens purchased on Bibox, and for any Tokens which Bibox as a dealer or internet portal participated or aided in the sale to Plaintiff and members of the Class, in the last three years, less any amounts received by the purchaser for or on account of the disposition of such Tokens, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

**SEVENTH CAUSE OF ACTION**
**Control Person Liability for Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei)**

260.     Plaintiff realleges the allegations above.

261.     The Illinois Securities Law of 1953 requires securities to be registered prior to their sale in Illinois.  815 Ill. Comp. Stat. Ann. 5/5.  The statute provides that any sale of an unregistered security is "voidable at the election of the purchaser," and "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale," are jointly and severally liable to each purchaser "for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold" except that, if the securities were sold, the amount

is reduced by "any amounts received by the purchaser for or on account of the disposition of the securities." *Id.* 5/13(A)(1)-(2).

262.    The Tokens are securities within the meaning of 815 Ill. Comp. Stat. Ann. 5/2.1. Bibox sold or solicited purchases of the Tokens to Plaintiff and members of the Class and was a dealer or internet portal that participated or aided in making the sale of the Tokens to Plaintiff and members of the Class.  The Tokens were neither registered as required under the Illinois Securities Law of 1953 nor subject to any exemption from registration.

263.    Sale of the Tokens occurred in the State of Illinois.

264.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

265.    Accordingly, the Individual Defendants, as persons who indirectly or directly controlled Bibox, have violated the Illinois Securities Law of 1953 through Bibox's sale of unregistered securities and because Bibox was a dealer or internet portal that participated or aided in making the sale of unregistered securities.

266.    Neither Plaintiff nor any Class member has failed, within 15 days from the date of receipt thereof, to accept an offer to repurchase any Tokens purchased by them for a price equal to the full amount paid therefor plus interest thereon and less any income thereon.

267.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of this Complaint.  Prior to filing this Complaint, Plaintiff has provided to the

Individual Defendants, by certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of their election to rescind, on behalf of the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

268.    Plaintiff and Class members who own the Tokens seek the full amount paid for any Tokens purchased on Bibox, and for any Tokens which Bibox as a dealer or internet portal participated or aided in the sale to Plaintiff and members of the Class, in the last three years, together with interest from the date of payment for the Tokens at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

269.    Plaintiff and Class members who no longer own the Tokens seek equivalent rescissory damages for any Tokens purchased on Bibox, and for any Tokens which Bibox as a dealer or internet portal participated or aided in the sale to Plaintiff and members of the Class, in the last three years, less any amounts received by the purchaser for or on account of the disposition of such Tokens, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

## **PRAYER FOR RELIEF**

270. On behalf of themselves and the Class, Plaintiff requests relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

(c) That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled, including a declaration that the purchase agreements between each members of the Class and Bibox are void;

(e) That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under state law);

(f) That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

(g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL

271.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a

trial by jury for all claims.

Dated:      April 3, 2020
            New York, New York

                                     Respectfully submitted,

<u>/s/ Philippe Z. Selendy</u>          <u>/s/ Kyle W. Roche</u>
Philippe Z. Selendy                  Kyle W. Roche
Jordan A. Goldstein                  Edward Normand
Spencer Gottlieb                     Velvel (Devin) Freedman *(pro hac pending)*
Michelle Foxman                      Alex Potter (*admission pending*)
SELENDY & GAY, PLLC                  ROCHE CYRULNIK
1290 Sixth Avenue, 17th Floor            FREEDMAN LLP
New York, NY 10104                   99 Park Avenue, 19th Floor
pselendy@selendygay.com              New York, NY 10016
jgoldstein@selendygay.com            kyle@rcfllp.com
sgottlieb@selendygay.com             tnormand@rcfllp.com
mfoxman@selendygay.com               vel@rcfllp.com
                                     apotter@rcfllp.com

CERTIFICATION OF
SECURITIES CLASS ACTION COMPLAINT

I, Alexander Clifford, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.    I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.    I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on Bibox: Bibox Token ("BIX").

5.    During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.    I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.    I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

_____

Alexander Clifford

Chicago, Illinois