**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE BIBOX GROUP HOLDINGS
LIMITED SECURITIES LITIGATION

Case No. 1:20-cv-2807-DLC

Honorable Denise L. Cote

**JURY DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................ 1

II.     PARTIES ........................................................................................... 6

        A.      Plaintiff .................................................................................. 6

        B.      Defendants ............................................................................. 7

III.    JURISDICTION AND VENUE ......................................................... 8

IV.     FACTUAL ALLEGATIONS ............................................................ 11

        A.      The First Cryptocurrency: Bitcoin ....................................... 11

        B.      Ethereum .............................................................................. 13

        C.      ERC-20 Tokens .................................................................... 14

        D.      The Advent Of The "ICO" ................................................... 15

        E.      Bibox Solicited And Sold ERC-20 Tokens in the United States ......................... 18

                1.      Bibox Issued, Solicited and Sold BIX Tokens ........................................... 18

                2.      Bibox Sought to Prop up the Price of BIX through Token Buybacks and
                        Burns ...................................................................................... 24

                3.      Bibox Allowed and Targeted U.S. Investors on its Exchange and in the
                        BIX ICO .................................................................................. 27

                4.      Bibox Solicited the Buying and Selling of the Tokens on its Exchange ... 29

        F.      Because of Defendants' and Issuers' Efforts, Investors Would Not Reasonably
                Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were
                Securities .............................................................................. 39

        G.      The Tokens Are Securities .................................................... 44

                1.      Under The SEC's April 2019 Framework, The Tokens Were Securities .. 45

                2.      Each Token Is A Security ........................................................... 54

        H.      The Class Has Suffered Significant Damages From Defendants' Actions ........... 73

V.      DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT
        PREVENTED PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A
        CLAIM AT THE TIME THE EVENTS OCCURRED ................................................... 74

VI.     CLASS ALLEGATIONS ................................................................. 76

VII.    CAUSES OF ACTION ..................................................................... 79

        FIRST CAUSE OF ACTION ............................................................ 79

SECOND CAUSE OF ACTION ...................................................................... 80

THIRD CAUSE OF ACTION ........................................................................ 82

FOURTH CAUSE OF ACTION ..................................................................... 85

FIFTH CAUSE OF ACTION .......................................................................... 86

SIXTH CAUSE OF ACTION ......................................................................... 88

SEVENTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY
    LIABILITY) ............................................................................................. 89

EIGHTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY)
    ..................................................................................................................... 90

NINTH CAUSE OF ACTION (ALABAMA STATE LAW – ADDITIONAL
    LIABILITY) ............................................................................................. 91

TENTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY)... 93

ELEVENTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY)
    ..................................................................................................................... 94

TWELFTH CAUSE OF ACTION (ALASKA STATE LAW – ADDITIONAL
    LIABILITY) ............................................................................................. 96

THIRTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY
    LIABILITY) ............................................................................................. 97

FOURTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY
    LIABILITY) ............................................................................................. 98

FIFTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – ADDITIONAL
    LIABILITY) ........................................................................................... 100

SIXTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY
    LIABILITY) ........................................................................................... 101

SEVENTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY
    LIABILITY) ........................................................................................... 102

EIGHTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – ADDITIONAL
    LIABILITY) ........................................................................................... 104

NINETEENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY
    LIABILITY) ........................................................................................... 105

TWENTIETH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY
    LIABILITY) ........................................................................................... 107

TWENTY-FIRST CAUSE OF ACTION (CALIFORNIA STATE LAW –
    ADDITIONAL LIABILITY) ................................................................. 108

TWENTY-SECOND CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY
    LIABILITY) ........................................................................................... 110

TWENTY-THIRD CAUSE OF ACTION (COLORADO STATE LAW – ADDITIONAL
    LIABILITY) ........................................................................................... 111

TWENTY-FOURTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY LIABILITY) ................................................................ 112

TWENTY-FIFTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY LIABILITY) ................................................................ 114

TWENTY-SIXTH CAUSE OF ACTION (CONNECTICUT STATE LAW – ADDITIONAL LIABILITY) .......................................................... 115

TWENTY-SEVENTH CAUSE OF ACTION (DELAWARE STATE LAW – PRIMARY LIABILITY) ................................................................ 117

TWENTY-EIGHTH CAUSE OF ACTION (DELAWARE STATE LAW – ADDITIONAL LIABILITY) .......................................................... 118

TWENTY-NINTH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ................................................................ 119

THIRTIETH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ................................................................ 121

THIRTY-FIRST CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY) .......................................................... 122

THIRTY-SECOND CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) ................................................................ 124

THIRTY-THIRD CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) ................................................................ 125

THIRTY-FOURTH CAUSE OF ACTION (FLORIDA STATE LAW – ADDITIONAL LIABILITY) ................................................................ 126

THIRTY-FIFTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) ................................................................ 128

THIRTY-SIXTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) ................................................................ 129

THIRTY-SEVENTH CAUSE OF ACTION (GEORGIA STATE LAW – ADDITIONAL LIABILITY) ................................................................ 130

THIRTY-EIGHTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) ................................................................ 132

THIRTY-NINTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) ................................................................ 133

FORTIETH CAUSE OF ACTION (HAWAII STATE LAW – ADDITIONAL LIABILITY) ................................................................ 134

FORTY-FIRST CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY) ................................................................ 136

FORTY-SECOND CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY) ................................................................ 137

FORTY-THIRD CAUSE OF ACTION (IDAHO STATE LAW – ADDITIONAL LIABILITY) ................................................................ 139

FORTY-FOURTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) ................................................................................. 140

FORTY-FIFTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) ................................................................................. 142

FORTY-SIXTH CAUSE OF ACTION (ILLINOIS STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 144

FORTY-SEVENTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY LIABILITY) ................................................................................. 146

FORTY-EIGHTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY LIABILITY) ................................................................................. 147

FORTY-NINTH CAUSE OF ACTION (INDIANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 148

FIFTIETH CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY).. 150

FIFTY-FIRST CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY) ................................................................................................. 151

FIFTY-SECOND CAUSE OF ACTION (IOWA STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 152

FIFTY-THIRD CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY LIABILITY) ................................................................................. 154

FIFTY-FOURTH CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY LIABILITY) ................................................................................. 155

FIFTY-FIFTH CAUSE OF ACTION (KANSAS STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 156

FIFTY-SIXTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY LIABILITY) ................................................................................. 158

FIFTY-SEVENTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY LIABILITY) ................................................................................. 159

FIFTY-EIGHTH CAUSE OF ACTION (KENTUCKY STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 161

FIFTY-NINTH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY LIABILITY) ................................................................................. 162

SIXTIETH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY LIABILITY) ................................................................................. 164

SIXTY-FIRST CAUSE OF ACTION (LOUISIANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................. 165

SIXTY-SECOND CAUSE OF ACTION (MAINE STATE LAW – PRIMARY LIABILITY) ................................................................................. 167

SIXTY-THIRD CAUSE OF ACTION (MAINE STATE LAW – PRIMARY LIABILITY) ................................................................................. 168

iv

SIXTY-FOURTH CAUSE OF ACTION (MAINE STATE LAW – ADDITIONAL
LIABILITY) ............................................................................................ 169

SIXTY-FIFTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 171

SIXTY-SIXTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 173

SIXTY-SEVENTH CAUSE OF ACTION (MARYLAND STATE LAW –
ADDITIONAL LIABILITY)...................................................................... 174

SIXTY-EIGHTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
PRIMARY LIABILITY) ............................................................................ 176

SIXTY-NINTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
PRIMARY LIABILITY) ............................................................................ 177

SEVENTIETH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
ADDITIONAL LIABILITY)...................................................................... 178

SEVENTY-FIRST CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 180

SEVENTY-SECOND CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 181

SEVENTY-THIRD CAUSE OF ACTION (MICHIGAN STATE LAW – ADDITIONAL
LIABILITY) ............................................................................................ 182

SEVENTY-FOURTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 184

SEVENTY-FIFTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 185

SEVENTY-SIXTH CAUSE OF ACTION (MINNESOTA STATE LAW –
ADDITIONAL LIABILITY)...................................................................... 186

SEVENTY-SEVENTH CAUSE OF ACTION (MISSISSIPPI STATE LAW –
PRIMARY LIABILITY) ............................................................................ 188

SEVENTY-EIGTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 189

SEVENTY-NINTH CAUSE OF ACTION (MISSISSIPPI STATE LAW –
ADDITIONAL LIABILITY)...................................................................... 191

EIGHTIETH CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 192

EIGHTY-FIRST CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 194

EIGHTY-SECOND CAUSE OF ACTION (MISSOURI STATE LAW – ADDITIONAL
LIABILITY) ............................................................................................ 195

EIGHTY-THIRD CAUSE OF ACTION (MONTANA STATE LAW – PRIMARY
LIABILITY) ............................................................................................ 197

EIGHTY-FOURTH CAUSE OF ACTION (MONTANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 198

EIGHTY-FIFTH CAUSE OF ACTION (NEBRASKA STATE LAW – PRIMARY LIABILITY) ................................................................................ 199

EIGHTY-SIXTH CAUSE OF ACTION (NEBRASKA STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 200

EIGHTY-SEVENTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY LIABILITY) ................................................................................ 202

EIGHTY-EIGHTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY LIABILITY) ................................................................................ 203

EIGHTY-NINTH CAUSE OF ACTION (NEVADA STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 205

NINETIETH CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY) ................................................................................ 206

NINETY-FIRST CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY) ................................................................................ 208

NINETY-SECOND CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 209

NINETY-THIRD CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY LIABILITY) ................................................................................ 211

NINETY-FOURTH CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY LIABILITY) ................................................................................ 212

NINETY-FIFTH CAUSE OF ACTION (NEW JERSEY STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 213

NINETY-SIXTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) ................................................................................ 215

NINETY-SEVENTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) ................................................................................ 216

NINETY-EIGTH CAUSE OF ACTION (NEW MEXICO STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 218

NINETY-NINTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) ................................................................................ 219

ONE HUNDREDTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) ................................................................................ 221

ONE HUNDRED AND FIRST CAUSE OF ACTION (NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 222

ONE HUNDRED AND SECOND CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ................................................................................ 224

ONE HUNDRED AND THIRD CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ................................................................................ 225

ONE HUNDRED AND FOURTH CAUSE OF ACTION (NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY) .............................................................. 226

ONE HUNDRED AND FIFTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) .................................................................... 228

ONE HUNDRED AND SIXTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) .................................................................... 229

ONE HUNDRED AND SEVENTH CAUSE OF ACTION (OHIO STATE LAW – ADDITIONAL LIABILITY).............................................................. 230

ONE HUNDRED AND EIGTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) .................................................................... 231

ONE HUNDRED AND NINTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) .................................................................... 232

ONE HUNDRED AND TENTH CAUSE OF ACTION (OKLAHOMA STATE LAW – ADDITIONAL LIABILITY).............................................................. 234

ONE HUNDRED AND ELEVENTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) .................................................................... 235

ONE HUNDRED AND TWELFTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) .................................................................... 237

ONE HUNDRED AND THIRTEENTH CAUSE OF ACTION (OREGON STATE LAW – ADDITIONAL LIABILITY).............................................................. 238

ONE HUNDRED AND FOURTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)............................................................ 240

ONE HUNDRED AND FIFTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY) .................................................................. 241

ONE HUNDRED AND SIXTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY) ................................................... 242

ONE HUNDRED AND SEVENTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – PRIMARY LIABILITY)............................................................ 244

ONE HUNDRED AND EIGHTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – PRIMARY LIABILITY) .................................................... 245

ONE HUNDRED AND NINETEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW – ADDITIONAL LIABILITY) ................................................ 246

ONE HUNDRED AND TWENTIETH CAUSE OF ACTION (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)............................................................ 248

ONE HUNDRED AND TWENTY-FIRST CAUSE OF ACTION (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)............................................................ 249

ONE HUNDRED AND TWENTY-SECOND CAUSE OF ACTION (RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY) ................................................... 250

ONE HUNDRED AND TWENTY-THIRD CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)............................................................ 252

ONE HUNDRED AND TWENTY-FOURTH CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY) .................................... 253

ONE HUNDRED AND TWENTY-FIFTH CAUSE OF ACTION (SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY) .................................................. 255

ONE HUNDRED AND TWENTY-SIXTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY) ........................................................... 256

ONE HUNDRED AND TWENTY-SEVENTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY) ........................................ 258

ONE HUNDRED AND TWENTY-EIGHTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY) .................................... 259

ONE HUNDRED AND TWENTY-NINTH CAUSE OF ACTION (TENNESSEE STATE LAW – PRIMARY LIABILITY) ........................................................... 260

ONE HUNDRED AND THIRTIETH CAUSE OF ACTION (TENNESSEE STATE LAW – PRIMARY LIABILITY) .......................................................... 262

ONE HUNDRED AND THIRTY-FIRST CAUSE OF ACTION (TENNESSEE STATE LAW – ADDITIONAL LIABILITY) ................................................. 263

ONE HUNDRED AND THIRTY-SECOND CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY) .......................................................... 265

ONE HUNDRED AND THIRTY-THIRD CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY) ................................................................. 266

ONE HUNDRED AND THIRTY-FOURTH CAUSE OF ACTION (TEXAS STATE LAW – ADDITIONAL LIABILITY) ................................................. 267

ONE HUNDRED AND THIRTY-FIFTH CAUSE OF ACTION (UTAH STATE LAW – PRIMARY LIABILITY) .......................................................... 269

ONE HUNDRED AND THIRTY-SIXTH CAUSE OF ACTION (UTAH STATE LAW – PRIMARY LIABILITY) .......................................................... 270

ONE HUNDRED AND THIRTY-SEVENTH CAUSE OF ACTION (UTAH STATE LAW – ADDITIONAL LIABILITY) ................................................. 271

ONE HUNDRED AND THIRTY-EIGHTH CAUSE OF ACTION (VERMONT STATE LAW – PRIMARY LIABILITY) ........................................................ 273

ONE HUNDRED AND THIRTY-NINTH CAUSE OF ACTION (VERMONT STATE LAW – PRIMARY LIABILITY) ........................................................ 274

ONE HUNDRED AND FORTIETH CAUSE OF ACTION (VERMONT STATE LAW – ADDITIONAL LIABILITY) ................................................................. 275

ONE HUNDRED AND FORTY-FIRST CAUSE OF ACTION (VIRGINIA STATE LAW – PRIMARY LIABILITY) ........................................................ 277

ONE HUNDRED AND FORTY-SECOND CAUSE OF ACTION (VIRGINIA STATE LAW – PRIMARY LIABILITY) ........................................................ 278

ONE HUNDRED AND FORTY-THIRD CAUSE OF ACTION (VIRGINIA STATE LAW – ADDITIONAL LIABILITY) ................................................. 279

ONE HUNDRED AND FORTY-FOURTH CAUSE OF ACTION (WASHINGTON
STATE LAW – PRIMARY LIABILITY)........................................................ 281

ONE HUNDRED AND FORTY-FIFTH CAUSE OF ACTION (WASHINGTON
STATE LAW – ADDITIONAL LIABILITY).................................................. 282

ONE HUNDRED AND FORTY-SIXTH CAUSE OF ACTION (WEST VIRGINIA
STATE LAW – PRIMARY LIABILITY)........................................................ 283

ONE HUNDRED AND FORTY-SEVENTH CAUSE OF ACTION (WEST VIRGINIA
STATE LAW – PRIMARY LIABILITY)........................................................ 285

ONE HUNDRED AND FORTY-EIGHTH CAUSE OF ACTION (WEST VIRGINIA
STATE LAW – ADDITIONAL LIABILITY).................................................. 286

ONE HUNDRED AND FORTY-NINTH CAUSE OF ACTION (WISCONSIN STATE
LAW – PRIMARY LIABILITY).................................................................... 288

ONE HUNDRED AND FIFTIETH CAUSE OF ACTION (WISCONSIN STATE LAW
– PRIMARY LIABILITY) ........................................................................... 289

ONE HUNDRED ANF FIFTY-FIRST CAUSE OF ACTION (WISCONSIN STATE
LAW – ADDITIONAL LIABILITY) ............................................................. 291

ONE HUNDRED AND FIFTY-SECOND CAUSE OF ACTION (WYOMING STATE
LAW – PRIMARY LIABILITY) ................................................................... 292

ONE HUNDRED AND FIFTY-THIRD CAUSE OF ACTION (WYOMING STATE
LAW – PRIMARY LIABILITY) ................................................................... 294

ONE HUNDRED AND FIFTY-FOURTH CAUSE OF ACTION (WYOMING STATE
LAW – ADDITIONAL LIABILITY LIABILITY)............................................ 295

Plaintiff Alexander Clifford, individually and on behalf of all others similarly situated, brings this action against Defendants Bibox Group Holdings Limited, Bibox Technology Ltd., Bibox Technology OÜ (collectively "Bibox"), Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei.  Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of relevant whitepapers, press releases, media reports, and other publicly disclosed reports and information about Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.  Plaintiff hereby alleges as follows:

## I.    <u>INTRODUCTION</u>

1.    Within the Class Period, which is from October 1, 2017 through the present, Bibox and Defendants Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei (the "Individual Defendants") promoted, offered, and sold six digital tokens, BIX, EOS, TRX, OMG, LEND, and ELF (together the "Tokens") throughout the United States, through its online exchange (as to all the Tokens) and through its initial coin offering ("ICO") of BIX, without registering as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling, in violation of federal and state securities laws.  Individually and on behalf of investors who purchased the Tokens in the United States (the "Class"), Plaintiff brings claims to recover the consideration paid for the Tokens, together with interest thereon, as well as attorneys' fees and costs.

2.    A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions; these blockchain-dependent assets are sometimes referred to as "crypto-assets." Various types of crypto-assets can reside on

blockchains, including crypto-assets, such as Bitcoin and Ethereum, which are decentralized digital commodities. There are also "smart contracts" that operate under a set of predetermined conditions agreed to by users. With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

3.     Certain of these digital tokens are classified as "utility tokens" and are associated with particular projects. Their primary purpose is to allow the holder to use or access the associated project. For example, one private-jet company has adopted a business model based on issuing utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes. A utility token presumes a functional network on which the token can be used.

4.     Other tokens are more speculative, are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Although these tokens derive their value from the startup behind the project, they are unlike traditional securities in that they do not give the holder ownership in any corporate entity. Rather, investors purchase these tokens with the hope that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project. Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and Bibox was required to register itself as an exchange with the SEC. Neither the Issuers nor Bibox filed any such registration statements. Instead, Bibox and the (non-

BIX) Issuers entered into contracts to list these Tokens for sale on the Bibox exchange in violation of federal and state law.  As a result, Bibox and the Issuers reaped billions of dollars in profits.

5.      The scheme worked as follows: working to capitalize on the enthusiasm for crypto-assets like bitcoin, an Issuer would announce a revolutionary digital token.  This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an ICO to  investors and then turn to Bibox to list the new token, at which point Bibox would undertake its own efforts to promote sales, and to solicit and encourage purchases, by a wide universe of investors.  The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens.  Bibox would profit handsomely as well by receiving a percentage of each trade and by receiving substantial payments from Issuers to have their tokens listed.  Bibox also profited handsomely as an Issuer of the BIX token—which it issued in an October 2017 ICO in the lead up to the launch of its exchange.

6.      The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities."  But the vast majority of these new tokens turned out to be empty promises.  They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace.  In reality, they often had no utility at all.  The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed.  Indeed, all of the Tokens are now trading at a tiny fraction of their 2017–2018 highs.  One of the Tokens at issue, TRX, is down more than 92 percent from its 2018 high.  After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively;

3

today, they trade at around $5.08 and $0.13 per token.  The EOS token reached a high of $22.89.  Today, it is worth only $3.15.

7.      Investors were provided with scant information when deciding whether to purchase a token.  The main offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token.  These whitepapers would often omit, however, the robust disclosures that securities laws and the SEC have long deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow.  Instead, these ICOs were the "Wild West"—with investors left to fend for themselves.  Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

8.      In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors.  Issuers and exchanges like Bibox, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture.  In truth, these tokens were securities under federal and state securities laws.

9.      It was not clear to a reasonable investor at purchase that, contrary to the Issuers and Bibox's representations, the Tokens were securities.  That the Tokens were securities would not have been reasonably apparent until, at the earliest, April 3, 2019, when the SEC released a detailed "Framework" to analyze digital assets, indicating the Tokens  are "investment contracts" and

therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C.

§ 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§ 77c(a)(10).[1]  Prior to that time, based on statements of Bibox and the SEC, a reasonable investor

would not have concluded that these Tokens were securities that should have been registered with

the SEC.  But the Tokens are in fact securities.

10.     The Tokens' status as securities has been confirmed by recent regulatory action by

the SEC.  On September 30, 2019, the SEC found that another major issuer of digital tokens,

Block.one, which had issued a token called EOS between June 2017 and June 2018, had likewise

violated the Securities Act by selling unregistered securities to the public.  As a result of an SEC

enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination

that EOS is a security applies with equal force to the other Tokens, which are securities under the

SEC's April 2019 Framework.

11.     Bibox and the Issuers wrongfully engaged in millions of transactions—including

the solicitation, offer, and sale of securities—without registering the Tokens as securities, and

without Bibox registering with the SEC as an exchange or broker-dealer.  As a result, investors

were not informed of the significant risks inherent in these investments, as federal and state

securities laws require.

12.     Bibox participated in illegal solicitations and sales of securities for which no

registration statement was in effect, and as to which no exemption from registration was available.

Each ICO was a generalized solicitation made using statements posted on the Internet and

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiff and the general public in the United States.  Because these sales, as well as Bibox's underlying contracts with the Issuers that facilitated these sales, violated both the Securities Act and the Exchange Act, Plaintiff and the Class are entitled to recover the consideration they paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid Bibox on such purchases.

13.     In addition, numerous Class members resided, and were present at the time they traded in the Tokens, in States or territories that provide their own "Blue Sky" protections for investors.[3]  Under these laws, investors in these jurisdictions who purchased unregistered Tokens are entitled to rescission, and generally interest thereon, attorneys' fees, and costs.

14.     Accordingly, Plaintiff individually and on behalf of the Class brings claims to recover the consideration paid for the Tokens, together with interest thereon, as well as attorneys' fees and costs.

## II.   **PARTIES**

### A.  **Plaintiff**

15.     Plaintiff Alexander Clifford is a resident of Chicago, Illinois.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Blue Sky statutes typically define "securities" to include "investment contracts," which has been interpreted by State courts commensurate with the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

16.     Plaintiff and members of the Class purchased the Tokens on Bibox and pursuant to contracts with Bibox, from Illinois during the Class Period.  A true and correct copy of Clifford's transactions is included in Exhibit A.

**B. Defendants**

17.     Bibox issued its own token, BIX, in the BIX ICO during October 2017.  The Bibox exchange was launched in November 2017.  Within a few months, it had a market capitalization of approximately $218 million.  Bibox facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Bibox taking a fee for every transaction it facilitates.

18.     Bibox's founders, Wanlin "Aries" Wang, Ji "Kevin" Ma, and Jeffrey Lei, founded Bibox in China but shortly thereafter moved Bibox's operations to Estonia, in response to the Chinese government's ban on crypto-asset trading.  Within one year, however, Bibox expanded its footprint to the United States, Switzerland, Canada, China, South Korea, Japan, Singapore, and Vietnam.

19.     Defendant Bibox Group Holdings Limited is a British Virgin Islands company, which during the Class Period had offices located at 1120 6th Avenue, Suite 1507, New York, New York 10036.  On information and belief, Bibox Group Holdings Limited is the parent company of the group of entities doing business as Bibox.

20.     Defendant Bibox Technology Ltd. is a company incorporated in the Republic of Estonia that contributes to the operation of the Bibox exchange.

21.     Defendant Bibox Technology OÜ is a company incorporated in the Republic of Estonia that contributes to the operation of the Bibox exchange.

22.     Although it is thus unclear where Bibox is physically headquartered, it is clear, as shown below, that since its founding Bibox has regularly and intentionally engaged in numerous

online securities transactions inside the United States, with United States residents, without complying with U.S. laws.  In addition, Bibox has promoted inside the United States the sale of digital assets on its exchange, has availed itself of the jurisdiction of the New York courts, and has maintained offices in New York.

23.    Defendant Wanlin "Aries" Wang is a co-founder of Bibox.  In his role, he is responsible for "picking and listing" digital assets on Bibox.

24.    Defendant Ji "Kevin" Ma is the Business Vice President of Bibox and co-founded Bibox with Wang and Lei.

25.    Defendant Jeffrey Lei is the Chief Executive Officer of Bibox and co-founded Bibox with Wang and Ma.

## III.    <u>JURISDICTION AND VENUE</u>

26.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state.

27.    Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

28.    Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e,  78o(a)(1), 78t, 78cc(b).

29.     This Court has jurisdiction over violations of state Blue Sky statutes pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

30.     This Court has personal jurisdiction over Defendants. Defendants purposefully availed themselves of the privilege of conducting activities in the United States in connection with their offer or sale of unregistered securities and failure to register with the SEC as an exchange or broker-dealer, including activities occurring in or aimed at the State of New York, by maintaining an interactive commercial website accessible and used by U.S. investors, marketing in the United States and New York to those investors, employing agents, employees, and vendors in the United States and New York, and participating, enabling, and directing those contacts from within the United States and New York. Defendants engaged in conduct that had a foreseeable substantial effect in the United States connected with those offers and sales. Defendants also transacted business within New York pursuant to N.Y. C.P.L.R. 302(a)(1).

31.     This Court also has personal jurisdiction over Defendant Wanlin "Aries" Wang specifically based on his representations that he resides in New York. Wang held himself out as a resident of Long Island City in a 2018 lawsuit he initiated in New York, described further below. Wang, who is an active user on LinkedIn and has "liked" multiple posts even in July 2020, lists his location and his address for Bibox as "New York, New York."

32.     Wang is also an avid user of Twitter, most recently posting on July 15, 2020, and still lists his location there as "New York, NY."

33.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where the offer or sale took place. On information and belief, Defendant Bibox Group Holdings maintained an office and transacted business in this District during at least

part of the Class Period.  Bibox presently employs individuals responsible for the maintenance of its exchange business in this District.  For example, Taylor Zhang is responsible for "ICO Listing" at Bibox Exchange and Meilun Li is the "Director of Operations" at Bibox Exchange.  Bibox has also availed itself of the New York state courts located within this District, commencing an action in Supreme Court in New York County, *see Wang et al. v. Liu*, Index No. 0655050/2018 (New York Cty. Sup. Court), arising from business activities occurring within this District.  That complaint alleged, among other things, that "Wang is a citizen of China who resides in Long Island City, New York"; Bibox Holdings "is a British Virgin Islands company with offices located at 1120 6th Avenue, Suite 1507, New York, New York 10036"; Bibox Holdings is "located in New York County"; and Bibox Holdings "operates the Bibox Exchange, a crypto-asset exchange that was co-founded by Wang in or around September 2017."  Bibox's U.S. subsidiary, Bibox Technology LLC, opened business checking accounts within this judicial district.  And Wang has attended blockchain conferences and announced Bibox corporate developments in New York City:





## IV.   FACTUAL ALLEGATIONS

### A.  The First Cryptocurrency: Bitcoin

34.     A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both.  Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

35.     Bitcoin was the world's first decentralized crypto-asset.  It is also the largest and most popular crypto-asset, with a market capitalization of approximately $212 billion.  Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of $359 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

11

36.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

37.     Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

38.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

39.     Mining is one method by which an individual can acquire crypto-assets like Bitcoin. A second and more common manner is to obtain crypto-assets from someone else.  This is often accomplished by acquiring it through an online "crypto-asset exchange."

40.     Online crypto-asset exchanges are one place to purchase Bitcoin and other crypto-assets.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

41.     In April 2013, there were only seven crypto-assets listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets.  As of this filing, the site monitors more than 6,600 crypto-assets.

42.     For a time, Bitcoin was the only crypto-asset available on exchanges.  As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well, and trading volumes expanded.  In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

43.     Bitcoin is a commodity, rather than a security, because it allows for quick and secure transactions, can serve as a long-term store of value, and is decentralized from any government or private control. There is no "Bitcoin Inc." that has the ability to cause the price of bitcoin to rise through careful management or fall through mismanagement or deception. Instead, Bitcoin's value is purely a response to market-wide forces, and a customer buying a bitcoin is not investing in a common enterprise. Both the CFTC and courts have accordingly recognized that Bitcoin is appropriately classified as a commodity.

**B.  Ethereum**

44.     Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $44 billion.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem,"—that is, the overall network of individuals using Ethereum or participating in the development of its network.)  Ethereum, like Bitcoin, is a commodity rather than a security.

45.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.   A smart contract is a program that verifies and enforces the negotiation or

performance of a contract.   Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

46.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.   They each put up $1,000 worth of ether.   They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.   The rest of the ether may or may not be worth more than it was at the beginning of the month.

47.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.   The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

48.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

49.     An ERC is an application standard for a smart contract.   Anyone can create an ERC and then seek support for that standard.   Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.   The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

**C.  ERC-20 Tokens**

50.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.   ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain, known as "ERC-20 tokens."

51.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than crypto-assets like Bitcoin and Ethereum because they do not operate on an independent blockchain.

52.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 token transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

53.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

**D.  The Advent Of The "ICO"**

54.     Between 2014 and 2016, Bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

55.     By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more dramatic.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

56.     Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to

register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in the Tokens were denied access to important information before making their investment decision.

57.    Potential purchasers were reached through various crypto-asset exchanges and social media sites that published active and upcoming ICOs.

58.    Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs was registered with the SEC.  Wang himself has recognized "that a lot of projects raised hundreds of millions of dollars, I think that this situation proved that market overheated.  It's a bubble.  I don't believe that any project, at the current stage, that they need $100 million to develop.  The most reasonable way is traditional venture capital, where they support a project based on lots of data analysis and based on the experience they have, but, in initial coin offerings, a lot of people who have no professionalism to back them, but the investment is not like a professional investment, it's not an institutional investment . . . That makes the market not very healthy."

59.    Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.  In the months leading up to Bibox's ICO, for example, issuers such as EOS, Bancor, and Status had *each* raised at least *one hundred million dollars* from selling their ERC-20 tokens through ICOs.

60.    Like most ICOs, ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO.  These whitepapers advertised the sale of tokens or coins through the ICO.  They typically advertised the creation of a "new blockchain architecture."

61.     The whitepapers typically contained vastly less information than a registration statement filed with the SEC would have included.  For example, whitepapers did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

62.     When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer.  In almost all cases, these tokens could also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

63.     These tokens were frequently listed on crypto-asset exchanges, where they were bought and sold using other crypto-assets (such as Bitcoin or Ethereum) or traditional currencies such as the U.S. dollar.

64.     Even after an ICO, an issuer could receive a direct financial benefit from high prices of their tokens by selling them to customers on these exchanges.  These subsequent offerings were not registered or flagged to customers; instead, they most often relied on the same whitepapers that had accompanied the sale of the tokens in the ICO, as well as continuing marketing efforts from the issuers seeking to increase the price of the tokens.

65.     As a result of the lack of information, trading of tokens on exchanges such as Bibox was rife for manipulation.  In fact, Wang has admitted that "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These

17

tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago. When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of crypto-asset, just as they were on the US stock exchange so many years ago."

66.    The Issuers declined to register the Tokens with the SEC, and Bibox declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### E.  Bibox Solicited And Sold ERC-20 Tokens in the United States

#### 1.    Bibox Issued, Solicited and Sold BIX Tokens

67.    Bibox solicited the buying and selling of the BIX token through both an ICO and through subsequent sales on its exchange and other exchanges.

68.    In or around October 2017, Bibox published the "Bibox whitepaper."  In the whitepaper, Bibox announced the "BIX Token."  Bibox promoted the BIX Token as providing a "certain amount of discount for users [to] pay their transaction fees" on the Bibox Platform.  Bibox further "promise[d] to use 25% of *seasonal net profit* [to] buyback BIX Token."

69.    BIX was launched through use of the ERC-20 protocol in October 2017 in a month-long ICO raising approximately $19 million.

70.    Bibox retained a substantial portion of BIX tokens such that BIX investors' fortunes were linked with those of Bibox.  At launch, Bibox created 500 million tokens through use of the ERC-20 protocol.  In its whitepaper, Bibox initially advertised that it would sell 55 percent of BIX tokens to investors through its ICO:

18

- **Allocation Plan**

| Percentage | Amount | Target |
|---|---|---|
| 55% | 275m | ICO |
| 35% | 175m | Initial Team |
| 10% | 50m | Angel Investment |

71.     After the ICO, however, Bibox informed investors on its website that the "actual allocation" was different than its "allocation plan" such that ICO investors only held approximately 48.4 percent of the circulation amount of BIX with Bibox holding the remaining amount:

BIX Token (BIX) is a new ERC20 based token going to ICO on Ethereum. The total amount of BIX Token is 500 million,  but the actual circulation amount of BIX Token is 271,520,349 BIX. T unsold parts have been destroyed. BIX Token will be available to trade when Bibox.com goes c
Click Here for Detail

Allocation Plan

| Percentage | Amount | Holding Party |
|---|---|---|
| 55% | 275m | ICO |
| 35% | 175m | Initial Team |
| 10% | 50m | Angel Investment |

The Actual Allocation

| Amount | Holding Party |
|---|---|
| 131,520,349 | ICO |
| 140,000,000 | Initial Team |

Initial Team Section has certain locking period as followed:

| Lifting Plan | Rate |
|---|---|
| Initial Period | 20% |
| After 1 year | 20% |
| After 2 year | 20% |
| After 3 year | 20% |
| After 4 year | 20% |

72.     Bibox promoted its ICO on Twitter, where it disseminated its "ICO details" and offered promotional discounts to incentivize investors to purchase BIX:



73.     On October 14, 2017, Bibox posted a five-part promotional YouTube "interview" for the BIX ICO between a Bibox marketing associate and Tom Budd, an advisor to Bibox and former Booz Allen Hamilton consultant and product manager at Deutsche Bank.   The BIX whitepaper described Budd as an Advisor "[b]ased in NYC" and the "founder of Coinstrategem a crypto management consultancy and a co-founder of EtheraLabs and Dark Star Ventures, a crypto accelerator and asset fund respectively."   Budd's LinkedIn also lists him as based in New York, New York.

74.     Through the interview, Budd pitched the investment case for buying BIX, explaining that every quarter, 25% of the profits of Bibox would be used to buy back tokens from 500 million initial BIX tokens until there were 200 million in circulation, thus "raising the value of the token."   Asked by Bibox's marketing associate whether "that is what is going to drive up the price, the value of this token," Budd responded, "you got it."

75.     Bibox further solicited purchase of BIX tokens through an investor "roadshow" in New York City.   On October 17, 2017, Bibox tweeted its "Road Show Announcement" giving the

details for an October 18, 2017, presentation held at WeWork Union Square in New York City in conjunction with the Chinese Blockchain Investors meetup group, which describes itself as a "New York-based community connecting high-profile investors and professionals who envision the future of blockchain technologies."

76.    After the event, Bibox tweeted that its "chief ICO Executive and Advisor gave the keynote speech" in an apparent reference to Tom Budd.

77.    Following the BIX ICO, on or around November 24, 2017, Bibox listed BIX on its unregistered exchange.  Bibox and Individual Defendants solicited the sale of BIX in order to serve their own financial interests.  Because the Defendants continued to possess many BIX tokens themselves and because they did not comply with any rules and regulations prohibiting their subsequent sale of those BIX tokens, Defendants could profit directly from high BIX prices.  They achieved these prices through continuous systematic marketing of the BIX tokens, including the publication of information designed to make the BIX tokens appear to be favorable investments. Bibox continued to solicit purchases of BIX on its exchange both on its website and on social media.  For example, Bibox promoted the potential or actual price performance of BIX:

**Bibox**
@Bibox365

#MaybeByNextSummer

#BIX is as hot as the sun



5:14 AM · Sep 3, 2019 · Twitter Web App

**Bibox** @Bibox365 · Mar 28, 2019

📢 $bix is up 7.65% to $0.337855 $USD in the last 24 hours.

Data from @CoinMarketCap

#Bibox #BiboxToken $BIX #cryptocurrency #gem



💬 4          🔁 6          ♡ 19

22

78.     Wang also touted the performance of BIX on his personal Twitter:



79.     Bibox sought to incentivize investors to purchase or hold BIX through incentives and reward programs:



**2.    Bibox Sought to Prop up the Price of BIX through Token Buybacks and Burns**

80.    Bibox has also sought to make BIX tokens attractive investments by propping up the price of BIX tokens through a campaign of repurchasing and token burning, describing that "BIX repurchase and burn" has the effect of "accelerating deflation and improving BIX values."

24

81.     On April 20, 2018, Bibox announced "The First Buyback and Destroy [sic] of the Bix," stating that "in accordance with our whitepaper, we use 25% of our net profits to burn BIX each quarter.  We have burned 1,575,600 BIX based on our 1st quarter profits."

82.     Bibox would also promote and advertise its BIX burn/buybacks to investors through social media:





83.     Bibox made similar token burn/buyback announcements on its website on July 26, 2018, November 1, 2018, January 11, 2019, April 26, 2019, July 25, 2019, January 13, 2019, and April 3, 2020.

84.     On August 17, 2019, Bibox also announced it would perform buybacks of BIX tokens "in the market and burn it every month" beyond its quarterly repurchase and burn plan "in order to further enhance the value of BIX," among other things.

85.     *Second*, Bibox solicited the buying and selling of other ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.  Indeed, Wang has conceded that "[k]eeping ICOs attractive in the future will be the single factor that most determines if the success of these exchanges continues."

86.     In less than a year from launching, Bibox was listed as within the top exchanges based on 24-hour trading volume.  In fact, in an interview in New York on November 29, 2019,

Wang disclosed that Bibox's exchange business alone had been valued at $500 million.  In another interview, Wang stated that Bibox had two million registered users.  And in another interview, Wang conceded that Bibox's largest user base is in the United States.

### 3. Bibox Allowed and Targeted U.S. Investors on its Exchange and in the BIX ICO

87.     Bibox specifically directed its promotion and advertisement of BIX and its unregistered exchange to the United States.  Wang would tout Bibox's ranking against other crypto-asset exchanges in English on social media accessible in the United States, where Wang has represented Bibox has its largest user base:



88.     In 2017 and 2018, Bibox representatives, including Wang, attended and spoke at numerous conferences in which they touted BIX and the Bibox exchange, including in New York City and San Francisco, California.  For example, on February 21 and 25, 2019, Bibox tweeted that its "team in America" would participate in an upcoming "roadshow" in San Francisco:



89.     On March 4, 2019, Bibox tweeted that its "Director of Operations in North America, Meilun Li" had participated in the San Francisco roadshow and promoted new Bibox products.

90.     That Bibox targeted and made its exchange available to users located in the United States (while seeking to conceal the fact that it was offering unregistered securities) is also clear from events following the filing of the original Complaint in this action, when Bibox purported to begin excluding users located in the United States.

91.     As of April 10, 2020, responding in the press to the filing of the original Complaint in this action, Bibox represented that it is "running the exchange [that] provides crypto trading service and cryptocurrencies are not securities."

92.     But as of at least August 2020, Bibox has provided a pop-up notice for those viewing its user agreement that due to "stipulations regarding crypto in the USA" it was "temporarily unable to provide services to American users" and "will disable all functions of the American users."



93.     At least as of August 23, 2020, Bibox has displayed the same message upon accessing its main homepage.

94.     On August 11, 2020, however, Bibox publicly stated on its English-language Telegram account that it was *not* blocking users in the United States from its platform despite its purported prohibition of users in the United States, but rather that it did not "recommend US users to use bibox" and recommended U.S. users withdraw their funds.

### 4.      Bibox Solicited the Buying and Selling of the Tokens on its Exchange

95.     How did a company that was barely a year old generate such extraordinary growth? By building a platform that solicited the buying and selling of unregistered securities on a historically unprecedented scale.  Defendants did this by taking advantage of the market's lack of sophistication with digital tokens, particularly ERC-20 tokens, and the market excitement for Bitcoin and Ethereum more generally.  Wang has conceded that "the creation of ERC-20 is

important to the history of exchanges" and that "ERC-20 drives an increasing amount of tokens into the crypto world through ICOs."

96.    Shortly after an issuer launched an ICO, the issuer would quickly seek to have its tokens listed on crypto-asset exchanges like Bibox, in order to give the issuer access to millions of retail investors to whom they could market the tokens.

97.    Wang stated that there are two fundamentals Bibox considers before it lists a token: the "idea" and the "team."  Wang explained:

> Firstly, we want to see that the project has a very solid idea …
> Secondly, we see the team as very important because we know that
> some projects have fake team members – that's really not what we
> are trying to do.

98.    Bibox emphasized the active role it takes with respect to each Token listed on its exchange in the BIX whitepaper, stating that it uses "Bibox's blockchain experts [to] evaluate each token" that it lists.  The BIX whitepaper also purported that Bibox would "only select high quality digital assets [to] list to trade at secondary market."  And Wang's LinkedIn page continues to describe that his role at Bibox is in part to "[p]ick and list credible Cryptocurrencies on exchange."

99.    Bibox has thus sought to solicit trading and purchases of the Tokens throughout the Class Period, including with representations to investors that the Tokens are "credible," "high quality," and that they are based on a "solid idea."

100.    Exchanges like Bibox are crucial to the successful sale of unregistered securities to investors.  In discussing an exchange's role in crypto-assets, Wang has stated: "Exchanges are important because they're sort of 'on top of the food chain' of the crypto economy."  Indeed, after their ICOs, Issuers aggressively pursued "listing agreements" with crypto-asset exchanges such as Bibox.  The purpose of pursuing these listing agreements was to create secondary markets for the purchase, sale, and trading of their Token.

30

101.    Issuers entered into listing agreements with crypto-asset exchanges that targeted United States consumers with the intent of creating secondary trading markets for the purchase, sale, and trading of their Token in the United States.

102.    These listing agreements were critical to the Issuers' efforts to increase the trading price of their Token by increasing market demand and access to the Tokens, especially in the United States.  Indeed, many of these trading agreements included "listing fees," whereby the Issuer paid the crypto-asset exchanges an upfront fee to get the exchange to list their token.

103.    Defendants also engaged in steps necessary for the distribution of the Tokens throughout the Class Period by promoting them on social media.  The below are some of the many instances where Defendants—through an official Bibox-related account—promoted and solicited sales of the Tokens.  For example, shortly after Bibox agreed to list a new token on its crypto-asset exchange, it would often advertise that listing to its user base, such as with the EOS token:



104.    As another example, on December 10, 2017, Bibox announced the listing of ETHLend (LEND) token on its website and Twitter:



105.    In connection with the launch of the LEND token, Bibox also offered a "giveaway" or "reward" for purchasing LEND tokens on Bibox:



106.    Upon the listing of the OMG token, Bibox advertised zero transaction fees and that users would be able to "claim your rewards" for trading:



107.    Even long after Bibox first listed a Token on its exchange, it would continue to solicit trading and purchases of the Token:



108.    Bibox would also tout the potential for returns on tokens it listed:



109.    Bibox also touted interactive trading tools that would help a user "claim your profits":



110.    And Issuers themselves promoted the listing of their tokens on Bibox.  For example, the founder of TRON, Justin Sun, tweeted about the TRX token:



111.    Each of the Tokens was listed on Bibox, pursuant to agreements with the Issuers, and each was traded by members of the Class.  Bibox's website served as a continuous form of solicitation throughout the class period that both promoted and enabled sales of the Tokens—displaying detailed price and trading data of the Tokens:



112.    And Bibox has sought to engage investors to trade on its exchange "whenever and wherever" they are through its App platform.

113.    Bibox's website, as shown above, is a highly interactive website accessible to users in the United States, displayable in English, and that allows users to display pricing information in U.S. dollars.  Bibox also collects significant identifying, including country-specific, information on its users.  Users register for an account by providing an email address or phone number.. Users then must verify their email or phone number by entering a verification code.   Users can then access an interactive user center:

114.    In order to have full user capabilities, including lifting withdrawal limits, users must provide identity authentication:

1. Please prepare ID documents in advance. Click Account-Verification to enter the identity authentication page



115.    Users outside of mainland China are then directed to enter their country, ID type, last and first name, and ID number:



116.    Bibox recommends that, after the identity verification, users set up two-factor authentication linked to their phone number or Google account to verify the user's identity each time before trading.

38

117.    Bibox profited handsomely from listing tokens on its platform.  In addition to receiving fees for each transaction performed on its exchange, Bibox received large cash payments from Issuers seeking to get their tokens listed.  As Wang has explained:

> [E]xchanges have a solid model.  They charge users trading fees and charge token sale fees related to ICOs. . . .  During the peak of the ICO market in 2017, the cost to list an ICO on a centralized exchange crept to between $1 million and $2 million on the top ten exchanges with the highest liquidity levels.  Compare that to what stock exchanges charge for an IPO.  According to NASDAQ, the initial listing fee of an IPO is usually between $125,000 and $300,000 (excluding the yearly listing fee).

118.    Bibox, however, has used both an initial listing fee and community voting to select and list ICOs.  Community voting involves exchange users paying Bibox their own Bibox-issued tokens (BIX tokens) in order to "vote" for the listing of other tokens—providing an additional way for Bibox to monetize token listing.

**F.  Because of Defendants' and Issuers' Efforts, Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities**

119.    In connection with the ICOs, from 2017 until early 2019, the Issuers and Bibox made numerous misleading statements and omitted key information to lead reasonable investors to conclude that the Tokens were not securities.

120.    <u>Issuers</u>.  Issuers touted false technical details about their supposed crypto-asset and its utility, compared their Token to Bitcoin and Ethereum (which are not securities), and then often explicitly told investors that the Token was not a security.

121.    Beyond their express statements, Issuers took advantage of two key informational asymmetries in order to mislead the market into believing that the Tokens were not securities.  First, the market lacked understanding and awareness concerning how crypto-assets operated, and specifically the differences between Bitcoin, Ethereum, and ERC-20 tokens.  Second, the market

also had no visibility into Issuers' technology or development during and after their ICO, and the

Issuers took advantage of the excitement generated by the hundreds of millions of dollars flooding

into various crypto-asset projects marketing themselves as the next Bitcoin. The high-profile

success of each successive ICO lent temporary credibility to ICOs as a whole.

122.    Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens,"

rather than "security tokens" (which would be securities that would have to be registered with the

SEC). As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to

investors that these were not securities.

123.    Issuers in fact expressly declared that the Tokens were not securities. For example,

the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses,
> purpose, attributes, functionalities or features, expressed or implied.
> Although EOS Tokens may be tradable, they are not an investment,
> currency, security, commodity, a swap on a currency, security, or
> commodity or any kind of financial instrument.

124.    Similarly, the TRON whitepaper stated that it "is not a security," and owning

> TRX does not mean that its owner has been afforded with the
> proprietary right, controlling right, and/or policy-making right
> regarding the TRON platform.  As an encrypted token used in
> TRON, TRX does not belong to any of the following categories:
> (a) currency of any type; (b) securities; (c) stock rights of a legal
> entity; (d) stocks, bonds, bills, warrants, certificates, investment
> contract, or other instruments affording similar rights.

125.    Through the summer of 2017, TRON issued a buzzword-heavy whitepaper, which

it updated multiple times in the lead up to its ICO. TRON described the design and capabilities of

its "***currently up and running platform***," with a roadmap for ten years of prospective

developments.  TRON described its offering as a Bitcoin-like protocol for "a worldwide free

content entertainment system with the blockchain and distributed storage technology."  TRON

explained that its protocol "allows each user to freely publish, store and own data, and in the

40

decentralized autonomous form, decides the distribution, subscription and push of contents and enables content creators by releasing, circulating and dealing with digital assets, thus forming a **_decentralized_** content entertainment ecosystem."

126.    To further the impression that TRX was not a security, TRON misleadingly compared TRX to Bitcoin in its whitepapers.  The TRON whitepaper asserted, for example, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin, [t]he [TRON] market is based on blockchain and trade in virtual currency."

127.    In the face of promises that TRX would be "similar to Bitcoin," and "better than" Ethereum, and considering the new technology at issue and TRON's other statements, many investors were understandably unaware that TRX tokens had fundamentally different features than crypto-assets, which the SEC has determined are not securities.  Many of the other Tokens likewise misleadingly compared themselves to Bitcoin or Ethereum, which are not required to be registered as securities.

128.    The EOS whitepaper, for example, argued that EOS would replace Bitcoin and Ethereum.  The ELF whitepaper discussed, at length, how governance structures for crypto-assets like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over crypto-assets like Bitcoin and Ethereum.  The OMG whitepaper discussed "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for this type of assets.

129.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

130.    <u>Bibox</u>.  Bibox has also made false or misleading statements.

131.    The BIX whitepaper misrepresented that BIX was not a security by stating it was not "abetting investment in the form of securities," leaving a reasonable investor to conclude that BIX was not a security.

132.    Bibox has also conveyed that securities are not traded on its exchange.  Indeed, as recently as April 10, 2020, responding in the press to the filing of the original Complaint in this action, Bibox represented that it is "running the exchange [that] provides crypto trading service and cryptocurrencies are not securities."

133.    Bibox would also emphasize the utility of the Tokens listed on its exchange in a way that would lead a reasonable investor to conclude that the token was not a security.  Bibox emphasized, for example, that purchasers could "use the BIX to pay for services on the exchange." In its description of the TRX token, Bibox stated it was "building the infrastructure for a truly decentralized Internet."  LEND was billed as providing "decentralized solutions to avoid loss of capital and to make one true global lending market available."  ELF was touted as being "used to pay for resource fees used in the network, such as deployment of smart contracts, operating and upgrading of systems (transaction fees, cross-chain data transfer fees)."

134.    Exchanges like Bibox have also routinely touted their offerings as complying with the securities laws.

135.    <u>SEC</u>.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Complaint, are securities.  In fact, it was not until six

months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

136.    Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

137.    Other.  Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

138.    In sum, before the SEC issued its Framework on April 3, 2019, a reasonable investor would not have concluded that ERC-20 tokens were generally subject to the securities laws.  On the contrary, they were confronted with representations both from token issuers and from crypto-asset discussions that would have led them reasonably to believe they were not investing in securities.

43

### G.  The Tokens Are Securities

139.    Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.  On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

140.    Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset (including an ERC-20 token) is a security.  Under application of the Framework, the Tokens were securities at issuance.

141.    In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales).  Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers.  Investors had a reasonable expectation of profit

based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on crypto-asset exchanges such as Bibox.

### 1. Under The SEC's April 2019 Framework, The Tokens Were Securities

#### a. ERC-20 Investors Invested Money

142.    Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

143.    Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens. The Tokens were listed on Bibox, and Bibox permitted investors to purchase ICOs with bitcoin and ether.

#### b. ERC-20 Investors Participated In A Common Enterprise

144.    The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

145.    The Tokens are no different. Investors were passive participants in the Tokens' ICOs and the profits of each investor were intertwined with those of the Issuers and of other investors. Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens. Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets. Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

146.   For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned value for the network."  For the other Tokens as well, investors participated in a common enterprise by purchasing the Tokens.

       c.   <u>Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them</u>

147.   As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

148.   Investors in the Tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The Tokens were sold to investors prior to a network or "ecosystem" on which they could be used being fully developed.  For pre-functional tokens, such as the Tokens at issue in the Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

149.   Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets thereby satisfy the *Howey* test:

The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

  - The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

  - This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

  - The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

150.     The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

151.     For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."

152.     The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials.

153.     The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a

business or operation."  The whitepaper for the aelf Token, for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during the Token sale."  Under the SEC's April 2019 Framework, the Tokens were securities under federal and state securities laws.

        d.   <u>Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers</u>

154.   The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

155.   Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams.   ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

156.   Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

157.   On July 11, 2018, for example, the co-founder of another exchange, Binance, explained that the team behind a particular token is a fundamental factor to the success of a project and that Binance actually considers the team in determining which coins to list:  "It's kind of hard to tell if they're going to do the right thing or the wrong thing.  But a team with a good history tends to carry on."

158.     The SEC explained in its Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).   This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.   In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade.   For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

- o Determining who will receive additional digital assets and under what conditions.

- o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

- o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.d

- o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

- o The AP has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset.  In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

- o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

- o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

- o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

159.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

51

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

160.   Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.   The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.   Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

161.   This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.   Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.   In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.   It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

53

162.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

163.    Under the Framework, notwithstanding the complexity of the issue to a reasonable investor, the Tokens satisfied most if not all of the factors the SEC described as relevant to its determination that a digital asset is a security.

### 2.    Each Token Is A Security

a.    a.   Bibox Token (BIX)

164.    The BIX token was launched through its month-long ICO in October 2017.  The Bibox whitepaper showed it would use assets raised to develop and improve the Bibox Platform:



165.    The Bibox whitepaper also included a "competition warning," which informed individuals that the success of the Bibox platform would be dependent on the efforts of Bibox:

**5.2 Competition Warning:**

We know that our exchange is a highly competitive area. There are thousands of teams planning and proceeding to develop trading platforms. The competition will be cruel, but in this era, every good concept, start-ups, or even mature companies will face the risk of such competition. But for us, this competition is the driving force for our development.

166.    At the time of the BIX ICO, Bibox took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that BIX had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all BIX were issued by Bibox at creation at very little economic cost—and enormous potential upside—to the Bibox founders.

167.    The creation of BIX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which BIX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that BIX was something other than a security, when it *was* a security.

168.    Investors purchased BIX tokens on Bibox with the reasonable expectation that they would make a profit—an expectation reinforced though Bibox's solicitations and marketing efforts.

169.    BIX token holders stood to share in potential profits from the successful launch of the BIX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the BIX ecosystem.

170.    Investors' profits were to be derived from the managerial efforts of others—Bibox, its co-founders, and Bibox's development team.  Investors in BIX relied on the managerial and entrepreneurial efforts of Bibox and its executive and development team to manage and develop

the Bibox software.  And Bibox has continuously endeavored to support the market for and the price of BIX through its burn and repurchases of BIX described herein.

171.     Investors in BIX reasonably expected Bibox and Bibox's development team to provide significant managerial efforts after BIX's launch.  The BIX whitepaper touted that "Bibox's founding team is formed by top tier Chinese blockchain giants."  And the BIX whitepaper listed and promoted the qualifications of its "Advisors"—such as Tom Budd as described herein— and their experience in crypto-asset and financial services.

172.     The expertise of Bibox was critical in monitoring the operation of BIX, promoting BIX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The BIX protocol and governance structure were predetermined before the ICO was launched.

173.     Accordingly, under the SEC's Framework, the BIX token was and is a security.

b.  EOS

174.     The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on Bibox since at least December 3, 2017.

175.     EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets.  In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

176.     In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

177.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With promises that EOS would be better than other crypto-assets, many individuals were unaware that EOS tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

178.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it *was* a security.

179.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

180.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

181.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.   The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

182.    Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

183.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

184.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

185.    Accordingly, under the SEC's Framework, the EOS token was a security.

186.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

187.   The SEC's September 30, 2019 settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities.  Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

188.   The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other digital tokens discussed herein.

c.   TRON (TRX)

189.   Over its three-day ICO, from August 31 to September 2, 2017, TRON raised approximately $70 million in proceeds.  TRX was listed on Bibox starting on February 11, 2018.

190.   On February 10, 2018, Bibox promoted TRX on its website:

59



191.    In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated."   The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

192.    The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform."   The whitepaper identified potential "risks after supervisory regulations are formed."   This disclaimer merely contemplated potential *future*

regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

> Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens purchased during the ICO period may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

193.    TRON promoted TRX as being similar to Bitcoin.  The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in virtual currency."  By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

194.    The creation of TRX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that TRX was something other than a security, when it *was* a security.

195.    Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

196.    TRX token holders stood to share in potential profits from the successful launch of the TRX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

197.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team.  Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

198.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

199.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The TRX protocol and governance structure were predetermined before the ICO was launched.

200.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

    d.  OmiseGo (OMG)

201.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

202.    In June 2017, OmiseGO published the "OmiseGO whitepaper."  The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway."  As part of

this system, OmiseGO announced the OMG token.  According to the whitepaper, "[o]wning OMG

tokens buys the right to validate this blockchain, within its consensus rules."

203.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens.

Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG

would serve as a "clearinghouse" for these type of assets.  The whitepaper provided an example

of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade

is now cleared on the OMG chain."

204.    On July 10, 2019, Bibox listed the OMG token:



## Bibox Will List OmiseGo（OMG）on 07/10/2019

**Service**
4 months ago · Updated

Follow

**I. Listing Time**

07/10/2019 11:00 A.M. (GMT+8), deposit and withdrawal functions will be opened.

07/10/2019 4:00 P.M. (GMT+8), OMG/ETH、OMG/BTC、OMG/USDT trading pairs will be opened.

**II. Token Information**

OmiseGO (OMG) is a public Ethereum-based financial technology for use in mainstream digital wallets. OmiseGo enables real-time, peer-to-peer value exchange and payment services agnostically across jurisdictions and organizational silos, and across both fiat money and decentralized currencies. Designed to enable financial inclusion and disrupt existing institutions, access will be made available to everyone via the OmiseGO network and digital wallet framework.Omise, which serves business customers in Japan, Thailand and Indonesia, currently operates an ecommerce platform that lets companies take payments from customers online. It has a full-featured white label payment management platform for these businesses. With OmiseGO, and the OMG token, Omise aims to simplify the barriers to payments by removing the need to own a bank account.

Total Supply: 140,245,398 OMG
Circulating Supply： –
ICO Price： –

**III. Related Links**

OMG Listing Event, Biboxers Can Enjoy 0 OMG Transaction Fee & Deposit Rewards

Official Website： https://omisego.network/

Whitepaper： Click for Details

Block Explorer: Click for Detail

Fees: Click for Detail

Click here to deposit

Deposit Guide

Risk Warning：

Cryptocurrency investments are risky. Please make investments wisely according to your own risk tolerance.

Bibox Team

Official website： https://www.bibox.com/

07/09/2019

205.    At 10:00 a.m. today, the OMG token traded at approximately $5.08.

206.    At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that OMG had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

207.    The creation of OMG tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that OMG was something other than a security, when it *was* a security.

208.    Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

209.    OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

210.    Investors' profits were to be derived from the managerial efforts of others— OmiseGO, its co-founders, and OmiseGO development team.  Investors in OMG relied on the

managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

211.     Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

212.     The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The OMG protocol and governance structure were predetermined before OMG was launched.

213.     Accordingly, under the SEC's Framework, the OMG token was and is a security.

   e.   ETHLend (LEND)

214.     The LEND ICO raised approximately $17 million from the sale of unregistered securities in November 2017.

215.     On December 10, 2017, Bibox listed the LEND token:

# 【News】 Bibox Lists ETHLenD (LEND)

**Service**
4 months ago · Updated

Follow

Dear Bibox users:

Bibox launches ETHLenD (LEND) and starts LEND/BTC and LEND/ETH trading on 2017-12-10 15:00 (Beijing Time). You can start depositing now.

---

What is ETHLenD?

ETHLend.io introduces decentralized lending on Ethereum network by using ERC-20 compatible tokens or Ethereum Name Service (ENS) domains as a collateral. ETHLend solves the problem on reducing the loss of loan capital on default. On healthy loan relationships the loan is paid back. ETHLend provides decentralized solutions to avoid loss of capital and to make one true global lending market available.

Official Website: https://ethlend.io/

---

Fees：

Deposit fee：
* Free

Withdrawal fee：
* Network transaction fee

Transaction fee：
* No service charge for the first month.
* Please wait the update news on Bibox website and community to see the specific date of charging.

---

Click here to deposit your account.
Deposit Guide

Risk warning：
Crytocurrency investment carries risks. Please assess the risks and invest careful.

Bibox Team
Official website： https://www.bibox.com/
Official email： service@bibox.com

12/10/2017

216.    In the months following the Bibox listing, the price of LEND skyrocketed from less than 8 cents to more than 37 cents per token:



217.    At 10:00 a.m. today, the LEND[4] token traded at less than $0.81.

218.    The LEND whitepaper, released by a company called ETHLend, stated that the LEND platform "provides secured lending with the use of ERC-20 compatible tokens as a collateral.  For example, users with a token portfolio are not required to sell the tokens to receive liquidity."  ETHLend promoted the LEND token as enabling individuals to "borrow[] Ether to participate in different ICOs, buy[] dips (bear market movements) and purchas[e] tokens from the exchange for investment strategies without the need to sell tokens."

219.    The LEND whitepaper was silent as to the regulatory nature of LEND tokens. Instead, the whitepaper discussed how LEND would be used "as the medium of exchange" and "the main utility that is used for lending and borrowing within the Ethereum network."  It asserted that this would "allow all ETH and ERC20 token holders the ability to unlock billions of dollars' worth of liquidity" and that it would "do the same with Bitcoin in the near future."  Given its

---

[4] In September 2018, the LEND token was rebranded as the "Aave token."

supposed relationship to Ethereum and Bitcoin, investors reasonably understood that LEND was not subject, at issuance, to U.S. securities laws.

220.    At the time of the LEND ICO, ETHLend took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that LEND had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all LEND were issued by ETHLend at creation at very little economic cost—and enormous potential upside—to the ETHLend founders.

221.    The creation of LEND tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which LEND tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that LEND was something other than a security, when it *was* a security.

222.    Investors purchased LEND tokens with the reasonable expectation that they would make a profit.

223.    LEND token holders stood to share in potential profits from the successful launch of the LEND token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the LEND ecosystem.

69

224.    Investors' profits were to be derived from the managerial efforts of others—ETHLend, its co-founders, and the ETHLend development team.  Investors in LEND relied on the managerial and entrepreneurial efforts of LEND and its executive and development team to manage and develop the LEND software.

225.    Investors in LEND reasonably expected ETHLend and the ETHLend development team to provide significant managerial efforts after LEND's launch.

226.    The expertise of ETHLend was critical in monitoring the operation of LEND, promoting LEND, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The LEND protocol and governance structure were predetermined before the ICO was launched.

227.    Accordingly, under the SEC's Framework, the LEND token was and is a security.

f.  aelf (ELF)

228.    In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

229.    In November 2017, aelf published the "aelf whitepaper."  The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community."  As part of this system, aelf announced the ELF token. According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

230.    The aelf whitepaper was silent as to the regulatory nature of ELF tokens.  Instead, the whitepaper discussed, at length, how governance structures for crypto-assets like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over crypto-assets like Bitcoin and Ethereum because "vital decisions [in aelf]

will be carried out through a mechanism that resembles **representative democracy**." (Emphasis added.)

231.    On December 21, 2017, Bibox listed the ELF token:



232.    In the month following the Bibox listing, the price of the ELF Token skyrocketed from less than $1 to more than $2.50 per token:



233.    At 10:00 a.m. today, the ELF token traded at approximately 13 cents.

234.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that ELF had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

235.    The creation of ELF tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ELF was something other than a security, when it *was* a security.

236.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

237.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

238.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team.  Investors in ELF relied on the managerial and entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

239.    Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

240.    The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ELF protocol and governance structure were predetermined before ELF was launched.

241.    Accordingly, under the SEC's Framework, the ELF token was and is a security.

**H.  The Class Has Suffered Significant Damages From Defendants' Actions**

242.    As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

243.    The Tokens today are worth far less than the price Plaintiff and the Class paid for them.

244.    To the extent Plaintiff still hold any Tokens, he hereby demands rescission and makes any necessary tender of the Tokens.

**V.    DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED**

245.    Consistent with the perspective of a reasonable investor, neither Plaintiff nor members of the Class were in a position to appreciate their ability to bring claims based on Defendants' misconduct until April 3, 2019, at the earliest.

246.    In the whitepapers describing the Tokens, as well as in their social media and other marketing, as described above, Defendants and Issuers deliberately created the impression that Tokens were not securities.  This included explicit statements that the Tokens were not securities as well as misleading comparisons to Bitcoin and other crypto-assets that are not securities.

247.    For example, in its summer of 2017 whitepapers, TRON falsely stated that "TRX is not a security" and does not belong to the category of securities, in that TRX was a security at the time.

248.    In its whitepaper, Bibox falsely stated that it was not "abetting investment in the form of securities," in that BIX was a security.  As recently as April 10, 2020, Bibox has continued to maintain the misrepresentation that it is "running the exchange [that] provides crypto trading service and cryptocurrencies are not securities."

249.    In the EOS Token Purchase Agreement, Block.one expressly represented that EOS tokens were not securities and to disclaim in its FAQ that EOS tokens were securities—stating "block.one does not believe that the distribution of EOS Tokens or the EOS Tokens themselves are securities" or similar financial instruments.

250.    These misstatements were material to the assessment of purchasers' legal rights and claims based on the Tokens' status as a securities.

251.    Issuers also made material misleading omissions in their whitepapers.    In describing the technical details about the TRON protocol design and implementation to enable

TRX's utility (including the file structure protocol and technical implementation details such as BitSwap strategy and Proof-of-Replication), TRON failed to disclose that it had plagiarized those technical details from other issuers' whitepapers.

252.    In describing its plan to create a decentralized blockchain that would be technically superior to other available blockchains in its June 5, 2017 whitepaper, Block.one failed to disclose that its blockchain's governance system could be controlled by a single "arbitrator" and was not decentralized.

253.    These omissions were material to the assessment of the Tokens' prospective utility.

254.    Because of these representations and omissions, Plaintiff and members of the Class reasonably believed they were purchasing a decentralized asset that had functionality at issuance. In fact, however, they were investing in Defendants' efforts, not knowing that some Issuers had no plan for the Tokens.

255.    Under the misimpression that the Tokens were not securities, as a result of Defendants' and Issuers' fraudulent statements and omissions, Plaintiff did not realize that they were in a position to bring claims under federal or state law regulating securities.  Defendants' and Issuers' misrepresentation would not have been apparent until, at the earliest, April 3, 2019, when the SEC clarified the legal paradigm for assessing the security status of crypto-assets like the Tokens.

256.    Indeed, independent of Defendants' and the Issuers' state of mind in making the materially misleading misstatements and omissions described above, these misstatements and omissions—which reflected the massive asymmetry in information available to Defendants and Issuers and unavailable to Plaintiff and the Class—prevented Plaintiff and the Class from realizing

that they were in a position to bring claims under federal or state law regulating securities until

April 3, 2019.

## VI.    **CLASS ALLEGATIONS**

257.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks

certification of the following Subclasses (together, the "Class"):

a.    Subclass 1: All persons who purchased any of the following tokens on the Bibox exchange and are not subject to any applicable arbitration clause: EOS, TRX, OMG, LEND, and ELF, between October 1, 2017 and the present, in a domestic transaction and were injured thereby.

b.    Subclass 2: All persons who purchased any of the following tokens on the Bibox exchange and are subject to any applicable arbitration clause: EOS, TRX, OMG, LEND, and ELF, between October 1, 2017 and the present, in a domestic transaction and were injured thereby.

c.    Subclass 3: All persons who purchased BIX tokens, which were first sold on or about October 1, 2017, in a domestic transaction directly from Defendants and were injured thereby and are not subject to any applicable arbitration clause.

d.    Subclass 4: All persons who purchased BIX tokens, which were first sold on or about October 1, 2017, in a domestic transaction directly from Defendants and were injured thereby and are subject to any applicable arbitration clause.

e.    Subclass 5: All persons who purchased BIX tokens, other than those sold directly from Defendants, which were first sold between October 1, 2017 and the present, in a domestic transaction and were injured thereby and are not subject to any applicable arbitration clause.

f.    Subclass 6: All persons who purchased BIX tokens, other than those sold directly from Defendants, which were first sold between October 1, 2017 and the present, in a domestic transaction and were injured thereby and are subject to any applicable arbitration clause.

258.    Accordingly, the Class Period is October 1, 2017 through the present.

259.    Excluded from the Class and Subclasses are Defendants, their officers and

directors, and members of their immediate families or their legal representatives, heirs, successors,

or assigns and any entity in which Defendants have or had a controlling interest.

260.    Plaintiff reserves the right to amend the Class and Subclass definitions if investigation or discovery indicates that the definitions should be narrowed, expanded, or otherwise modified.

261.    The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  The precise number of Class and Subclass members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

262.    Members of the Class and Subclasses are readily ascertainable and identifiable. Members of the Class and Subclasses may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

263.    Plaintiff's claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiff does not have any interest that is in conflict with the interests of the members of the Class or the Subclasses.

264.    Plaintiff and members of the Class and Subclasses sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

265.    Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclasses and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to those of the Class and Subclasses.

266.    Plaintiff seeks declaratory relief for himself and the Class and Subclasses, asking the Court to declare their purchase agreements with Bibox void, such that prosecuting separate actions by or against individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Subclasses that would establish incompatible standards of conduct for Bibox; and Bibox has acted on grounds that apply generally to the Class and Subclasses, so that the declaratory relief is appropriate respecting the class as a whole.

267.    Common questions and answers of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether the BIX whitepaper contained false or misleading statements;

- Whether Bibox operated as an unregistered exchange;

- Whether Bibox operated as an unregistered broker-dealer;

- Whether Bibox offered or sold the Tokens to members of the Class and Subclasses;

- Whether the members of the Class and Subclasses suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class and Subclass members are entitled to void their purchase agreements with Bibox and to recover the monies they paid thereunder.

268.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclasses to individually redress the wrongs done to them.

269.    There will be no difficulty in the management of this action as a class action.

## VII.    <u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
**(SECURITIES ACT – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Bibox)**

270.    Plaintiff realleges the allegations above.

271.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

272.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

273.    When issued, the Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, *id.* § 77b(a)(1). Bibox promoted, solicited or sold Tokens to Plaintiff and members of the Class. Bibox thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to

carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

274. Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

275. Accordingly, Bibox has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

276. Plaintiff and the Class seek rescissory damages with respect to purchases of Tokens within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 77m.

## SECOND CAUSE OF ACTION
### (EXCHANGE ACT – PRIMARY LIABLIITY)
### Contracts With an Unregistered Exchange
### Sections 5 and 29(b) of the Exchange Act
### (Bibox)

277. Plaintiff realleges the allegations above.

278. In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitutes, maintains, or

provides a market place or facilities for bringing together purchasers and sellers of securities." 17 C.F.R. § 240.3b-16.

279.     Bibox has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because Bibox has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

280.     Bibox has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

281.     In the course of planning to operate and as operating as an unregistered exchange within the United States, Bibox has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered exchange within the United States, Bibox would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox would operate in violation of section 5 of the Exchange Act.

282.     In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, in the performance of its contracts with the issuers of digital tokens, which is a contract for listing a security on an exchange, and pursuant to and consistent with its Terms of Use, Bibox has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Bibox and paid Bibox fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which

Bibox was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

283.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Bibox entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Bibox would be and was operating in violation of section 5.

284.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

285.    Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with Bibox and to recover, as rescissory damages, the fees they have paid under those contracts.

286.    Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Bibox within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 78cc(b).

### THIRD CAUSE OF ACTION
**(EXCHANGE ACT – PRIMARY LIABLIITY)**
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Bibox)**

287.    Plaintiff realleges the allegations above.

288.     In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  *Id.* § 78o(a)(1).

289.     As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, Bibox has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

290.     A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  *Id.* § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.  Bibox has operated as a broker during the Class Period by facilitating the sale of digital assets as part of other entities' ICOs, including by marketing the digital assets, accepting investors' orders, accepting payment for orders, and working with issuers to transfer digital assets to investors after payment.

291.     A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business."  Bibox has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by having a regular turnover inventory of

securities, by purchasing digital assets for accounts in Bibox's name (often at a discount to the ICO price), and by then selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

292.    In the course of planning to operate and as operating as an unregistered broker-dealer, Bibox has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered broker-dealer within the United States, Bibox would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox would operate in violation of section 15(a)(1) of the Exchange Act.

293.    In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of digital tokens, and pursuant to and consistent with its Terms of Use, Bibox has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Bibox and paid Bibox fees for the use of its exchange. The parties to these contracts thus reached an agreement whereby and pursuant to which Bibox was operating in violation of section 15(a)(1) of the Exchange Act.

294.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Bibox entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Bibox would be and was operating in violation of section 5.

295.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract

for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract." *Id.* § 78cc.

296.   Section 29(b) affords Plaintiff and the Class the right, which they hereby pursue, to void their purchase agreements with Bibox and to recover, as rescissory damages, the fees they have paid under those contracts.

297.   Plaintiff and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Bibox within the last three years and within one year from when an investor could adequately plead that a Token is a security. *Id.* § 78cc(b).

<div align="center">

**FOURTH CAUSE OF ACTION**
**(EXCHANGE ACT – ADDITIONAL LIABLIITY)**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Individual Defendants)**

</div>

298.   Plaintiff realleges the allegations above.

299.   This Count is asserted against the Individual Defendants for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

300.   Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.   Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange and operation as an unregistered broker-dealer as described herein.

301.     The Individual Defendants have the power to direct or cause the direction of the management and policies of Bibox.

302.     The Individual Defendants, separately or together, have sufficient influence to have either caused Bibox to register as an exchange and broker-dealer or prevented Bibox from effecting transactions of securities as an unregistered exchange and unregistered broker-dealer.

303.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Bibox's failure to register as an exchange or broker dealer and Bibox's offer of securities on an unregistered exchange and operation as an unregistered broker-dealer.

304.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

<div align="center">

**FIFTH CAUSE OF ACTION**
**(SECURITIES ACT – PRIMARY LIABILITY)**
**Sale of Securities By Means of A Prospectus**
**Containing Untrue Statements and Omissions of Material Facts**
**Sections 5 and 12(a)(2) of the Securities Act**
**(Bibox)**

</div>

305.     Plaintiff realleges the allegations above.

306.     Section 12(a)(2) of the Securities Act provides in relevant part: "Any person who offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person

purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security" *Id.* § 77*l*(a)(2).

307. When issued, BIX tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Bibox offered, promoted, solicited, or sold BIX tokens by means of a prospectus (the "Prospectus"). The Prospectus consists of the BIX whitepaper issued prior to its ICO.

308. Bibox's statement in the Prospectus that it was not "abetting investment in the form of securities" was false.

309. This Count does not allege fraud. For the purposes of asserting this claim, Plaintiff does not allege that Bibox acted with intentional, reckless, or otherwise fraudulent intent, except as to any statements of opinion or belief.

310. Bibox directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

311. Members of the Class acquired the BIX tokens pursuant to Bibox's offering and sale of BIX tokens. Members of the Class did not know, nor could they have known in the exercise of reasonable care, of the material misstatements and omissions in the Prospectus before acquiring the BIX tokens or prior to April 3, 2019. Members of the Subclass sustained damages, including the substantial price decline of the Tokens, because of the material misstatements and omissions.

312.   Accordingly, Bibox has violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2).

313.   Plaintiff and Subclasses 3-6 seek rescissory damages with respect to purchases of BIX tokens during the Class Period.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(SECURITIES ACT – ADDITIONAL LIABILITY)**
**Control Person Liability for Violations of**
**Sections 5, 12(a)(1), and 12(a)(2) of the Securities Act**
**(Individual Defendants)**

</div>

314.   Plaintiff realleges the allegations above.

315.   This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

316.   Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein and to cause the complained-of misrepresentations in the prospectus for the BIX tokens.

317.   The Individual Defendants have the power to direct or cause the direction of the management and policies of Bibox and inclusion of misrepresentations in the BIX Prospectus.

318.   The Individual Defendants, separately or together, have sufficient influence to have caused Bibox to solicit transactions of securities and to include misrepresentations in the BIX Prospectus.

319.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Bibox's solicitation of securities and inclusion of misrepresentations in the BIX Prospectus.

320.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

<div align="center">

**SEVENTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Ala. Code § 8-6-19**
**(Bibox)**

</div>

321.     Plaintiff realleges the allegations above.

322.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

323.     The Alabama Securities Act forbids the offer or sale of unregistered securities.  Ala. Code § 8-6-4.  Any person who offers or sells a security in violation of Section 8-6-4 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.  Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition."  *Id.* § 8-6-19(a).

324.     When issued, the Tokens were securities within the meaning of the Alabama Securities Act.  *Id.* § 8-6-2.  On information and belief, Bibox offered or sold the Tokens to members of the Class in Alabama.  The Tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act.  *Id.* § 8-6-10.

325.    Upon information and belief, the Tokens were offered or sold in Alabama, including without limitation through solicitations directed by Bibox to Alabama and received in Alabama.

326.    Accordingly, Bibox has violated the Alabama Securities Act through Bibox's sale of unregistered securities.

327.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

328.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ala. Code § 8-6-19**
**(Bibox)**

</div>

329.    Plaintiff realleges the allegations above.

330.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

331.    The Alabama Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Alabama law.  Ala. Code § 8-6-3.  Any person who offers or sells a security in violation of Section 8-6-3 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.  Damages are the amount that would be

recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19.

332.     When issued, the Tokens were securities within the meaning of the Alabama Securities Act.  *Id.* § 8-6-2.  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Alabama.  *Id.* § 8-6-2.

333.     On information and belief, Bibox transacted business as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by Bibox to Alabama and received in Alabama.

334.     Bibox was not registered as a broker-dealer or agent in Alabama, nor was it subject to any exemption from registration.

335.     Accordingly, Bibox has violated the Alabama Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

336.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

337.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Ala. Code § 8-6-19**
**(Individual Defendants)**

338.     Plaintiff realleges the allegations above.

339.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

340.     Every person who directly or indirectly controls an entity liable under the Alabama Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct" is jointly and severally liable "with and to the same extent" as the seller, unless the non-seller "is able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Ala. Code § 8-6-19(c).

341.     When issued, the Tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-19. On information and belief, Bibox offered and sold the Tokens to members of the Class in Alabama and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act, and Bibox was not registered as a broker-dealer or agent under Alabama law. *Id.* § 8-6-3.

342.     On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by Bibox to Alabama and received in Alabama.

343.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or

sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

344.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Alabama Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

345.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

346.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TENTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**AS § 45.56.710**
**(Bibox)**

</div>

347.    Plaintiff realleges the allegations above.

348.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

349.    The Alaska Securities Act forbids the sale of unregistered securities.  AS § 45.56.100.  Any person who sells a security in violation of Section 45.56.100 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under

AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

350.     When issued, the Tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900.  On information and belief, Bibox sold the Tokens to members of the Class in Alaska.  The Tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act. *Id.* § 45.56.110.

351.     Upon information and belief, the Tokens were sold in Alaska, including without limitation through solicitations directed by Bibox to Alaska and received in Alaska.

352.     Accordingly, Bibox has violated the Alaska Securities Act through Bibox's sale of unregistered securities.

353.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

354.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ELEVENTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**AS § 45.56.710**
**(Bibox)**

355.     Plaintiff realleges the allegations above.

356.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

357.     The Alaska Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Alaska law.  AS § 45.56.300.  Any person who sells a security in violation of Section 45.56.300 is "liable to the

customer," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

358.    When issued, the Tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900.  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Alaska. *Id.*

359.    On information and belief, Bibox transacted business as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by Bibox to Alaska and received in Alaska.

360.    Bibox was not registered as a broker-dealer or agent in Alaska, nor was it subject to any exemption from registration.

361.    Accordingly, Bibox has violated the Alaska Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

362.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

363.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWELFTH CAUSE OF ACTION**
**(ALASKA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**AS § 45.56.710(g)**
**(Individual Defendants)**

364.    Plaintiff realleges the allegations above.

365.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

366.    Every person who "directly or indirectly controls a person liable under" the Alaska Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions," every "individual who is an employee of or associated with a person liable … and who materially aids the conduct giving rise to the liability," and every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability" is "jointly and severally with and to the same extent as" the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.   *Id.* § 45.56.710(g).

367.    When issued, the Tokens were securities within the meaning of the Alaska Securities Act.  *Id.* § 45.56.900.  On information and belief, Bibox sold the Tokens to members of the Class in Alaska and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Alaska law.  *Id.* § 45.56.300.

368.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by Bibox to Alaska and received in Alaska.

369.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

370.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Alaska Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

371.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

372.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTEENTH CAUSE OF ACTION
### (ARIZONA STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**A.R.S. § 44-2001**
**(Bibox)**

373.    Plaintiff realleges the allegations above.

374.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

375.    The Arizona Securities Act forbids the sale of unregistered securities.  A.R.S. § 44-1841.  Any purchase of a security in violation of Section 44-1841 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

376.    When issued, the Tokens were securities within the meaning of the Arizona Securities Act.  *Id.* § 1801.  On information and belief, Bibox sold the Tokens to members of the Class in Arizona.  The Tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act.  *Id.* § 1843.

377.    Upon information and belief, the Tokens were sold in Arizona, including without limitation through solicitations directed by Bibox to Arizona and received in Arizona.

378.    Accordingly, Bibox has violated the Arizona Securities Act through Bibox's sale of unregistered securities.

379.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

380.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FOURTEENTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**A.R.S. § 44-2001**
**(Bibox)**

381.    Plaintiff realleges the allegations above.

382.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

383.    The Arizona Securities Act forbids any person from transacting business as a dealer or agent unless he is registered under Arizona law.  A.R.S. § 44-1842.  Any purchase of a security in violation of Section 44-1842 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

384.    When issued, the Tokens were securities within the meaning of the Arizona Securities Act.  *Id.* § 1801.  On information and belief, Bibox transacted business as a dealer or agent when it sold the Tokens to members of the Class in Arizona.  *Id.* § 1801.

385.    On information and belief, Bibox transacted business as a dealer or agent in Arizona, including without limitation through solicitations directed by Bibox to Arizona and received in Arizona.

386.    Bibox was not registered as a dealer or agent in Arizona, nor was it subject to any exemption from registration.

387.    Accordingly, Bibox has violated the Arizona Securities Act by transacting business as an unregistered dealer or agent in the sale of securities.

388.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

389.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTEENTH CAUSE OF ACTION
### (ARIZONA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**A.R.S. § 44-2003**
**(Individual Defendants)**

390.     Plaintiff realleges the allegations above.

391.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

392.     Any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale of securities under the Arizona Securities Act "shall be jointly and severally liable to the person who is entitled to maintain" an action under A.R.S. § 44-2001.  A.R.S. § 44-2003.

393.     When issued, the Tokens were securities within the meaning of the Arizona Securities Act.  *Id.* § 1801.  On information and belief, Bibox sold the Tokens to members of the Class in Arizona and acted as the dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act, and Bibox was not registered as a dealer or agent under Arizona law.  *Id.* § 1841.

394.     On information and belief, Bibox sold the Tokens and acted as a dealer or agent in Arizona, including without limitation through solicitations directed by Bibox to Arizona and received in Arizona.

395.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the

wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

396.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Arizona Securities Act through Bibox's sale of unregistered securities and operation as an unregistered dealer or agent.

397.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

398.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ark. Stat. Ann. § 23-42-106**
**(Bibox)**

</div>

399.    Plaintiff realleges the allegations above.

400.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

401.    The Arkansas Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Arkansas law.  *Id.* 23-42-301.  Any person who transacts business in violation of Section 23-42-301 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security."  *Id.* § 23-42-106(a)(1) – (2)(B)(i).  "Damages are the amount that would be recoverable upon a tender of the security less the value of the security

<div align="center">101</div>

when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

402.    When issued, the Tokens were securities within the meaning of the Arkansas Securities Act.  *Id.* § 23-42-102(17).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Arkansas. *Id.* §§ 23-42-102(1)(A), 23-42-102(3)(A).

403.    On information and belief, Bibox transacted business as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by Bibox to Arkansas and received in Arkansas.

404.    Bibox was not registered as a broker-dealer or agent in Arkansas.

405.    Accordingly, Bibox has violated the Arkansas Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

406.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

407.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer or Sale of Securities**
**Ark. Stat. Ann. § 23-42-106(a)**
**(Bibox)**

</div>

408.    Plaintiff realleges the allegations above.

409.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

410.    The Arkansas Securities Act forbids the offer or sale of unregistered securities. Ark. Code Ann. § 23-42-501.  Any person who offers or sells a security in violation of Section 23-42-501 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i).  "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security."  *Id.* § 23-42-106(a)(2)(B)(ii).

411.    When issued, the Tokens were securities within the meaning of the Arkansas Securities Act.  *Id.* § 23-42-102(17).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Arkansas.  The Tokens were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act.  *Id.* § 23-42-503.

412.    Upon information and belief, the Tokens were offered or sold in Arkansas, including without limitation through solicitations directed by Bibox to Arkansas and received in Arkansas.

413.    Accordingly, Bibox has violated the Arkansas Securities Act through Bibox's sale of unregistered securities.

414.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

415. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTEENTH CAUSE OF ACTION
### (ARKANSAS STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Ark. Stat. Ann § 23-42-106**
**(Individual Defendants)**

416. Plaintiff realleges the allegations above.

417. This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

418. Every person who controls a person liable under the Arkansas Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every partner, officer, or director of the seller and any other person occupying a similar status or performing a similar function with respect to the seller is jointly and severally liable for the actions of the seller, unless the non-seller satisfies the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of actions of the seller that give rise to the liability alleged to exist. *Id*. § 23-42-106(d).

419. When issued, the Tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Bibox offered and sold the Tokens to members of the Class in Arkansas and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act, and Bibox was not registered as a broker-dealer or agent under Arkansas law. *Id.* §§ 23-42-501, 23-42-301.

420. On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by Bibox to Arkansas and received in Arkansas.

421.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

422.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Arkansas Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

423.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

424.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETEENTH CAUSE OF ACTION
### (CALIFORNIA STATE LAW – PRIMARY LIABILITY)
**Unqualified Offer or Sale of Securities**
**Cal. Corp. Code § 25503**
**(Bibox)**

425.    Plaintiff realleges the allegations above.

426.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in California.

427.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities.  Cal Corp. Code §§ 25110, 25130.  Any person who offers or sells a security in violation of Sections 25110 or 25130 are "liable to any person

acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received therefrom, upon the tender of such security, or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) his purchase price plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

428.    When issued, the Tokens were securities within the meaning of the California Securities Act.  *Id.* § 25019.  On information and belief, Bibox offered or sold the Tokens to members of the Class in California.  The Tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act.  *Id.* §§ 25110, 25130.

429.    Upon information and belief, the Tokens were offered or sold in California, including without limitation through solicitations directed by Bibox to California and received in California.

430.    Accordingly, Bibox has violated the California Securities Act through Bibox's sale of unqualified securities.

431.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

432.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTIETH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unlicensed Broker-Dealer**
**Cal. Corp. Code § 25501.5(a)**
**(Bibox)**

433.    Plaintiff realleges the allegations above.

434.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in California.

435.    The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law.  *Id*. § 25210.  Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1).  Upon recission and tender of the Tokens, such purchaser is entitled to recover the consideration paid for the Tokens plus interest at the legal rate, less the amount of any income received on the Tokens.  *Id.* § 25501.5(a)(2).  A purchaser who no longer owns the Tokens is entitled to damages in an amount equal to the difference between: (i) the price at which the security was brought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Tokens by the purchaser. *Id.* § 25501.5(a)(4).

436.    When issued, the Tokens were securities within the meaning of the California Securities Act.  *Id.* § 25019.  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in California.  *Id.* § 25004.

437.    On information and belief, Bibox transacted business as a broker-dealer or agent in California, including without limitation through solicitations directed by Bibox to California and received in California.

438.     Bibox was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

439.     Accordingly, Bibox has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

440.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

441.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-FIRST CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Cal. Corp. Code § 25504**
**(Individual Defendants)**

</div>

442.     Plaintiff realleges the allegations above.

443.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in California.

444.     Every person who directly or indirectly controls an entity liable under the California Securities Act for unlawfully selling unqualified securities  or for operating as an unregistered broker-dealer or agent in the sale of those securities as well as "every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions . . . are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 25504.

445.    When issued, the Tokens were securities within the meaning of the California Securities Act.  *Id.* § 25019.  On information and belief, Bibox offered and sold the Tokens to members of the Class in California.  The Tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act, and Bibox was not licensed or exempt from licensing as a broker-dealer or agent under California law.  *Id.* § 25210.

446.    On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in California, including without limitation through solicitations directed by Bibox to California and received in California.

447.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unqualified securities.

448.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the California Securities Act through Bibox's offer or sale of unqualified securities.

449.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

450.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-SECOND CAUSE OF ACTION**
**(COLORADO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Colo. Rev. Stat. § 11-51-604**
**(Bibox)**

451.    Plaintiff realleges the allegations above.

452.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in state of Colorado.

453.    The Colorado Securities Act forbids the sale of unregistered securities.  Colo. Rev. Stat. § 11-51-301.  Any person who sells a security in violation of Section 301 "is liable to the person buying the security from such seller for the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security.  Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition."  *Id.* § 11-51-604(1).

454.    When issued, the Tokens were securities within the meaning of the Colorado Securities Act.  *Id.* § 11-51-201(17).  On information and belief, Bibox sold the Tokens to members of the Class in the state of Colorado.  The Tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act.  *Id.* § 11-51-301.

455.    On information and belief, the Tokens were sold in the state of Colorado, including without limitation through solicitations directed by Bibox to the state of Colorado and received in the state of Colorado.

456.    Accordingly, Bibox has violated the Colorado Securities Act through Bibox's sale of unregistered securities.

457.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

458.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-THIRD CAUSE OF ACTION
### (COLORADO STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Colo. Rev. Stat. § 11-51-604**
**(Individual Defendants)**

459.     Plaintiff realleges the allegations above.

460.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Colorado.

461.     Every person who directly or indirectly controls an entity liable under the Colorado Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or sales representative in the sale of those securities, "is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Colo. Rev. Stat. § 11-51-604(5).

462.     When issued, the Tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17).  On information and belief, Bibox sold the Tokens to members of the Class in the state of Colorado and acted as the broker-dealer or sales representative for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act, and Bibox was not registered or

exempt from registration as a broker-dealer or sales representative under Colorado law. *Id.* §§ 11-51-301, 11-51-401(1).

463.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or sales representative in the state of Colorado, including without limitation through solicitations directed by Bibox to the state of Colorado and received in the state of Colorado.

464.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or sales representative as described herein.

465.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Colorado Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or sales representative.

466.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

467.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-FOURTH CAUSE OF ACTION**
**(CONNECTICUT STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Conn. Gen. Stat. § 36b-29**
**(Bibox)**

468.    Plaintiff realleges the allegations above.

112

469.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

470.     The Connecticut Uniform Securities Act forbids the offer or sale of unregistered securities.  Conn. Gen. Stat. § 36b-16.  Any person who offers or sells a security in violation of Section 36b-16 "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security."  *Id.* § 36b-29(a).

471.     When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act.  *Id.* § 36b-3(19).  Bibox offered or sold the Tokens to members of the Class in the state of Connecticut.  The Tokens were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act.  *Id.* § 36b-16.

472.     On information and belief, the Tokens were offered or sold in the state of Connecticut, including without limitation through solicitations directed by Bibox to the state of Connecticut and received in the state of Connecticut.

473.     Accordingly, Bibox has violated the Connecticut Uniform Securities Act through Bibox's sale of unregistered securities.

474.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

475.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-FIFTH CAUSE OF ACTION**
**(CONNECTICUT STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Conn. Gen. Stat. § 36b-29**
**(Bibox)**

476.     Plaintiff realleges the allegations above.

477.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

478.     The Connecticut Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Connecticut law.   Conn. Gen. Stat. § 36b-6(a).   Any person who offers or sells a security in violation of Section 36b-6(a) is "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security."   *Id.* § 36b-29(a).

479.     When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act.   *Id.* § 36b-3(19).   Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the state of Connecticut.   *Id.* § 36b-3(1) and (5).

480.     On information and belief, Bibox transacted business as a broker-dealer or agent in the state of Connecticut, including without limitation through solicitations directed by Bibox to the state of Connecticut and received in the state of Connecticut.

481.     Bibox was not registered as a broker-dealer or agent in the state of Connecticut, nor was it subject to any exemption from registration.

114

482.    Accordingly, Bibox has violated the Connecticut Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

483.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

484.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-SIXTH CAUSE OF ACTION
## (CONNECTICUT STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Conn. Gen. Stat. § 36b-29
### (Individual Defendants)

485.    Plaintiff realleges the allegations above.

486.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

487.    Every person who directly or indirectly controls an entity liable under the Connecticut Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a person, [and] every person occupying a similar status or performing similar functions," is jointly and severally liable "with and to the same extent" as the entity liable, unless "the person who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist."  Conn. Gen. Stat. § 36b-29(c).

488.    When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act.  *Id.* § 36b-3(19).  Bibox offered and sold the Tokens to members of the Class in the state of Connecticut and acted as the broker-dealer or agent for the sale and purchase

115

of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Connecticut law.  *Id.* §§ 36b-16, 36b-6(a).

489.    On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in the state of Connecticut, including without limitation through solicitations directed by Bibox to the state of Connecticut and received in the state of Connecticut.

490.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

491.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Connecticut Uniform Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

492.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

493.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-SEVENTH CAUSE OF ACTION**
**(DELAWARE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Del. Code tit. 6, § 73-605**
**(Bibox)**

494.    Plaintiff realleges the allegations above.

495.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Delaware.

496.    The Delaware Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Delaware law.  Del. Code tit. 6, § 73-301.  Any person who offers or sells a security in violation of Section 301 "is liable to the person buying . . . the security from or to him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security." *Id.* § 73-605(a)(1-2).

497.    When issued, the Tokens were securities within the meaning of the Delaware Securities Act.  *Id.* § 73-103(23).  Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the state of Delaware.  *Id.* § 73-103(1), (3).

498.    On information and belief, Bibox transacted business as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by Bibox to the state of Delaware and received in the state of Delaware.

499.    Bibox was not registered as a broker-dealer or agent in the state of Delaware.

500.    Accordingly, Bibox has violated the Delaware Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

501.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

502.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<p style="text-align:center"><strong>TWENTY-EIGHTH CAUSE OF ACTION<br>(DELAWARE STATE LAW – ADDITIONAL LIABILITY)<br>Control Person Liability<br>Del. Code tit. 6, § 73-605<br>(Individual Defendants)</strong></p>

503.    Plaintiff realleges the allegations above.

504.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Delaware.

505.    Every person who directly or indirectly controls an entity liable under the Delaware Securities Act for operating as an unregistered broker-dealer or agent, as well as "every partner, officer, or director of such a seller . . . [and] every person occupying a similar status or performing similar functions" is jointly and severally liable "unless the nonseller who is so liable sustains the burden of proof that the person did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Del. Code tit. 6, § 73-605(b).

506.    When issued, the Tokens were securities within the meaning of the Delaware Securities Act. *Id.* § 73-103(23). Bibox offered and sold the Tokens to members of the Class in the state of Delaware and acted as the broker-dealer or agent for the sale and purchase of those securities. Bibox was not registered as a broker-dealer or agent under Delaware law. *Id.* § 73-301.

507.     On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by Bibox to the state of Delaware and received in the state of Delaware.

508.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of securities and the operation of an unregistered broker-dealer or agent as described herein.

509.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Delaware Securities Act through Bibox's offer or sale of securities and operation as an unregistered broker-dealer or agent.

510.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

511.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-NINTH CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**D.C. Code Ann. § 31-5606.05**
**(Bibox)**

512.     Plaintiff realleges the allegations above.

513.     This Cause of Action is brought on behalf of Class members to whom the Tokens were offered or sold in the District of Columbia.

514.    The District of Columbia Securities and Investor Protection Act forbids the offer or sale of unregistered securities. D.C. Code Ann. § 31-5603.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

515.    When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Bibox offered or sold the Tokens to members of the Class in District of Columbia. The Tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act. *Id.* § 31.5601.01(31).

516.    On information and belief, the Tokens were offered or sold in District of Columbia, including without limitation through solicitations directed by Bibox to District of Columbia and received in District of Columbia.

517.    Accordingly, Bibox has violated the District of Columbia Securities and Investor Protection Act through Bibox's sale of unregistered securities.

518.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

519.     Class members who no longer own the Tokens seek damages for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTIETH CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**D.C. Code Ann. § 31-5606.05**
**(Individual Defendants)**

520.     Plaintiff realleges the allegations above.

521.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the District of Columbia.

522.     The District of Columbia Securities and Investor Protection Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under District of Columbia law.  D.C. Code Ann. § 31-5602.01.  Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

523.     When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the District of Columbia.  *Id.* § 36b-3(1) and (5).

524.    On information and belief, Bibox transacted business as a broker-dealer or agent in the District of Columbia, including without limitation through solicitations directed by Bibox to the District of Columbia and received in District of Columbia.

525.    Bibox was not registered as a broker-dealer or agent in the District of Columbia, nor was it subject to any exemption from registration.

526.    Accordingly, Bibox has violated the District of Columbia Securities and Investor Protection Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

527.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

528.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-FIRST CAUSE OF ACTION**
**(DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**D.C. Code Ann. § 31-5606.05**
**(Individual Defendants)**

</div>

529.    Plaintiff realleges the allegations above.

530.    This Cause of Action is brought on behalf of Class members to whom the Tokens were offered or sold in District of Columbia.

531.    Every person who directly or indirectly controls an entity liable under the District of Columbia Securities Act for unlawfully selling unregistered securities or for operation of an unlicensed broker-dealer, as well as "partner, officer, or director of the person liable" or "a person occupying a similar status or performing similar functions" is "liable jointly and severally with,

and to the same extent as the person liable, unless her or she is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution among the several persons so liable." D.C. Code Ann. § 31-5606.05(c).

532.    When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Bibox offered and sold the Tokens to members of the Class in District of Columbia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under District of Columbia law.

533.    On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in District of Columbia, including without limitation through solicitations directed by Bibox to District of Columbia and received in District of Columbia.

534.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and operation of an unregistered broker-dealer as described herein.

535.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the District of Columbia Securities and Investor Protection Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer.

536.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

537.     Class members who no longer own the Tokens seek damages for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-SECOND CAUSE OF ACTION
## (FLORIDA STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Fla. Stat. § 517.211
### (Bibox)

538.     Plaintiff realleges the allegations above.

539.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Florida.

540.     The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities.  Fla. Stat. § 517.07(1).  Any person who offers or sells a security in violation of Section 517.07(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees.  *Id.* § 517.211.

541.     When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act.  *Id.* § 517.021(22).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Florida.  The Tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act.  *Id.* §§ 517.051, 517.061.

542.     Upon information and belief, the Tokens were offered or sold in Florida, including without limitation through solicitations directed by Bibox to Florida and received in Florida.

124

543.    Accordingly, Bibox has violated the Florida Securities and Investor Protection Act through Bibox's sale of unregistered securities.

544.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

545.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-THIRD CAUSE OF ACTION**
**(FLORIDA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Fla. Stat. § 517.211**
**(Bibox)**

</div>

546.    Plaintiff realleges the allegations above.

547.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Florida.

548.    The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law.  Fla. Stat. § 517.12(1).  Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees.  *Id.* § 517.211.

549.    When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act.  *Id.* § 517.021(22).  On information and belief, Bibox transacted business as a dealer when it offered or sold the Tokens to members of the Class in Florida.  *Id.* § 517.021(6).

550.    On information and belief, Bibox transacted business as a dealer in Florida, including without limitation through solicitations directed by Bibox to Florida and received in Florida.

551.    Bibox was not registered as a dealer in Florida, nor was it subject to any exemption from registration.

552.    Accordingly, Bibox has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

553.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

554.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-FOURTH CAUSE OF ACTION**
**(FLORIDA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Fla. Stat. § 517.211**
**(Individual Defendants)**

555.    Plaintiff realleges the allegations above.

556.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Florida.

557.    Every person who directly or indirectly controls an entity liable under the Florida Securities and Investor Protection Act for unlawfully selling unregistered securities or for operating as an unregistered dealer in the sale of those securities, as well as "every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action

126

for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." *Id.* § 517.211(1).

558. When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Bibox offered and sold the Tokens to members of the Class in Florida and acted as the dealer for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Florida law. *Id.* § 517.12(1).

559. On information and belief, Bibox offered and sold the Tokens and acted as a dealer in Florida, including without limitation through solicitations directed by Bibox to Florida and received in Florida.

560. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer as described herein.

561. Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Florida Securities and Investor Protection Act through Bibox's offer or sale of unregistered securities and operation as an unregistered dealer.

562.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

563.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-FIFTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Ga. Code Ann. § 10-5-58**
**(Bibox)**

</div>

564.     Plaintiff realleges the allegations above.

565.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Georgia.

566.     The Georgia Uniform Securities Act forbids the sale of unregistered securities.  Ga. Code Ann. § 10-5-20.  Any person who sells a security in violation of Section 10-5-20 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

567.     When issued, the Tokens were securities within the meaning of the Georgia Uniform Securities Act.  *Id.* § 10-5-2(31).  On information and belief, Bibox sold the Tokens to members of the Class in Georgia.  The Tokens were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act.  *Id.* § 10-5-10.

568.     Upon information and belief, the Tokens were sold in Georgia, including without limitation through solicitations directed by Bibox to Georgia and received in Georgia.

569.     Accordingly, Bibox has violated the Georgia Uniform Securities Act through Bibox's sale of unregistered securities.

570.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

571.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-SIXTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ga. Code Ann. § 10-5-58**
**(Bibox)**

</div>

572.     Plaintiff realleges the allegations above.

573.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Georgia.

574.     The Georgia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Georgia law. Ga. Code Ann. §§ 10-5-30, 10-5-31.  Any person who sells a security in violation of Sections 10-5-30 or 10-5-31 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

575.     When issued, the Tokens were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Georgia. *Id.* §§ 10-5-2(1), (3).

576.     On information and belief, Bibox transacted business as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by Bibox to Georgia and received in Georgia.

577.     Bibox was not registered as a broker-dealer or agent in Georgia, nor was it subject to any exemption from registration.

578.     Accordingly, Bibox has violated the Georgia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

579.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

580.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-SEVENTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Ga. Code Ann. § 10-5-58**
**(Individual Defendants)**

581.     Plaintiff realleges the allegations above.

582.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Georgia.

583.     Every person who directly or indirectly controls an entity liable under the Georgia Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as as well as "[a]n individual who is a managing partner, executive officer, or director of a person liable" including "an individual having similar status or performing similar functions," "[a]n individual who is an employee of or associated with the person liable, and who materially aids the conduct giving rise

130

to the liability," and "[a] person who is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." *Id.* §§ 10-5-58(g).

584.    When issued, the Tokens were securities within the meaning of the Georgia Uniform Securities Act.  *Id.* § 10-5-2(31).  On information and belief, Bibox sold the Tokens to members of the Class in Georgia and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Georgia law.  *Id.* §§ 10-5-30, 10-5-31.

585.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by Bibox to Georgia and received in Georgia.

586.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

587.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Georgia Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

588.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

589.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-EIGHTH CAUSE OF ACTION**
**(HAWAII STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**HRS § 485A-509(d)**
**(Bibox)**

590.     Plaintiff realleges the allegations above.

591.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

592.     The Hawaii Uniform Securities Act forbids the offer or sale of unregistered securities.  HRS § 485A-301.  Any person who sells a security in violation of Section 485A-301 is "liable to the purchaser . . . the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(b).

593.     When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act.  *Id.* § 485A-102.  On information and belief, Bibox sold the Tokens to members of the Class in Hawaii.  The Tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act.  *Id.* § 485A-201.

594.    Upon information and belief, the Tokens were sold in Hawaii, including without limitation through solicitations directed by Bibox to Hawaii and received in Hawaii.

595.    Accordingly, Bibox has violated the Hawaii Uniform Securities Act through Bibox's sale of unregistered securities.

596.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

597.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-NINTH CAUSE OF ACTION
### (HAWAII STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### HRS § 485A-509(d)
### (Bibox)

598.    Plaintiff realleges the allegations above.

599.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

600.    The Hawaii Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Hawaii law. HRS § 485A-401(a).  Any person who sells a security in violation of Section 485A-401(a) is "liable to the purchaser . . . the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(d) (citing *Id.* § 485A-509(b)).

601.    When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act.  *Id.* § *Id.* § 485A-102.  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Hawaii.  *Id.* § *Id.* § 485A-402.

602.    On information and belief, Bibox transacted business as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by Bibox to Hawaii and received in Hawaii.

603.    Bibox was not registered as a broker-dealer or agent in Hawaii, nor was it subject to any exemption from registration.

604.    Accordingly, Bibox has violated the Hawaii Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

605.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

606.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTIETH CAUSE OF ACTION
### (HAWAII STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**HRS § 485A-509(g)**
**(Individual Defendants)**

607.    Plaintiff realleges the allegations above.

608.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

609.    Every person who directly or indirectly controls an entity liable under the Hawaii Uniform Securities Act for unlawfully selling unregistered securities or for operating as an

134

unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  HRS § 485A-509(g).

610.    When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act.  *Id.* § 485A-102.  On information and belief, Bibox sold the Tokens to members of the Class in Hawaii and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Hawaii law.  *Id.* § 485A-401(a).

611.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by Bibox to Hawaii and received in Hawaii.

612.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

613. Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Hawaii Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

614. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

615. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<p align="center"><strong>FORTY-FIRST CAUSE OF ACTION<br>(IDAHO STATE LAW – PRIMARY LIABILITY)</strong><br><strong>Unregistered Sale of Securities</strong><br><strong>I.C. § 30-14-509(b)</strong><br><strong>(Bibox)</strong></p>

616. Plaintiff realleges the allegations above.

617. This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

618. The Idaho Uniform Securities Act forbids the offer or sale of unregistered securities. I.C. § 30-14-301. Any person who sells a security in violation of Section 30-14-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3) of this section. *Id.* § 30-14-509(b)(1). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United

<p align="center">136</p>

States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

619.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act.  *Id.* § 30-14-102 (28).   On information and belief, Bibox sold the Tokens to members of the Class in Idaho.   The Tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act.  *Id.* § 30-14-201.

620.    Upon information and belief, the Tokens were sold in Idaho, including without limitation through solicitations directed by Bibox to Idaho and received in Idaho.

621.    Accordingly, Bibox has violated the Idaho Uniform Securities Act through Bibox's sale of unregistered securities.

622.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

623.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-SECOND CAUSE OF ACTION**
**(IDAHO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**I.C. § 30-14-509(d)**
**(Bibox)**

</div>

624.    Plaintiff realleges the allegations above.

625.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

626.    The Idaho Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Idaho law.  I.C. §§ 30-14-401(a), 30-14-402(a).  Any person who sells a security in violation of Sections 30-14-

401(a) and 30-14-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (3)." *Id.* § 30-14-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 30-14-509(b)(3). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

627.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Idaho. *Id.* §§ 30-14-102(2), 30-14-102(4).

628.    On information and belief, Bibox transacted business as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by Bibox to Idaho and received in Idaho.

629.    Bibox was not registered as a broker-dealer or agent in Idaho, nor was it subject to any exemption from registration.

630.    Accordingly, Bibox has violated the Idaho Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

631.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

632.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-THIRD CAUSE OF ACTION
### (IDAHO STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**I.C. § 30-14-509(g)**
**(Individual Defendants)**

633.    Plaintiff realleges the allegations above.

634.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

635.    Every person who directly or indirectly controls an entity liable under the Idaho Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. I.C. § 30-14-509(g).

636.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Idaho and acted as the broker-dealer or agent for the sale and purchase of those securities.  *Id.*  §§ 30-14-102(2), 30-14-102(4). The Tokens were neither registered under, nor

subject to exemption from registration under the Idaho Uniform Securities Act, and Bibox was not registered as a broker-dealer or agent under Idaho law.  *Id.* §§ 30-14-201, 30-14-202.

637.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by Bibox to Idaho and received in Idaho.

638.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

639.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Idaho Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

640.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

641.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-FOURTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Bibox)**

</div>

642.    Plaintiff realleges the allegations above.

643.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

644.     The Illinois Securities Law of 1953 forbids the sale of unregistered securities.  815 Ill. Comp. Stat. Ann. 5/5.  Any person who sells a security in violation of Section 5/5 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses."  *Id.* § 5/13.

645.     When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953.  *Id.* § 5/2.1.  Bibox sold the Tokens to Plaintiff and members of the Class in Illinois.  The Tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953.  *Id.* §§ 5/3, 5/4.

646.     The Tokens were sold in Illinois, including without limitation through solicitations directed by Bibox to Illinois and received in Illinois.

647.     Accordingly, Bibox has violated the Illinois Securities Law of 1953 through Bibox's sale of unregistered securities.

648.     Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of the original Complaint. Prior to filing the original Complaint, Plaintiff provided to Bibox, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months

141

after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

649.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

650.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.


## FORTY-FIFTH CAUSE OF ACTION
## (ILLINOIS STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer or Salesperson
### 815 Ill. Comp. Stat. Ann. 5/13
### (Bibox)

651.    Plaintiff realleges the allegations above.

652.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

653.    The Illinois Securities Law of 1953 forbids any person from transacting business as a dealer or salesperson unless he is registered or exempt from registration under Illinois law. 815 Ill. Comp. Stat. Ann. 5/8.  Any person who sells a security in violation of Section 5/8 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

654.   When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953.  *Id.* § 5/2.1.  Bibox transacted business as a dealer or salesperson when it sold the Tokens to Plaintiff and members of the Class in Illinois.  *Id.* §§ 5/2.7, 5/2.9.

655.   Bibox transacted business as a dealer or salesperson in Illinois, including without limitation through solicitations directed by Bibox to Illinois and received in Illinois.

656.   Bibox was not registered as a dealer or salesperson in Illinois, nor was it subject to any exemption from registration.

657.   Accordingly, Bibox has violated the Illinois Securities Law of 1953 by transacting business as an unregistered dealer or salesperson in the sale of securities.

658.   Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of the original Complaint. Prior to filing the original Complaint, Plaintiff provided to Bibox, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service."  *Id.* 5/13(B).

659.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

660.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-SIXTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Individual Defendants)**

</div>

661.    Plaintiff realleges the allegations above.

662.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

663.    Every person who directly or indirectly controls an entity liable under the Illinois Securities Law of 1953 for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser." *Id.* § 5/15(A).

664.    When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. Bibox sold the Tokens to members of the Class in Illinois and acted as the dealer or salesperson for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953, and Bibox was not registered or exempt from registration as a dealer or salesperson under Illinois law. *Id.* § 5/8.

<div align="center">144</div>

665.    Bibox sold the Tokens and acted as a dealer or salesperson in Illinois, including without limitation through solicitations directed by Bibox to Illinois and received in Illinois.

666.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or salesperson as described herein.

667.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Illinois Securities Law of 1953 through Bibox's sale of unregistered securities and operation as an unregistered dealer or salesperson.

668.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of this Complaint. Prior to filing this Complaint, Plaintiff has provided to Bibox, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of himself and the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

669.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

670.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-SEVENTH CAUSE OF ACTION**
**(INDIANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Indiana Code § 23-19-5-9(a)**
**(Bibox)**

</div>

671.     Plaintiff realleges the allegations above.

672.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

673.     The Indiana Uniform Securities Act forbids the offer or sale of unregistered securities. Indiana Code § 23-19-3-1. Any person who sells a security in violation of Section 23-19-3-1 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages. . . ." *Id.* § 23-19-5-9(a).

674.     When issued, the Tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Bibox sold the Tokens to members of the Class in Indiana. The Tokens were neither registered under, nor subject to exemption from registration under the Indiana Securities Act. *Id.* § 23-19-2-1

675.     Upon information and belief, the Tokens were sold in Indiana, including without limitation through solicitations directed by Bibox to Indiana and received in Indiana.

<div align="center">146</div>

676.     Accordingly, Bibox has violated the Indiana Uniform Securities Act through Bibox's sale of unregistered securities.

677.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

678.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-EIGHTH CAUSE OF ACTION**
**(INDIANA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**23-19-5-9(a)**
**(Bibox)**

</div>

679.     Plaintiff realleges the allegations above.

680.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

681.     The Indiana Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Indiana law. Indiana Code § 23-19-4-1(a).  Any person who sells a security in violation of Section 23-19-4-1(a) is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages. . . ." *Id.* § 23-19-5-9(a).

682.     When issued, the Tokens were securities within the meaning of the Indiana Securities Act.  *Id.* § 23-19-1-2(28).  On information and belief, Bibox transacted business as a

broker-dealer or agent when it  sold the Tokens to members of the Class in Indiana.  *Id.* § 23-19-1-2(1), (3).

683.    On information and belief, Bibox transacted business as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by Bibox to Indiana and received in Indiana.

684.    Bibox was not registered as a broker-dealer or agent in Indiana, nor was it subject to any exemption from registration.

685.    Accordingly, Bibox has violated the Indiana Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

686.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

687.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-NINTH CAUSE OF ACTION
### (INDIANA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Indiana Code § 23-19-5-9(d)**
**(Individual Defendants)**

688.    Plaintiff realleges the allegations above.

689.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

690.    Every person who directly or indirectly controls an entity liable under the Indiana Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable

with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist   Indiana Code § 23-19-5-9(d).

691.   When issued, the Tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28).  On information and belief, Bibox sold the Tokens to members of the Class in Indiana and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Indiana Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Indiana law.  *Id.* § 23-19-4-1(a).

692.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by Bibox to Indiana and received in Indiana.

693.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

694.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Indiana Uniform Securities Act through Bibox's  sale of unregistered securities and operation as an unregistered broker-dealer or agent.

695.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

696.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTIETH CAUSE OF ACTION**
**(IOWA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**I.C.A. § 502.509(2)**
**(Bibox)**

</div>

697.    Plaintiff realleges the allegations above.

698.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

699.    The Iowa Uniform Securities Act forbids the offer or sale of unregistered securities. I.C.A. § 502.301.  Any person who sells a security in violation of Section 502.301 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages. . . ." *Id.* § 502.509(2).

700.    When issued, the Tokens were securities within the meaning of the Iowa Securities Act.  *Id.* § 502.102(28) sold the Tokens to members of the Class in Iowa.  The Tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act.  *Id.* § 502.201.

701.    Upon information and belief, the Tokens were sold in Iowa, including without limitation through solicitations directed by Bibox to Iowa and received in Iowa.

<div align="center">150</div>

702.    Accordingly, Bibox has violated the Iowa Uniform Securities Act through Bibox's sale of unregistered securities.

703.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

704.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-FIRST CAUSE OF ACTION
### (IOWA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### I.C.A. § 502.509(4)
### (Bibox)

705.    Plaintiff realleges the allegations above.

706.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

707.    The Iowa Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Iowa law.  I.C.A. § 502.401(1).  Any person who sells a security in violation of Section 502.401(1) is "liable to the customer" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages. . . ." *Id.* § 502.509(4) (citing § 502.509(2)).

708.    When issued, the Tokens were securities within the meaning of the Iowa Securities Act.  *Id.* § 502.102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Iowa.  *Id.* § 502.102(2), (4).

151

709.     On information and belief, Bibox transacted business as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by Bibox to Iowa and received in Iowa.

710.     Bibox was not registered as a broker-dealer or agent in Iowa, nor was it subject to any exemption from registration.

711.     Accordingly, Bibox has violated the Iowa Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

712.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

713.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-SECOND CAUSE OF ACTION
### (IOWA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**I.C.A. § 502.509(7)**
**(Individual Defendants)**

714.     Plaintiff realleges the allegations above.

715.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

716.     Every person who directly or indirectly controls an entity liable under the Iowa Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable . . . including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the

seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  I.C.A. § 502.509(7)

717.   When issued, the Tokens were securities within the meaning of the Iowa Securities Act.  *Id.* § 502.102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Iowa and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Iowa law.  *Id.* § 502.401(1).

718.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by Bibox to Iowa and received in Iowa.

719.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

720.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Iowa Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

721.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

722.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-THIRD CAUSE OF ACTION**
**(KANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Kan. Stat. Ann. § 17-12a509**
**(Bibox)**

</div>

723.    Plaintiff realleges the allegations above.

724.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

725.    The Kansas Uniform Securities Act forbids the offer or sale of unregistered securities.  Kan. Stat. Ann. § 17-12a301.  Any person who sells a security in violation of Section 17-12a301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court, upon the tender of the security," or if the purchaser no longer owns the security, "[a]ctual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court."  *Id.* § 17-12a509(b).

726.    When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act.  *Id.* § 17-12a102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Kansas.  The Tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act.  *Id.* § 17-12a301.

727.    Upon information and belief, the Tokens were sold in Kansas, including without limitation through solicitations directed by Bibox to Kansas and received in Kansas.

728.    Accordingly, Bibox has violated the Kansas Uniform Securities Act through Bibox's sale of unregistered securities.

729.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

730.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-FOURTH CAUSE OF ACTION**
**(KANSAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Kan. Stat. Ann. § 17-12a509**
**(Bibox)**

</div>

731.    Plaintiff realleges the allegations above.

732.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

733.    The Kansas Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kansas law. Kan. Stat. Ann. § 17-12a401(a).  Any person acting as a broker-dealer who sells a security in violation of Section 17-12a401(a) is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security … upon the tender of the security, or for actual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it," and "interest from the date of the purchase at the rate provided for interest on judgments by Kan. Stat.

Ann. § 16-204, and amendments thereto, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 17-12a509(b)(1)-(3), (d).

734. When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Kansas. *Id.* § 17-12a102(2), (4).

735. On information and belief, Bibox transacted business as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by Bibox to Kansas and received in Kansas.

736. Bibox was not registered as a broker-dealer or agent in Kansas, nor was it subject to any exemption from registration.

737. Accordingly, Bibox has violated the Kansas Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

738. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

739. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-FIFTH CAUSE OF ACTION**
**(KANSAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Kan. Stat. Ann. § 17-12a509**
**(Individual Defendants)**

740. Plaintiff realleges the allegations above.

741. This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

742.     Every person who directly or indirectly controls an entity liable under the Kansas Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who is a managing partner, executive officer, or director" of such an entity, "including an individual having a similar status or performing similar functions," and any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual "sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Kan. Stat. Ann. § 17-12a509(g).

743.     When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act.  *Id.* § 17-12a102(28).   On information and belief, Bibox sold the Tokens to members of the Class in Kansas and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Kansas law. *Id.* §§ 17-12a301, 17-12a401.

744.     On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by Bibox to Kansas and received in Kansas.

745.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the

wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

746.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Kansas Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

747.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

748.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-SIXTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Ky. Rev. Stat. Ann. § 292.480**
**(Bibox)**

749.     Plaintiff realleges the allegations above.

750.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

751.     The Securities Act of Kentucky forbids the offer or sale of unregistered securities. Ky. Rev. Stat. Ann. § 292.340.  Any person who offers or sells a security in violation of Section 292.340 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the

158

security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

752.    When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Kentucky.  The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky. *Id.* § 292.340.

753.    Upon information and belief, the Tokens were offered or sold in Kentucky, including without limitation through solicitations directed by Bibox to Kentucky and received in Kentucky.

754.    Accordingly, Bibox has violated the Securities Act of Kentucky through Bibox's offer and sale of unregistered securities.

755.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

756.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-SEVENTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ky. Rev. Stat. Ann. § 292.480**
**(Bibox)**

</div>

757.    Plaintiff realleges the allegations above.

758.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

759.    The Securities Act of Kentucky forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kentucky law.

<div align="center">159</div>

Ky. Rev. Stat. Ann. § 292.330(1), (3).  Any person who offers or sells a security in violation of Section 292.330 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition."  *Id.* § 292.480(1).

760.    When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky.  *Id.* § 292.310(19).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Kentucky.  *Id.* § 292.310(1), (2).

761.    On information and belief, Bibox transacted business as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by Bibox to Kentucky and received in Kentucky.

762.    Bibox was not registered as a broker-dealer or agent in Kentucky, nor was it subject to any exemption from registration.

763.    Accordingly, Bibox has violated the Securities Act of Kentucky by transacting business as an unregistered broker-dealer or agent in the offer and sale of securities.

764.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

765.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-EIGHTH CAUSE OF ACTION
### (KENTUCKY STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Ky. Rev. Stat. Ann. § 292.480
### (Individual Defendants)

766.     Plaintiff realleges the allegations above.

767.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

768.     Every person who directly or indirectly controls an entity liable under the Securities Act of Kentucky for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.  Ky. Rev. Stat. Ann. § 292.480(4).

769.     When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky.  *Id.* § 292.310(19).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Kentucky and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Kentucky law.  *Id.* §§ 292.330, 292.340.

770.     On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by Bibox to Kentucky and received in Kentucky.

771.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

772.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Securities Act of Kentucky through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

773.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

774.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-NINTH CAUSE OF ACTION**
**(LOUISIANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**La. Stat. Ann. § 51:714**
**(Bibox)**

775.     Plaintiff realleges the allegations above.

776.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

777.    The Louisiana Securities Law forbids the offer or sale of unregistered securities. La. Stat. Ann. § 51:705.  Any person who offers or sells a security in violation of Section 51:705 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment."  *Id.* §§ 51:714(A); 51:712(A)(1).

778.    When issued, the Tokens were securities within the meaning of the Louisiana Securities Law.  *Id.* § 51:702(15)(b).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Louisiana.  The Tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law.  *Id.* § 51:705.

779.    Upon information and belief, the Tokens were offered or sold in Louisiana, including without limitation through solicitations directed by Bibox to Louisiana and received in Louisiana.

780.    Accordingly, Bibox has violated the Louisiana Securities Law through Bibox's offer and sale of unregistered securities.

781.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

782.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTIETH CAUSE OF ACTION**
**(LOUISIANA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**La. Stat. Ann. § 51:714**
**(Bibox)**

</div>

783.    Plaintiff realleges the allegations above.

784.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

785.    The Louisiana Securities Law forbids any dealer or salesman from offering for sale or selling any securities unless he is registered or exempt from registration under Louisiana law. La. Stat. Ann. § 51:703(1).  Any person who offers or sells a security in violation of Section 51:703 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment."  *Id.* §§ 51:714(A); 51:712(A)(1).

786.   When issued, the Tokens were securities within the meaning of the Louisiana Securities Law.  *Id.* § 51:702(15)(b).  On information and belief, Bibox transacted business as a dealer or salesman when it offered or sold the Tokens to members of the Class in Louisiana.  *Id.* § 51:702(5), (14).

787.   On information and belief, Bibox transacted business as a dealer or salesman in Louisiana, including without limitation through solicitations directed by Bibox to Louisiana and received in Louisiana.

788.   Bibox was not registered as a dealer or salesman in Louisiana, nor was it subject to any exemption from registration.

789.   Accordingly, Bibox has violated the Louisiana Securities Law by transacting business as an unregistered dealer or salesman in the offer or sale of securities.

790.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

791.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FIRST CAUSE OF ACTION**
**(LOUISIANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**La. Stat. Ann. § 51:714**
**(Individual Defendants)**

792.   Plaintiff realleges the allegations above.

793.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

794.   Every person who directly or indirectly controls an entity liable under the Louisiana Securities Act for unlawfully offering or selling unregistered securities or for operating as an

unregistered dealer or salesman in the offer or sale of those securities, as well as "every general partner, executive officer, or director of such [entity], every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the [entity] unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist."  La. Stat. Ann. § 51:714(B).

795.    When issued, the Tokens were securities within the meaning of the Louisiana Securities Law.  *Id.* § 51:702(15)(b).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Louisiana and acted as the dealer or salesman for the offer, sale, and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Louisiana law.  *Id.* §§ 51:703; 51:705.

796.    On information and belief, Bibox offered and sold the Tokens and acted as a dealer or salesman in Louisiana, including without limitation through solicitations directed by Bibox to Louisiana and received in Louisiana.

797.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

798.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Louisiana Securities Law through Bibox's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

799.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

800.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-SECOND CAUSE OF ACTION**
**(MAINE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Me. Rev. Stat. tit. 32, § 16509**
**(Bibox)**

</div>

801.    Plaintiff realleges the allegations above.

802.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Maine.

803.    The Maine Uniform Securities Act forbids the offer or sale of unregistered securities.  Me. Rev. Stat. tit. 32, § 16301.  Any person who sells a security in violation of Section 16301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court."  *Id.* § 16509(2).

804.    When issued, the Tokens were securities within the meaning of the Maine Uniform

Securities Act.  *Id.* § 16102(28).  On information and belief, Bibox sold the Tokens to members of

the Class in Maine.  The Tokens were neither registered under, nor subject to exemption from

registration under the Maine Uniform Securities Act.  *Id.* § 16301.

805.    Upon information and belief, the Tokens were sold in Maine, including without

limitation through solicitations directed by Bibox to Maine and received in Maine.

806.    Accordingly, Bibox has violated the Maine Uniform Securities Act through

Bibox's sale of unregistered securities.

807.    Class members who own the Tokens have made or will make any necessary tender

and seek all remedies available at law or in equity for any Tokens purchased in the Class Period,

including any applicable costs, attorneys' fees, and interest.

808.    Class members who no longer own the Tokens seek damages for any Tokens

purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-THIRD CAUSE OF ACTION**
**(MAINE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Me. Rev. Stat. tit. 32, § 16509**
**(Bibox)**

</div>

809.    Plaintiff realleges the allegations above.

810.    This Cause of Action is brought on behalf of Class members to whom Tokens were

sold in Maine.

811.    The Maine Uniform Securities Act forbids any person from transacting business as

a broker-dealer or agent unless he is registered or exempt from registration under Maine law.  Me.

Rev. Stat. tit. 32, §§ 16401(1), 16402(1).  Any person who sells a security in violation of Sections

16401(1) or 16402(1) is "liable to the purchaser," who "may maintain an action to recover the

consideration paid for the security, less the amount of any income received on the security, and

<div align="center">168</div>

the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

812.    When issued, the Tokens were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Maine. *Id.* § 16102(2), (4).

813.    On information and belief, Bibox transacted business as a broker-dealer or agent in Maine, including without limitation through solicitations directed by Bibox to Maine and received in Maine.

814.    Bibox was not registered as a broker-dealer or agent in Maine, nor was it subject to any exemption from registration.

815.    Accordingly, Bibox has violated the Maine Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

816.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

817.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-FOURTH CAUSE OF ACTION**
**(MAINE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Me. Rev. Stat. tit. 32, § 16509**
**(Individual Defendants)**

</div>

818.    Plaintiff realleges the allegations above.

<div align="center">169</div>

819.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Maine.

820.    Every person who directly or indirectly controls an entity liable under the Maine Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer or director" of such an entity, "including an individual having a similar status or performing similar functions," any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," and any "broker-dealer, agent, investment adviser or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  Me. Rev. Stat. tit. 32, § 16509(7).

821.    When issued, the Tokens were securities within the meaning of the Maine Uniform Securities Act.  *Id.* § 16102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Maine and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Maine law.  *Id.* §§ 16401(1), 16402(1).

822.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Maine, including without limitation through solicitations directed by Bibox to Maine and received in Maine.

823.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

824.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Maine Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

825.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

826.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-FIFTH CAUSE OF ACTION
### (MARYLAND STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Bibox)**

827.     Plaintiff realleges the allegations above.

828.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

829.     The Maryland Securities Act forbids the offer or sale of unregistered securities. Md. Code Ann., Corps. & Ass'ns § 11-501.  Any person who offers or sells a security in violation of Section 501 is "civilly liable to the person buying a security from him," who "may sue either at

law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

830. When issued, the Tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Bibox offered or sold the Tokens to members of the Class in Maryland. The Tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act. *Id.* § 11-501.

831. Upon information and belief, the Tokens were offered or sold in Maryland, including without limitation through solicitations directed by Bibox to Maryland and received in Maryland.

832. Accordingly, Bibox has violated the Maryland Securities Act through Bibox's offer and sale of unregistered securities.

833. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

834. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SIXTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Bibox)**

835.   Plaintiff realleges the allegations above.

836.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

837.   The Maryland Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Maryland law. Md. Code Ann., Corps. & Ass'ns § 11-401(a).  Any person who offers or sells a security in violation of Section 401(a) is "civilly liable to the person buying a security from him," who "may sue either at law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

838.   When issued, the Tokens were securities within the meaning of the Maryland Securities Act.  *Id.* § 11-101(s)(1).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Maryland. *Id.* § 11-101(b), (c).

173

839.     On information and belief, Bibox transacted business as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by Bibox to Maryland and received in Maryland.

840.     Bibox was not registered as a broker-dealer or agent in Maryland, nor was it subject to any exemption from registration.

841.     Accordingly, Bibox has violated the Maryland Securities Act by transacting business as an unregistered broker-dealer or agent in the offer or sale of securities.

842.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

843.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SEVENTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Individual Defendants)**

844.     Plaintiff realleges the allegations above.

845.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

846.     Every person who directly or indirectly controls an entity liable under the Maryland Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every person occupying a similar status or performing similar functions, every employee of the [entity] who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as

the [entity], unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  *Id.* § 11-703(c)(1).

847.    When issued, the Tokens were securities within the meaning of the Maryland Securities Act.  *Id.* § 11-101(s)(1).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Maryland and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Maryland law.  *Id.* § 11-401(a).

848.    On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by Bibox to Maryland and received in Maryland.

849.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

850.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Maryland Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

851.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

852.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-EIGHTH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Mass. Gen. Laws Ann. ch. 110A, § 410(a)**
**(Bibox)**

853.     Plaintiff realleges the allegations above.

854.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

855.     The Massachusetts Securities Act forbids the offer or sale of unregistered securities. Mass. Gen. Laws Ann. ch. 110A, § 301.  Any person who offers or sells a security in violation of Section 301 is "is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410(a).

856.     When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act.  *Id.* § 401(f).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Massachusetts.  The Tokens were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act.  *Id.* § 402.

857.     Upon information and belief, the Tokens were offered or sold in Massachusetts, including without limitation through solicitations directed by Bibox to Massachusetts and received in Massachusetts.

858.     Accordingly, Bibox has violated the Massachusetts Securities Act through Bibox's sale of unregistered securities.

859.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

860.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-NINTH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mass. Gen. Laws Ann. ch. 110A, § 410(a)**
**(Bibox)**

</div>

861.     Plaintiff realleges the allegations above.

862.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

863.     The Massachusetts Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Massachusetts law.  Mass. Gen. Laws Ann. ch. 110A, § 201.  Any person who offers or sells a security in violation of Section 201 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security."  *Id.* § 410.

864.     When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act.  *Id.* § 401(f).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Massachusetts.  *Id.* § 401(b),(c).

865.     On information and belief, Bibox transacted business as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by Bibox to Massachusetts and received in Massachusetts.

866.     Bibox was not registered as a broker-dealer or agent in Massachusetts, nor was it subject to any exemption from registration.

867.     Accordingly, Bibox has violated the Massachusetts Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

868.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

869.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTIETH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mass. Gen. Laws Ann. ch. 110A, §410(b)**
**(Individual Defendants)**

870.     Plaintiff realleges the allegations above.

871.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

872.     Every person who directly or indirectly controls an entity liable under the Massachusetts Securities Act for unlawfully selling unregistered securities or for operating as an

unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Mass. Gen. Laws Ann. ch. 110A, §410(b).

873.    When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act.  *Id.* § 401(f). On information and belief, Bibox offered and sold the Tokens to members of the Class in Massachusetts and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act, and Bibox was not registered as a broker-dealer or agent under Massachusetts law.  *Id.* §§ 201(a), 301.

874.    On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by Bibox to Massachusetts and received in Massachusetts.

875.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

876.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Massachusetts Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

877.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

878.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-FIRST CAUSE OF ACTION**
**(MICHIGAN STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Mich. Comp. Laws Ann. § 451.2509**
**(Bibox)**

</div>

879.     Plaintiff realleges the allegations above.

880.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Michigan.

881.     The Michigan Securities Act forbids the offer or sale of unregistered securities. Mich. Comp. Laws Ann. § 451.2301.  Any person who sells a security in violation of Section 451.2301 is "liable to the purchaser" who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security," or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

882.     When issued, the Tokens were securities within the meaning of the Michigan Securities Act.  *Id.* § 451.2102c.  On information and belief, Bibox sold the Tokens to members

of the Class in Michigan.  The Tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act.  *Id.* § 451.2201.

883.    Upon information and belief, the Tokens were sold in Michigan, including without limitation through solicitations directed by Bibox to Michigan and received in Michigan.

884.    Accordingly, Bibox has violated the Michigan Securities Act through Bibox's sale of unregistered securities.

885.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

886.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-SECOND CAUSE OF ACTION**
**(MICHIGAN STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mich. Comp. Laws Ann. § 451.2509**
**(Bibox)**

</div>

887.    Plaintiff realleges the allegations above.

888.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Michigan.

889.    The Michigan Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Michigan law.  Mich. Comp. Laws Ann. § 451.2401.  Any person who sells a security in violation of Section 451.2401 is "liable to the customer" who, if a purchaser, "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees

determined by the court, upon the tender of the security" or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

890.    When issued, the Tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c.  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Michigan.  *Id.* § 451.2102.

891.    On information and belief, Bibox transacted business as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by Bibox to Michigan and received in Michigan.

892.    Bibox was not registered as a broker-dealer or agent in Michigan, nor was it subject to any exemption from registration.

893.    Accordingly, Bibox has violated the Michigan Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

894.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

895.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTY-THIRD CAUSE OF ACTION
### (MICHIGAN STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Mich. Comp. Laws Ann. § 451.2509**
**(Individual Defendants)**

896.    Plaintiff realleges the allegations above.

897.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Michigan.

898.     Every person who directly or indirectly controls an entity liable under the Michigan Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director" of a person liable . . . including each individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Mich. Comp. Laws Ann. § 451.2509(7).

899.     When issued, the Tokens were securities within the meaning of the Michigan Securities Act.  *Id.* § 451.2102c.  On information and belief, Bibox sold the Tokens to members of the Class in Michigan and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act, *id.* § 451.2201, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Michigan law.  *Id.* § 451.2401.

900.     On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by Bibox to Michigan and received in Michigan.

901.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of

unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

902.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Michigan Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

903.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

904.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-FOURTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Minnesota Statutes § 80A.76(b)**
**(Bibox)**

</div>

905.    Plaintiff realleges the allegations above.

906.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

907.    The Minnesota Securities Act forbids the offer or sale of unregistered securities. Minnesota Statutes § 80A.49(c).  Any person who sells a security in violation of Section 80A.49(c) is "liable to the purchaser" for "consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 80A.76(b).

908.     When issued, the Tokens were securities within the meaning of the Minnesota Securities Act.  *Id.* § 80A.41(30).  On information and belief, Bibox sold the Tokens to members of the Class in Minnesota.  The Tokens were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act.  *Id.* § 80A.45.

909.     Upon information and belief, the Tokens were sold in Minnesota, including without limitation through solicitations directed by Bibox to Minnesota and received in Minnesota.

910.     Accordingly, Bibox has violated the Minnesota Securities Act through Bibox's sale of unregistered securities.

911.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

912.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-FIFTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Minnesota Statutes § 80A.76(d)**
**(Bibox)**

913.     Plaintiff realleges the allegations above.

914.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

915.     The Minnesota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Minnesota law. Minnesota Statutes § 80A.56(a).  Any person who sells a security in violation of Section 80A.56(a) is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at 6 percent per year from the

date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 80A.76(d)

916.    When issued, the Tokens were securities within the meaning of the Minnesota Securities Act.  *Id.* § 80A.41(30).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Minnesota.  *Id.* § 80A.41(3), (5).

917.    On information and belief, Bibox transacted business as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by Bibox to Minnesota and received in Minnesota.

918.    Bibox was not registered as a broker-dealer or agent in Minnesota, nor was it subject to any exemption from registration.

919.    Accordingly, Bibox has violated the Minnesota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

920.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

921.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-SIXTH CAUSE OF ACTION
### (MINNESOTA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Minnesota Statutes § 80A.76(g)**
**(Individual Defendants)**

922.    Plaintiff realleges the allegations above.

186

923.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

924.    Every person who directly or indirectly controls an entity liable under the Minnesota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable . . . including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  *Id.* § 80A.76(g).

925.    When issued, the Tokens were securities within the meaning of the Minnesota Securities Act.  *Id.* § 80A.41(30).  On information and belief, Bibox sold the Tokens to members of the Class in Minnesota and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Minnesota law.  *Id.* § 80A.56(a).

926.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by Bibox to Minnesota and received in Minnesota.

927.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the

wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

928.     Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Minnesota Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

929.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

930.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-SEVENTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Miss. Code Ann. § 75-71-509(b)**
**(Bibox)**

</div>

931.     Plaintiff realleges the allegations above.

932.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

933.     The Mississippi Securities Act forbids the offer or sale of unregistered securities. Miss. Code Ann. § 75-71-301.  "A person is liable to the purchaser if the person sells a security in violation of Section 75-71-301."  *Id.* § 75-71-509(b).  Such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the

<div align="center">188</div>

security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

934.    When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Mississippi.  The Tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act.  *Id.* § 75-71-301.

935.    Upon information and belief, the Tokens were sold in Mississippi, including without limitation through solicitations directed by Bibox to Mississippi and received in Mississippi.

936.    Accordingly, Bibox has violated the Mississippi Securities Act through Bibox's sale of unregistered securities.

937.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

938.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-EIGTH CAUSE OF ACTION
### (MISSISSIPPI STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Miss. Code Ann. § 75-71-509(d)
### (Bibox)

939.    Plaintiff realleges the allegations above.

940.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

941.    The Mississippi Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Mississippi law.

Miss. Code Ann. § 75-71-401(a). "A person acting as a broker-dealer or agent that sells or buys a security in violation of Section 75-71-401(a) … is liable to the customer," *id.* § 75-71-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

942.    When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Mississippi. *Id.* § 75-71-102(2), (4).

943.    On information and belief, Bibox transacted business as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by Bibox to Mississippi and received in Mississippi.

944.    Bibox was not registered as a broker-dealer or agent in Mississippi, nor was it subject to any exemption from registration.

945.    Accordingly, Bibox has violated the Mississippi Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

946.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

947.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-NINTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Miss. Code Ann. § 75-71-509(g)**
**(Individual Defendants)**

948.    Plaintiff realleges the allegations above.

949.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

950.    Every person who directly or indirectly controls an entity liable under the Mississippi Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist.  Miss. Code Ann. § 75-71-509(g).

951.    When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Mississippi and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Mississippi law.  *Id.* §§ 75-71-301, 75-71-401(a).

952.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by Bibox to Mississippi and received in Mississippi.

953.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

954.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Mississippi Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

955.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

956.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTIETH CAUSE OF ACTION**
**(MISSOURI STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Mo. Rev. Stat. § 409.5-509(b)**
**(Bibox)**

957.    Plaintiff realleges the allegations above.

958.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

959.     The Missouri Securities Act forbids the offer or sale of unregistered securities.  Mo. Rev. Stat. § 409.3-301.  "A person is liable to the purchaser if the person sells a security in violation of section 409.3-301," and such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

960.     When issued, the Tokens were securities within the meaning of the Missouri Securities Act.  *Id.* § 409.1-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Missouri.  The Tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act.  *Id.* § 409.3-301.

961.     Upon information and belief, the Tokens were sold in Missouri, including without limitation through solicitations directed by Bibox to Missouri and received in Missouri.

962.     Accordingly, Bibox has violated the Missouri Securities Act through Bibox's sale of unregistered securities.

963.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

964.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-FIRST CAUSE OF ACTION
### (MISSOURI STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Mo. Rev. Stat. § 409.5-509(d)**
**(Bibox)**

965.    Plaintiff realleges the allegations above.

966.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

967.    The Missouri Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Missouri law.  Mo. Rev. Stat. § 409.4-401(a).  "A person acting as a broker-dealer or agent that sells or buys a security in violation of section 409.4-401(a) … is liable to the customer," *id.* § 409.5-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

968.    When issued, the Tokens were securities within the meaning of the Missouri Securities Act.  *Id.* § 409.1-102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in the state of Missouri. *Id.* § 409.1-102(1), (4).

969.    On information and belief, Bibox transacted business as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by Bibox to Missouri and received in Missouri.

194

970.     Bibox was not registered as a broker-dealer or agent in Missouri, nor was it subject to any exemption from registration.

971.     Accordingly, Bibox has violated the Missouri Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

972.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

973.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SECOND CAUSE OF ACTION**
**(MISSOURI STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mo. Rev. Stat. § 409.5-509(g)**
**(Individual Defendants)**

</div>

974.     Plaintiff realleges the allegations above.

975.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

976.     Every person who directly or indirectly controls an entity liable under the Missouri Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist.  Mo. Rev. Stat. § 409.5-509(g).

<div align="center">195</div>

977.    When issued, the Tokens were securities within the meaning of the Missouri Securities Act.  *Id.* § 409.1-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in Missouri and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Missouri law.  *Id.* §§ 409.3-301, 409.4-401(a).

978.    On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by Bibox to Missouri and received in Missouri.

979.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

980.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Missouri Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

981.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

982.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-THIRD CAUSE OF ACTION**
**(MONTANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Mont. Code Ann. § 30-10-307(1)**
**(Bibox)**

983.    Plaintiff realleges the allegations above.

984.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Montana.

985.    The Montana Securities Act forbids the offer or sale of unregistered securities. Mont. Code Ann. § 30-10-202.  "Any person who offers or sells a security in violation of 30-10-202 … is liable to the person buying the security from the offeror or seller, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 10% a year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the buyer no longer owns the security" in "the amount that would be recoverable upon a tender less: (a) the value of the security when the buyer disposed of it; and (b) interest at 10% a year from the date of disposition."  *Id.* § 30-10-307(1).

986.    When issued, the Tokens were securities within the meaning of the Montana Securities Act.  *Id.* § 30-10-103(24).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Montana.  The Tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act.  *Id.* § 30-10-202.

987.    Upon information and belief, the Tokens were offered or sold in Montana, including without limitation through solicitations directed by Bibox to Montana and received in Montana.

197

988.    Accordingly, Bibox has violated the Montana Securities Act through Bibox's sale of unregistered securities.

989.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

990.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-FOURTH CAUSE OF ACTION**
**(MONTANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mont. Code Ann. § 30-10-307(2)**
**(Individual Defendants)**

</div>

991.    Plaintiff realleges the allegations above.

992.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Montana.

993.    "Every person who directly or indirectly controls a seller liable under subsection (1), every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of the seller, and every broker-dealer or salesperson who participates or materially aids in the sale is liable jointly and severally with and to the same extent as the seller if the nonseller knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist."  Mont. Code Ann. § 30-10-307(2).

994.    When issued, the Tokens were securities within the meaning of the Montana Securities Act.  *Id.* § 30-10-103(24).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Montana.  The Tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act.  *Id.* § 30-10-202.

995.    Bibox offered or sold the Tokens in Montana, including without limitation through solicitations directed by Bibox to Montana and received in Montana.

996.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

997.    Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Montana Securities Act through Bibox's offer and sale of unregistered securities.

998.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

999.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-FIFTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Neb. Rev. Stat. § 8-1118(1)**
**(Bibox)**

</div>

1000.    Plaintiff realleges the allegations above.

1001.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nebraska.

1002.    The Nebraska Securities Act forbids the offer or sale of unregistered securities. Neb. Rev. Stat. § 8-1104.  Any person who offers or sells a security in violation of section 8-1104

<div align="center">199</div>

… shall be liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security" in "the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition." *Id.* § 8-1118(1).

1003.  When issued, the Tokens were securities within the meaning of the Nebraska Securities Act.  *Id.* § 8-1101(15).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Nebraska.  The Tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act.  *Id.* § 8-1104.

1004.  Upon information and belief, the Tokens were offered or sold in Nebraska, including without limitation through solicitations directed by Bibox to Nebraska and received in Nebraska.

1005.  Accordingly, Bibox has violated the Nebraska Securities Act through Bibox's sale of unregistered securities.

1006.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1007.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-SIXTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Neb. Rev. Stat. § 8-1118(3)**

**(Individual Defendants)**

1008.   Plaintiff realleges the allegations above.

1009.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nebraska.

1010.   "Every person who directly or indirectly controls a person liable under subsections (1) … of this section, including every partner, limited liability company member, officer, director, or person occupying a similar status or performing similar functions of a partner, limited liability company member, officer, or director, or employee of such person who materially aids in the conduct giving rise to liability, and every broker-dealer, issuer-dealer, agent, investment adviser, or investment adviser representative who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Neb. Rev. Stat. § 8-1118(3).

1011.   When issued, the Tokens were securities within the meaning of the Nebraska Securities Act.  *Id.* § 8-1101(15).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Nebraska.  The Tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act.  *Id.* § 8-1104.

1012.   Bibox offered or sold the Tokens in Nebraska, including without limitation through solicitations directed by Bibox to Nebraska and received in Nebraska.

1013.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the

wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

1014.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Nebraska Securities Act through Bibox's offer and sale of unregistered securities.

1015.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1016.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SEVENTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Nev. Stat. § 90.660(1)(b)**
**(Bibox)**

</div>

1017.   Plaintiff realleges the allegations above.

1018.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nevada.

1019.   The Nevada Securities Act forbids the offer or sale of unregistered securities.  Nev. Stat. § 90.460.  "A person who offers or sells a security in violation of" Neb. Rev. Stat. § 90.460 "is liable to the person purchasing the security." *Id.* § 90.660.  "Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages" in "the amount that would be recoverable upon a tender less the value of the security when the

purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.*

1020.   When issued, the Tokens were securities within the meaning of the Nevada Securities Act.  *Id.* § 90.295.  On information and belief, Bibox offered or sold the Tokens to members of the Class in Nevada.  The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act.  *Id.* § 90.460.

1021.   Upon information and belief, the Tokens were offered or sold in Nevada, including without limitation through solicitations directed by Bibox to Nevada and received in Nevada.

1022.   Accordingly, Bibox has violated the Nevada Securities Act through Bibox's sale of unregistered securities.

1023.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1024.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-EIGHTH CAUSE OF ACTION
### (NEVADA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Nev. Stat. § 90.660(1)(a)**
**(Bibox)**

1025.   Plaintiff realleges the allegations above.

1026.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nevada.

1027.   The Nevada Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless the person is registered or exempt from registration under Nevada law.  Nev. Stat. § 90.310(1).  "A person who offers or sells a security in violation

of … Subsection 1 of [Nevada Securities Act Section] 90.310 … is liable to the person purchasing the security," who "may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security" or "[d]amages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.* § 90.660(1)(a).

1028.  When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295.  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in the state of Nevada. *Id.* §§ 90.220, 90.285.

1029.  On information and belief, Bibox transacted business as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Bibox to Nevada and received in Nevada.

1030.  Bibox was not registered as a broker-dealer or agent in Nevada, nor was it subject to any exemption from registration.

1031.  Accordingly, Bibox has violated the Nevada Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1032.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1033.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-NINTH CAUSE OF ACTION**
**(NEVADA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Nev. Stat. § 90.660(4)**
**(Individual Defendants)**

1034.   Plaintiff realleges the allegations above.

1035.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nevada.

1036.   Every person who directly or indirectly controls an entity liable under the Nevada Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or sales representative in the sale of those securities, as well as any "partner, officer or director of the [entity] liable, a person occupying a similar status or performing similar functions, any agent of the [entity] liable, an employee of the [entity] liable if the employee materially aids in the act, omission or transaction constituting the violation," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist.  Nev. Stat. § 90.660(4).

1037.   When issued, the Tokens were securities within the meaning of the Nevada Securities Act.  *Id.* § 90.295.  On information and belief, Bibox offered or sold the Tokens to members of the Class in Nevada and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Nevada law.  *Id.* §§ 90.310(1), 90.460.

1038.   Bibox offered or sold the Tokens and acted as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Bibox to Nevada and received in Nevada.

1039.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1040.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Nevada Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1041.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1042.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETIETH CAUSE OF ACTION
### (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**N.H. Rev. Stat. § 421-B:5-509(b)**
**(Bibox)**

1043.   Plaintiff realleges the allegations above.

1044.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1045.   The New Hampshire Uniform Securities Act forbids the offer or sale of unregistered securities.  N.H. Rev. Stat. § 421-B:3-301.  Any person who sells a security in violation of Section 421-B:3-301 is liable to the purchaser for "the consideration paid for the

security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3)." *Id.* § 421-B:5-509(b)(1). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

1046.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act.  *Id.* § 421-B:1-102(53)(A).  On information and belief, Bibox sold the Tokens to members of the Class in New Hampshire.  The Tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act.  *Id.* § 421-B:2-201.

1047.   Upon information and belief, the Tokens were sold in New Hampshire, including without limitation through solicitations directed by Bibox to New Hampshire and received in New Hampshire.

1048.   Accordingly, Bibox has violated the New Hampshire Uniform Securities Act through Bibox's sale of unregistered securities.

1049.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1050.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-FIRST CAUSE OF ACTION
### (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**N.H. Rev. Stat. § 421-B:5-509(d)**
**(Bibox)**

1051.   Plaintiff realleges the allegations above.

1052.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1053.   The New Hampshire Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Hampshire law.   N.H. Rev. Stat. §§ 421-B:4-401(a), 421-B:4-402(a).   Any person who sells a security in violation of Sections 421-B:4-401(a) and 421-B:4-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (c)(3) [*sic*]." ((b)(3)) *Id.* § 421-B:5-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 421-B:5-509(b)(3). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

1054.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act.   *Id.* § 421-B:1-102(53)(A).   On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in New Hampshire.   *Id.*   §§ 421-B:1-102(3), 421-B:1-102(6).

1055.   On information and belief, Bibox transacted business as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by Bibox to New Hampshire and received in New Hampshire.

1056.   Bibox was not registered as a broker-dealer or agent in New Hampshire, nor was it subject to any exemption from registration.

1057.   Accordingly, Bibox has violated the New Hampshire Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1058.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1059.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SECOND CAUSE OF ACTION**
**(NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.H. Rev. Stat. § 421-B:5-509(g)**
**(Individual Defendants)**

</div>

1060.   Plaintiff realleges the allegations above.

1061.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1062.   Every person who directly or indirectly controls an entity liable under the New Hampshire Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains

the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. N.H. Rev. Stat. § 421-B:5-509(g).

1063.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act.  *Id.* § 421-B:1-102(53)(A).  On information and belief, Bibox sold the Tokens to members of the Class in New Hampshire and acted as the broker-dealer or agent for the sale and purchase of those securities.  *Id.*  §§ 421-B:1-102(3), 421-B:1-102(6). The Tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act, and Bibox was not registered as a broker-dealer or agent under New Hampshire law.  *Id.* §§ 421-B:2-201, 421-B:2-202.

1064.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by Bibox to New Hampshire and received in New Hampshire.

1065.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1066.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the New Hampshire Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1067.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1068.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-THIRD CAUSE OF ACTION
### (NEW JERSEY STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**NJ Stat. Ann. § 49:3-71(a), (c)**
**(Bibox)**

1069.   Plaintiff realleges the allegations above.

1070.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1071.   The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities.  NJ Stat. Ann. § 49:3-60(e).  Any person who offers or sells a security in violation of Section 49:3-60 is "liable . . . an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security."  *Id.* § 49:3-71(c).

1072.   When issued, the Tokens were securities within the meaning of the New Jersey Securities Act.  *Id.* § 49:3-49(m).  On information and belief, Bibox offered or sold the Tokens to

members of the Class in New Jersey.  The Tokens were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act.  *Id.* § 49:3-50

1073.   Upon information and belief, the Tokens were offered or sold in New Jersey, including without limitation through solicitations directed by Bibox to New Jersey and received in New Jersey.

1074.   Accordingly, Bibox has violated the New Jersey Uniform Securities Act through Bibox's sale of unregistered securities.

1075.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1076.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FOURTH CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**NJ Stat. Ann. § 49:3-71(a)**
**(Bibox)**

</div>

1077.   Plaintiff realleges the allegations above.

1078.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1079.   The New Jersey Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Jersey law.  NJ Stat. Ann. § 49:3-56(a).  Any person who offers or sells a security in violation of Section 49:3-56(a) is "liable . . . an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing

the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

1080.   When issued, the Tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in New Jersey.  *Id.* § 49:3-49(b), (c).

1081.   On information and belief, Bibox transacted business as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by Bibox to New Jersey and received in New Jersey.

1082.   Bibox was not registered as a broker-dealer or agent in New Jersey, nor was it subject to any exemption from registration.

1083.   Accordingly, Bibox has violated the New Jersey Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1084.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1085.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FIFTH CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**NJ Stat. Ann. § 49:3-71(d)**
**(Individual Defendants)**

</div>

1086.   Plaintiff realleges the allegations above.

1087.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1088.   Every person who directly or indirectly controls an entity liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.   *Id.* §  49:3-71(d)

1089.   When issued, the Tokens were securities within the meaning of the New Jersey Securities Act.  *Id.* § 49:3-49(m).   On information and belief, Bibox offered and sold the Tokens to members of the Class in New Jersey and acted as the broker-dealer or agent for the sale and purchase of those securities.   The Tokens were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under New Jersey law.   *Id.* § 49:3-56(a).

1090.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by Bibox to New Jersey and received in New Jersey.

1091.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the

wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1092.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the New Jersey Uniform Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1093.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1094.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SIXTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**N.M. Stat. Ann. § 58-13C-509**
**(Bibox)**

</div>

1095.   Plaintiff realleges the allegations above.

1096.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1097.   The New Mexico Uniform Securities Act forbids the sale of unregistered securities. N.M. Stat. Ann. § 58-13C-301.  Any person who sells a security in violation of Section 58-13C-301 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between the price at which the security was sold and the value the security would have had at the time of

the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

1098.   When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD).  On information and belief, Bibox sold the Tokens to members of the Class in New Mexico.  The Tokens were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act.  *Id.* §§ 58-13C-201–202.

1099.   Upon information and belief, the Tokens were sold in New Mexico, including without limitation through solicitations directed by Bibox to New Mexico and received in New Mexico.

1100.   Accordingly, Bibox has violated the New Mexico Uniform Securities Act through Bibox's sale of unregistered securities.

1101.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1102.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-SEVENTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.M. Stat. Ann. § 58-13C-509**
**(Bibox)**

1103.   Plaintiff realleges the allegations above.

1104.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1105.   The New Mexico Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Mexico law.  N.M. Stat. Ann. §§ 58-13C-401–402.  Any person who sells a security in violation of Sections 58-13C-401 or 58-13C-402 is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between the price at which the security was sold and the value the security would have had at the time of the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

1106.   When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act.  *Id.* § 58-13C-102(DD).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in New Mexico. *Id.* §§ 58-13C-102(A), (C).

1107.   On information and belief, Bibox transacted business as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by Bibox to New Mexico and received in New Mexico.

1108.   Bibox was not registered as a broker-dealer or agent in New Mexico, nor was it subject to any exemption from registration.

1109.   Accordingly, Bibox has violated the New Mexico Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1110.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1111.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-EIGTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.M. Stat. Ann. § 58-13C-509**
**(Individual Defendants)**

</div>

1112.   Plaintiff realleges the allegations above.

1113.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1114.   Every person who directly or indirectly controls an entity liable under the New Mexico Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer or director of a person liable" and every "individual who is an employee of or associated with a person liable" is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that the person did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist." *Id.* § 58-13C-509(G).

1115.   When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD).  On information and belief, Bibox sold the Tokens to members of the Class in New Mexico and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption

218

from registration under the New Mexico Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under New Mexico law. *Id.* §§ 58-13C-(401)–(402).

1116.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by Bibox to New Mexico and received in New Mexico.

1117.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.   Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1118.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the New Mexico Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1119.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1120.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>NINETY-NINTH CAUSE OF ACTION</u>
<u>(NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)</u>
**Unregistered Offer and Sale of Securities**
**N.C. Gen. Stat. Ann. § 78A-56(a)**

**(Bibox)**

1121.   Plaintiff realleges the allegations above.

1122.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1123.   The North Carolina Securities Act forbids the offer or sale of unregistered securities.  N.C. Gen. Stat. Ann. § 78A-24.  Any person who offers or sells a security in violation of Section 24 is "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security."  Id. §§ 78A-56(a)(1)–(2).

1124.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act.  *Id.* §78A-2(11).  On information and belief, Bibox offered or sold the Tokens to members of the Class in North Carolina.  The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act.  *Id.* § 78A-24.

1125.   Upon information and belief, the Tokens were offered or sold in North Carolina, including without limitation through solicitations directed by Bibox to North Carolina and received in North Carolina.

1126.   Accordingly, Bibox has violated the North Carolina Securities Act through Bibox's sale of unregistered securities.

1127.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1128.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDREDTH CAUSE OF ACTION
## (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer
### N.C. Gen. Stat. Ann. §78A-36
### (Bibox)

1129.   Plaintiff realleges the allegations above.

1130.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1131.   The North Carolina Securities Act forbids any person from transacting business as a dealer or salesman unless he is registered under North Carolina law.  N.C. Gen. Stat. Ann §78A-36(a).  Any person who offers or sells a security in violation of Section 36(a) "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security."  Id. §§ 78A-56(a)(1)–(2).

1132.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act.  *Id.* §78A-2 (11).  On information and belief, Bibox transacted business as a dealer or salesman when it offered or sold the Tokens to members of the Class in North Carolina.  *Id.* §§ 78A-2 (2), (9).

1133.   On information and belief, Bibox transacted business as a dealer or salesman in North Carolina, including without limitation through solicitations directed by Bibox to North Carolina and received in North Carolina.

1134.   Bibox was not registered as a dealer or salesman in North Carolina, nor was it subject to any exemption from registration.

1135.   Accordingly, Bibox has violated the North Carolina Securities Act by transacting business as an unregistered dealer or salesman in the sale of securities.

1136.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1137.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FIRST CAUSE OF ACTION**
**(NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.C. Gen. Stat. Ann. § 78A-56(c)**
**(Individual Defendants)**

</div>

1138.   Plaintiff realleges the allegations above.

1139.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1140.   Every person who directly or indirectly controls an entity liable under the North Carolina Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered dealer or salesman in the sale of those securities, as well as every "partner, officer, or director of the person," "every person occupying a similar status or performing similar functions," as well as "every dealer or salesman who materially aids in the sale" is jointly and severally liable with and to the same extent as the person, unless "able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Id. §§ 78A-56(c)(1).

1141.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act.  *Id.* §78A-2 (11).  On information and belief, Bibox offered and sold the Tokens to members of the Class in North Carolina and acted as the dealer or salesman for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act, and Bibox was not registered or exempt from registration as a dealer or salesman under North Carolina law.  *Id.* 78A-24.

1142.   On information and belief, Bibox offered and sold the Tokens and acted as a dealer or salesman in North Carolina, including without limitation through solicitations directed by Bibox to North Carolina and received in North Carolina.

1143.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

1144.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the North Carolina Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

1145.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1146.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND SECOND CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**N.D.C.C. §10-04-17**
**(Bibox)**

1147.   Plaintiff realleges the allegations above.

1148.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1149.   The North Dakota Securities Act forbids the offer or sale of unregistered securities. N.D.C.C. §10-04-04.  Any person who unlawfully contracts to sell or sells an unregistered security is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17(1).

1150.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act.  *Id.* §10-04-02 (19).  On information and belief, Bibox offered or sold the Tokens to members of the Class in North Dakota.  The Tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act.  *Id.* § 10-04-04.

1151.   Upon information and belief, the Tokens were offered or sold in North Dakota, including without limitation through solicitations directed by Bibox to North Dakota and received in North Dakota.

1152.   Accordingly, Bibox has violated the North Dakota Securities Act through Bibox's sale of unregistered securities.

1153.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1154.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRD CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.D.C.C. §10-04-17**
**(Bibox)**

</div>

1155.   Plaintiff realleges the allegations above.

1156.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1157.   The North Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under North Dakota law. N.D.C.C. §10-04-10.  Any person who offers or sells a security in violation of Section 10 is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities."  Id. § 10-04-17 (1).

1158.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act.  *Id.* § 10-04-02(19).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in North Dakota. *Id.* §§ 10-04-02 (1), (3).

1159.   On information and belief, Bibox transacted business as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Bibox to North Dakota and received in North Dakota.

1160.   Bibox was not registered as a broker-dealer or agent in North Dakota, nor was it subject to any exemption from registration.

1161.   Accordingly, Bibox has violated the North Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1162.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1163.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FOURTH CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.D.C.C. §10-04-17**
**(Individual Defendants)**

1164.   Plaintiff realleges the allegations above.

1165.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1166.   Every person who directly or indirectly controls a seller liable under the North Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any person who "supervises, or serves as an officer, director, or managing partner of a person liable under this section," an individual "who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability," as well as every "person that is a

broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless that person or individual "did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." N.D.C.C. §10-04-17(6).

1167.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. *Id.* §10-04-02 (19).  On information and belief, Bibox offered and sold the Tokens to members of the Class in North Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under North Dakota law. *Id.* § 10-04-04.

1168.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Bibox to North Dakota and received in North Dakota.

1169.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1170.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the North Dakota Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1171.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1172.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FIFTH CAUSE OF ACTION**
**(OHIO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Ohio Rev. Code Ann. § 1707.43**
**(Bibox)**

</div>

1173.   Plaintiff realleges the allegations above.

1174.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1175.   The Ohio Securities Act forbids the sale of unregistered securities.  Ohio Rev. Code Ann. § 1707.09 (A)(1).  Any person who sells a security in violation of Section 9(A)(1) is liable to the purchaser "in an action at law in any court of competent jurisdiction" for "the full amount paid by the purchaser and for all taxable costs."  Id. § 1707.43(A).

1176.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act.  Id. § 1707.01(B).  On information and belief, Bibox sold the Tokens to members of the Class in Ohio.  The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act.  Id. § 1707.09.

1177.   The Tokens were  sold in Ohio, including without limitation through solicitations directed by Bibox to Ohio and received in Ohio.

1178.   Accordingly, Bibox has violated the Ohio Securities Act through Bibox's sale of unregistered securities.

1179.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1180.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND SIXTH CAUSE OF ACTION
### (OHIO STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Dealer**
**Ohio Rev. Code Ann. § 1707.43**
**(Bibox)**

1181.   Plaintiff realleges the allegations above.

1182.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1183.   The Ohio Securities Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Ohio law.   Ohio Rev. Code Ann. § 1707.14.   Any person who sells a security in violation of Section 14 is "liable to the purchaser "in an action at law in any court of competent jurisdiction" for " the full amount paid by the purchaser and for all taxable costs. Id. § 1707.43(A).

1184.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act.   *Id.* §1707.01(B).   On information and belief, Bibox transacted business as a dealer when it sold the Tokens to members of the Class in Ohio.   *Id.* §§ 1707 E (1).

1185.   On information and belief, Bibox transacted business as a dealer in Ohio, including without limitation through solicitations directed by Bibox to Ohio and received in Ohio.

1186.   Bibox was not registered as a dealer in Ohio, nor was it subject to any exemption from registration.

1187.   Accordingly, Bibox has violated the Ohio Securities Act by transacting business as an unregistered dealer in the sale of securities.

1188.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1189.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND SEVENTH CAUSE OF ACTION**
**(OHIO STATE LAW – ADDITIONAL LIABILITY)**
**Joint and Several Liability**
**Ohio Rev. Code Ann. § 1707.43**
**(Individual Defendants)**

</div>

1190.   Plaintiff realleges the allegations above.

1191.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1192.   Every person that has "participated in or aided the seller in any way in making" the sale or contract for sale, are "jointly and severally liable" to the purchaser. Ohio Rev. Code Ann. § 1707.43.

1193.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B).  On information and belief, Bibox sold the Tokens to members of the Class in Ohio and acted as the dealer for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act, and Bibox was not registered or exempt from registration as a dealer under Ohio law.  *Id.* §§ 1707.09, 1707.14.

<div align="center">230</div>

1194.   Bibox  sold the Tokens and acted as a dealer in Ohio, including without limitation through solicitations directed by Bibox to Ohio and received in Ohio.

1195.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer as described herein.

1196.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Ohio Securities Act through Bibox's sale of unregistered securities and operation as an unregistered dealer.

1197.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1198.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND EIGTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### Okla. Sta. Ann. tit. 71§ 1-509(C)
#### (Bibox)

1199.   Plaintiff realleges the allegations above.

1200.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1201.   The Oklahoma Securities Act forbids the offer or sale of unregistered securities. Okla. Sta. Ann. tit. 71 § 1-301.  Any person who offers or sells a security in violation of Section

301 is liable to the "purchaser may maintain an action at law or in equity to recover the consideration paid for the security, and interest at the legal rate of interest per year from the date of the purchase, less the amount of any income received on the security, plus costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" "*Id.* §1-509 (B)(1).

1202.   When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act.  *Id.* § 1-102 (32).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Oklahoma.  The Tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act.  *Id.* § 1-301.

1203.   Upon information and belief, the Tokens were offered or sold in Oklahoma, including without limitation through solicitations directed by Bibox to Oklahoma and received in Oklahoma.

1204.   Accordingly, Bibox has violated the Oklahoma Securities Act through Bibox's sale of unregistered securities.

1205.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1206.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND NINTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Okla. Sta. Ann. tit. 71§ 1-509 (D)**
**(Bibox)**

</div>

1207.   Plaintiff realleges the allegations above.

1208.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1209.   The Oklahoma Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Oklahoma law. Okla. Sta. Ann. tit. 71 § 1-401-2.  Any person who offers or sells a security in violation of Sections 401 and 402 is liable to the customer, if purchaser, who "may maintain an action at law or in equity for recovery of actual damages…" in " the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest per year from the date of purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 1-509 (D).

1210.   When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act.  *Id.* §1-102. On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Oklahoma.  *Id.* §§ 1-102(4), (2).

1211.   On information and belief, Bibox transacted business as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by Bibox to Oklahoma and received in Oklahoma.

1212.   Bibox was not registered as a broker-dealer or agent in Oklahoma, nor was it subject to any exemption from registration.

1213.   Accordingly, Bibox has violated the Oklahoma Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1214.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1215.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TENTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Okla. Sta. Ann. tit. 71§ 1-509 (G)**
**(Individual Defendants)**

</div>

1216.   Plaintiff realleges the allegations above.

1217.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1218.   Every person who directly or indirectly controls an entity liable under the Oklahoma Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director" of such seller, "including an individual having similar status or performing similar functions," every employee of  or associated with such a seller who materially aids in the sale" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Okla. Sta. Ann. tit. 71 § 1-509(G).

1219.   When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act.  *Id.* § 1-102. On information and belief, Bibox offered and sold the Tokens to members of the Class in Oklahoma and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from

<div align="center">234</div>

registration under the Oklahoma Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Oklahoma law. *Id.* § 1-401-02.

1220.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by Bibox to Oklahoma and received in Oklahoma.

1221.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.   Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1222.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Oklahoma Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1223.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1224.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND ELEVENTH CAUSE OF ACTION**
**(OREGON STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**O.R.S. § 59:115**
**(Bibox)**

</div>

1225.   Plaintiff realleges the allegations above.

1226.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1227.   The Oregon Securities Act forbids the offer or sale of unregistered securities. O.R.S. § 59:055.  Any person who offers or sells a security in violation of Section 55 "is liable to the purchaser," who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages."  Id. §§ 59.115 (2)(a)-(b).

1228.   When issued, the Tokens were securities within the meaning of the Oregon Securities Act.  *Id.* §59.015 (19).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Oregon.  The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act.  *Id.* § 59.055 .

1229.   Upon information and belief, the Tokens were offered or sold in Oregon, including without limitation through solicitations directed by Bibox to Oregon and received in Oregon.

1230.   Accordingly, Bibox has violated the Oregon Securities Act through Bibox's sale of unregistered securities.

1231.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1232.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND TWELFTH CAUSE OF ACTION
### (OREGON STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**O.R.S. § 59:115**
**(Bibox)**

1233.   Plaintiff realleges the allegations above.

1234.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1235.   The Oregon Securities Act forbids any person from transacting business as a broker-dealer or salesperson unless he is registered under Oregon law.  O.R.S. § 59:165.  Any person who offers or sells a security in violation of Section 165 is "liable to the purchaser" who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages."  Id. § 59.115 (2).

1236.   When issued, the Tokens were securities within the meaning of the Oregon Securities Act.  *Id.* §59.015 (19).  On information and belief, Bibox transacted business as a broker-dealer or salesperson when it offered or sold the Tokens to members of the Class in Oregon.  *Id.* § 59.015 (1),(18).

1237.   On information and belief, Bibox transacted business as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Bibox to Oregon and received in Oregon.

1238.   Bibox was not registered as a broker-dealer or salesperson in Oregon, nor was it subject to any exemption from registration.

237

1239.   Accordingly, Bibox has violated the Oregon Securities Act by transacting business as an unregistered broker-dealer or salesperson in the sale of securities.

1240.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1241.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTEENTH CAUSE OF ACTION**
**(OREGON STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**O.R.S. § 59:115 (3)**
**(Individual Defendants)**

</div>

1242.   Plaintiff realleges the allegations above.

1243.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1244.   Every person who directly or indirectly controls an entity liable under the Oregon Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or salesperson in the sale of those securities, as well as every "partner, limited liability company manager, including a member who is a manager, officer or director of such seller", "every person occupying a similar status or performing similar functions," and "every person who participated or materially aids in the sale" is liable for unlawfully selling unregistered securities, unless that nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care could not have known, of the existence of facts on which the liability is based." O.R.S. § 59:115 (3).

1245.   When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § O.R.S.§ 59.015 (19).   On information and belief, Bibox offered and sold the

Tokens to members of the Class in Oregon and acted as the broker-dealer or salesperson for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act, and Bibox was not registered as a broker-dealer or salesperson under Oregon law.  *Id.* § 59.165.

1246.   Bibox offered and sold the Tokens and acted as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Bibox to Oregon and received in Oregon.

1247.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or salesperson as described herein.

1248.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Oregon Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or salesperson.

1249.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1250.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FOURTEENTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**70 Pa. Stat. Ann. § 1-502**
**(Bibox)**

1251.   Plaintiff realleges the allegations above.

1252.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1253.   The Pennsylvania Securities Act forbids the offer or sale of unregistered securities. 70 Pa. Stat. Ann. § 1-201.  Any person who offers or sells a security in violation of Section 1-201 is "liable to the person purchasing the security offered or sold in violation of section 201 from him who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security."  *Id.* § 1-502.

1254.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act.  *Id.* § 1-102(t).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Pennsylvania.  The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act.  *Id.* § 1-202.

1255.   Upon information and belief, the Tokens were offered or sold in Pennsylvania, including without limitation through solicitations directed by Bibox to Pennsylvania and received in Pennsylvania.

1256.   Accordingly, Bibox has violated the Pennsylvania Securities Act through Bibox's sale of unregistered securities.

1257.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1258.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FIFTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**70 Pa. Stat. Ann. § 1-501(a)**
**(Bibox)**

1259.   Plaintiff realleges the allegations above.

1260.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1261.   The Pennsylvania Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Pennsylvania law. 70 Pa. Stat. Ann. § 1-301(a).  Any person who offers or sells a security in violation of Section 1-301(a) is "liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-501(a).

1262.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act.  *Id.* § 1-102(t).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Pennsylvania.  *Id.* § 1-102(c) ("Agent"), (e) ("Broker-dealer").

241

1263. On information and belief, Bibox transacted business as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Bibox to Pennsylvania and received in Pennsylvania.

1264. Bibox was not registered as a broker-dealer or agent in Pennsylvania, nor was it subject to any exemption from registration.

1265. Accordingly, Bibox has violated the Pennsylvania Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1266. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1267. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND SIXTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**70 Pa. Stat. Ann. § 1-503**
**(Individual Defendants)**

1268. Plaintiff realleges the allegations above.

1269. This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1270. Every affiliate of an entity liable under the Pennsylvania Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "partner, principal executive officer or director of such person" and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have

242

known, of the existence of the facts by reason of which liability is alleged to exist.   70 Pa. Stat. Ann. § 1-503(a).

1271.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act.  *Id.* § 1-102.  On information and belief, Bibox offered and sold the Tokens to members of the Class in Pennsylvania and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act, *id.* § 1-202, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Pennsylvania law.  *Id.* §§ 1-301, 1-302.

1272.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Bibox to Pennsylvania and received in Pennsylvania.

1273.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1274.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Pennsylvania Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1275.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1276.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND SEVENTEENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**10 L.P.R.A. § 890**
**(Bibox)**

</div>

1277.   Plaintiff realleges the allegations above.

1278.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Puerto Rico.

1279.   The Puerto Rico Securities Act forbids the offer or sale of unregistered securities. 10 L.P.R.A. § 871.  Any person who offers or sells a security in violation of Section 871 is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards . . . starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1280.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act.  *Id.* § 881.  On information and belief, Bibox offered or sold the Tokens to members of the Class in Puerto Rico.  The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act.  *Id.* § 882.

1281.   Upon information and belief, the Tokens were offered or sold in Puerto Rico, including without limitation through solicitations directed by Bibox to Puerto Rico and received in Puerto Rico.

1282.   Accordingly, Bibox has violated the Puerto Rico Securities Act through Bibox's sale of unregistered securities.

1283.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1284.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND EIGHTEENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**10 L.P.R.A. § 890**
**(Bibox)**

</div>

1285.   Plaintiff realleges the allegations above.

1286.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Puerto Rico.

1287.   The Puerto Rico Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Puerto Rico law.  10 L.P.R.A. § 861(a).  Any person who offers or sells a security in violation of Section 861(a) is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards . . . starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1288.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act.  *Id.* § 881.  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Puerto Rico.  *Id.*

1289.   On information and belief, Bibox transacted business as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Bibox to Puerto Rico and received in Puerto Rico.

1290.   Bibox was not registered as a broker-dealer or agent in Puerto Rico.

1291.   Accordingly, Bibox has violated the Puerto Rico Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1292.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1293.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND NINETEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**10 L.P.R.A. § 890**
**(Individual Defendants)**

1294.   Plaintiff realleges the allegations above.

1295.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Puerto Rico.

1296.   Every person who directly or indirectly controls an entity liable under the Puerto Rico Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller," and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care

246

could not have known, of the existence of the facts by reason of which liability is alleged to exist. 10 L.P.R.A. § 890(b).

1297.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act.  *Id.* § 881.   On information and belief, Bibox offered and sold the Tokens to members of the Class in Puerto Rico and acted as the broker-dealer or agent for the sale and purchase of those securities.   The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act, and Bibox was not registered as a broker-dealer or agent under Puerto Rico law.  *Id.* § 861(a).

1298.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Bibox to Puerto Rico and received in Puerto Rico.

1299.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.   Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1300.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Puerto Rico Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1301.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1302.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTIETH CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**7 R.I. Gen. Laws Ann. § 7-11-605**
**(Bibox)**

</div>

1303.   Plaintiff realleges the allegations above.

1304.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1305.   The Rhode Island Securities Act forbids the offer or sale of unregistered securities. 7 R.I. Gen. Laws Ann. § 7-11-301.  Any person who offers or sells a security in violation of Section 7-11-301 is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605.

1306.   When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act.  *Id.* § 7-11-101(22).  On information and belief, Bibox offered or sold the Tokens

<div align="center">248</div>

to members of the Class in Rhode Island.  The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act.  *Id.* § 7-11-401.

1307.   Upon information and belief, the Tokens were offered or sold in Rhode Island, including without limitation through solicitations directed by Bibox to Rhode Island and received in Rhode Island.

1308.   Accordingly, Bibox has violated the Rhode Island Securities Act through Bibox's sale of unregistered securities.

1309.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1310.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-FIRST CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**7 R.I. Gen. Laws Ann. § 7-11-605**
**(Bibox)**

</div>

1311.   Plaintiff realleges the allegations above.

1312.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1313.   The Rhode Island Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Rhode Island law. 7 R.I. Gen. Laws Ann. § 7-11-201(a).  Any person who offers or sells a security in violation of Section 7-11-201(a) is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as

determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605(a).

1314.   When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act.  *Id.* § 7-11-101(22).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Rhode Island. *Id.* § 7-11-101(1).

1315.   On information and belief, Bibox transacted business as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Bibox to Rhode Island and received in Rhode Island .

1316.   Bibox was not registered as a broker-dealer or agent in Rhode Island, nor was it subject to any exemption from registration.

1317.   Accordingly, Bibox has violated the Rhode Island Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1318.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1319.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-SECOND CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**R.I. Gen. Laws Ann. § 7-11-605(d)**

**(Individual Defendants)**

1320.   Plaintiff realleges the allegations above.

1321.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1322.   Every person who directly or indirectly controls an entity liable under the Rhode Island Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "a partner, officer, or director of the person liable" and "a person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. R.I. Gen. Laws Ann. § 7-11-605(d).

1323.   When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act.  *Id.* § 7-11-101(22).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Rhode Island and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act, *id.* § 7-11-401, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Rhode Island law.  *Id.* § 7-11-202.

1324.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Bibox to Rhode Island and received in Rhode Island.

1325.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged

herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1326.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Rhode Island Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1327.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1328.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-THIRD CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**S.C. Code Ann. § 35-1-509**
**(Bibox)**

1329.   Plaintiff realleges the allegations above.

1330.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in South Carolina.

1331.   The South Carolina Securities Act forbids the offer or sale of unregistered securities.  S.C. Code Ann. § 35-1-301.  Any person who sells a security in violation of Section 35-1-301 is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by

the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 35-1-509(b).

1332.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29).  On information and belief, Bibox sold the Tokens to members of the Class in South Carolina.  The Tokens were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act. *Id.* § 35-1-201.

1333.   Upon information and belief, the Tokens were sold in South Carolina, including without limitation through solicitations directed by Bibox to South Carolina and received in South Carolina.

1334.   Accordingly, Bibox has violated the South Carolina Securities Act through Bibox's sale of unregistered securities.

1335.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1336.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND TWENTY-FOURTH CAUSE OF ACTION
### (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### S.C. Code Ann. § 35-1-509
### (Bibox)

1337.   Plaintiff realleges the allegations above.

1338.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1339.   The South Carolina Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Carolina law.  S.C. Code Ann. § 35-1-401(a).  Any person who sells a security in violation of Section 35-1-401(a) is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 35-1-509(d), 35-1-509(b).

1340.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act.  *Id.* § 35-1-102(29).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Carolina.  *Id.* §§ 35-1-102(2) ("Agent"), 35-1-102(4) ("Broker-dealer").

1341.   On information and belief, Bibox transacted business as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Bibox to South Carolina and received in South Carolina.

1342.   Bibox was not registered as a broker-dealer or agent in South Carolina, nor was it subject to any exemption from registration.

1343.   Accordingly, Bibox has violated the South Carolina Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1344.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1345.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-FIFTH CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**S.C. Code Ann. § 31-1-509**
**(Individual Defendants)**

</div>

1346.   Plaintiff realleges the allegations above.

1347.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1348.   Every person who directly or indirectly controls an entity liable under the South Carolina Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an individual "who is a managing partner, executive officer, or director of a person liable, . . . including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. S.C. Code. Ann. § 31-1-509(g).

1349.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29).  On information and belief, Bibox sold the Tokens to members of the Class in South Carolina and acted as the broker-dealer or agent for the sale and purchase of those securities.   The Tokens were neither registered under, nor subject to exemption from

registration under the South Carolina Securities Act, *id.* § 35-1-201, and Bibox was not registered or exempt from registration as a broker-dealer or agent under South Carolina law. *Id.* § 35-1-401.

1350.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Bibox to South Carolina and received in South Carolina.

1351.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1352.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the South Carolina Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1353.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1354.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-SIXTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Sale of Unregistered Securities**
**S.D. Codified Laws § 47-31B-509(b)**
**(Bibox)**

1355.   Plaintiff realleges the allegations above.

256

1356.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1357.   The South Dakota Securities Act forbids the sale of unregistered securities.  S.D. Codified Laws § 47-31B-301.  Any person who sells a security in violation of Section 47-31B-301 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b).

1358.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act.  *Id.* § 47-31B-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in South Dakota.  The Tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act.  *Id.* §§ 47-31B-201-47-31B-203.

1359.   Upon information and belief, the Tokens were sold in South Dakota, including without limitation through solicitations directed by Bibox to South Dakota and received in South Dakota.

1360.   Accordingly, Bibox has violated the South Dakota Securities Act through Bibox's sale of unregistered securities.

1361.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1362.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND TWENTY-SEVENTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**S.D. Codified Laws § 47-31B-509(d)**
**(Bibox)**

1363.   Plaintiff realleges the allegations above.

1364.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1365.   The South Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Dakota law. S.D. Codified Laws § 47-31B-401(a).

1366.   .  Any person who sells a security in violation of Section 47-31B-401(a) is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b), (d).

1367.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Dakota. *Id.* § 47-31B-102(2), (4).

1368.   On information and belief, Bibox transacted business as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Bibox to South Dakota and received in South Dakota.

1369.   Bibox was not registered as a broker-dealer or agent in South Dakota, nor was it subject to any exemption from registration.

1370.   Accordingly, Bibox has violated the South Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1371.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1372.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND TWENTY-EIGHTH CAUSE OF ACTION
### (SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**S.D. Codified Laws § 47-31B-509**
**(Individual Defendants)**

1373.   Plaintiff realleges the allegations above.

1374.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1375.   Every person who directly or indirectly controls an entity liable under the South Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director . . .  employee of or associated with" an entity so liable is "liable jointly and severally with and to the same extent as" such a person.  S.D. Codified Laws § 47-31B-509.

1376.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act.  *Id.* § 47-31B-102(28).  On information and belief, Bibox sold the Tokens to members of the Class in South Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption

from registration under the South Dakota Securities Act, and Bibox was not registered as a broker-dealer or agent under South Dakota law.  *Id.* §§ 47-31B-301, 47-31B-401(a).

1377.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Bibox to South Dakota and received in South Dakota.

1378.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1379.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the South Dakota Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1380.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1381.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND TWENTY-NINTH CAUSE OF ACTION**
**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Tenn. Code Ann. § 48-1-122**
**(Bibox)**

</div>

1382.   Plaintiff realleges the allegations above.

1383.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1384.   The Tennessee Securities Act forbids the sale of unregistered securities.   Tenn. Code Ann. § 48-1-104(a).  Any person who sells a security in violation of Section 104(a) is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition."  *Id.* § 48-1-122(a).

1385.   When issued, the Tokens were securities within the meaning of the Tennessee Securities Act.  *Id.* § 48-1-102(20).  On information and belief, Bibox sold the Tokens to members of the Class in Tennessee.  The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act.  *Id.* § 48-1-103.

1386.   Upon information and belief, the Tokens were sold in Tennessee, including without limitation through solicitations directed by Bibox to Tennessee and received in Tennessee.

1387.   Accordingly, Bibox has violated the Tennessee Securities Act through Bibox's sale of unregistered securities.

1388.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1389.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND THIRTIETH CAUSE OF ACTION**
**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Tenn. Code Ann. § 48-1-122**
**(Bibox)**

1390.   Plaintiff realleges the allegations above.

1391.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1392.   The Tennessee Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Tennessee law. Tenn. Code Ann. § 48-1-109.  Any person who sells a security in violation of Section 109 is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1393.   When issued, the Tokens were securities within the meaning of the Tennessee Securities Act.  *Id.* § 48-1-102(20).  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Tennessee.  *Id.* § 48-1-102(3),(4).

1394.   On information and belief, Bibox transacted business as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Bibox to Tennessee and received in Tennessee.

1395.   Bibox was not registered as a broker-dealer or agent in Tennessee, nor was it subject to any exemption from registration.

1396.   Accordingly, Bibox has violated the Tennessee Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1397.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1398.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-FIRST CAUSE OF ACTION**
**(TENNESSEE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Tenn. Code Ann. § 48-1-122(g)**
**(Individual Defendants)**

</div>

1399.   Plaintiff realleges the allegations above.

1400.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1401.   Every person who directly or indirectly controls an entity liable under the Tennessee Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation" is "liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 48-1-122(g).

1402.   When issued, the Tokens were securities within the meaning of the Tennessee Securities Act.  *Id.* § 48-1-102(20).  On information and belief, Bibox sold the Tokens to members of the Class in Tennessee and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Tennessee law.  *Id.* §§ 48-1-104(a), 48-1-109.

1403.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Bibox to Tennessee and received in Tennessee.

1404.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1405.  Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Tennessee Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1406.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1407.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND THIRTY-SECOND CAUSE OF ACTION
### (TEXAS STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Texas Civ. St. Art. § 581-33 A
### (Bibox)

1408.   Plaintiff realleges the allegations above.

1409.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Texas.

1410.   The Texas Blue Sky Law – Securities forbids the offer or sale of unregistered securities.  Texas Civ. St. Art. § 581-7.  Any person who offers or sells a security in violation of Section 581-7 is "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1411.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities.  *Id.* § 581-4 A.  On information and belief, Bibox offered or sold the Tokens to members of the Class in Texas.   The Tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities.  *Id.* § 581-6.

1412.   Upon information and belief, the Tokens were offered or sold in Texas, including without limitation through solicitations directed by Bibox to Texas and received in Texas.

1413.   Accordingly, Bibox has violated the Texas Blue Sky Law – Securities through Bibox's sale of unregistered securities.

1414.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1415.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-THIRD CAUSE OF ACTION**
**(TEXAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Texas Civ. St. Art. § 581-33 A**
**(Bibox)**

</div>

1416.   Plaintiff realleges the allegations above.

1417.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Texas.

1418.   The Texas Blue Sky Law – Securities forbids any person from transacting business as a dealer or agent unless he is registered or exempt from registration under Texas law.  Texas Civ. St. Art. § 581-12.  Any person who offers or sells a security in violation of Sections 581-12 "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1419.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A.  On information and belief, Bibox transacted business as a dealer or agent when it offered or sold the Tokens to members of the Class in Texas. *Id.* §§ 581-4 C, 581-4 D.

1420.   On information and belief, Bibox transacted business as a dealer or agent in Texas, including without limitation through solicitations directed by Bibox to Texas and received in Texas.

1421.   Bibox was not registered as a dealer or agent in Texas, nor was it subject to any exemption from registration.

1422.   Accordingly, Bibox has violated the Texas Blue Sky Law – Securities by transacting business as an unregistered dealer or agent in the sale of securities.

1423.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1424.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND THIRTY-FOURTH CAUSE OF ACTION
### (TEXAS STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Texas Civ. St. Art. § 581-33 F**
**(Individual Defendants)**

1425.         Plaintiff realleges the allegations above.

1426.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Texas.

1427.   Every person who directly or indirectly controls an entity liable under the Texas Blue Sky Law – Securities for unlawfully selling unregistered securities or for operating as an

267

unregistered dealer or agent in the sale of those securities, is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Texas Civ. St. Art. § 581-33 F.

1428.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities.  *Id.* § 581-4 A.  On information and belief, Bibox offered and sold the Tokens to members of the Class in Texas and acted as the dealer or agent for the sale and purchase of those securities.  *Id.*  §§ 581-4 C, 581-4 D. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities, and Bibox was not registered or exempt from registration as a dealer or agent under Texas law.  *Id.* §§ 581-5, 581-6*.*

1429.   On information and belief, Bibox offered and sold the Tokens and acted as a dealer or agent in Texas, including without limitation through solicitations directed by Bibox to Texas and received in Texas.

1430.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

1431.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Texas Blue Sky Law – Securities through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1432.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1433.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND THIRTY-FIFTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
**Unregistered Offer and Sale of Securities**
**Utah Code §61-1-22**
**(Bibox)**

1434.   Plaintiff realleges the allegations above.

1435.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1436.   The Utah Securities Act forbids the offer or sale of unregistered securities.  Utah Code Ann. § 61-1-7.  Any person who offers or sells a security in violation of Section 61-1-7 is liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1437.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Bibox offered or sold the Tokens to members of the Class in Utah.  The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act. *Id.* § 61-14.

1438.   Upon information and belief, the Tokens were offered or sold in Utah, including without limitation through solicitations directed by Bibox to Utah and received in Utah.

269

1439.   Accordingly, Bibox has violated the Utah Securities Act through Bibox's sale of unregistered securities.

1440.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1441.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND THIRTY-SIXTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**Utah Code § 61-1-22**
**(Bibox)**

1442.   Plaintiff realleges the allegations above.

1443.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1444.   The Utah Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Utah law.  Utah Code § 61-1-3(1).  Any person who offers or sells a security in violation of Section 61-1-3(1)is "liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security."  *Id.* § 61-1-22(b).

1445.   When issued, the Tokens were securities within the meaning of the Utah Securities Act.  *Id.* § 61-1-13(ee).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Utah.  *Id.* § 61-1-13(b),(c).

1446.   On information and belief, Bibox transacted business as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Bibox to Utah and received in Utah.

1447.   Bibox was not registered as a broker-dealer or agent in Utah, nor was it subject to any exemption from registration.

1448.   Accordingly, Bibox has violated the Utah Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1449.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1450.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND THIRTY-SEVENTH CAUSE OF ACTION
### (UTAH STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Utah Code Ann. § 61-1-22**
**(Individual Defendants)**

1451.   Plaintiff realleges the allegations above.

1452.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1453.   Every person who directly or indirectly controls an entity liable under the Utah Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase" are liable jointly and severally

"with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Utah Code Ann. § 61-1-22.

1454.   When issued, the Tokens were securities within the meaning of the Utah Securities Act.  *Id.* § 61-1-13(ee).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Utah and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Utah law.  *Id.* §§ 61-1-3, 61-1-7.

1455.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Bibox to Utah and received in Utah.

1456.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1457.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Utah Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1458.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1459.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-EIGHTH CAUSE OF ACTION**
**(VERMONT STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Bibox)**

</div>

1460.   Plaintiff realleges the allegations above.

1461.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1462.   The Vermont Securities Act forbids the offer or sale of unregistered securities.  Vt. Stat. Ann. tit. 9, § 5309.  Any person who offers or sells a security in violation of Section 5309 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509.

1463.   When issued, the Tokens were securities within the meaning of the Vermont Securities Act.  *Id.* § 5102(28).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Vermont.  The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act.  *Id.* §§ 5201-5203.

1464.   Upon information and belief, the Tokens were offered or sold in Vermont, including without limitation through solicitations directed by Bibox to Vermont and received in Vermont.

1465.   Accordingly, Bibox has violated the Vermont Securities Act through Bibox's sale of unregistered securities.

1466.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1467.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND THIRTY-NINTH CAUSE OF ACTION**
**(VERMONT STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Bibox)**

</div>

1468.   Plaintiff realleges the allegations above.

1469.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1470.   The Vermont Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Vermont law.  Vt. Stat. Ann. tit. 9, § 5401.  Any person who offers or sells a security in violation of Section 5401 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509 (b),(d).

1471.   When issued, the Tokens were securities within the meaning of the Vermont Securities Act.  *Id.* § 5102(28).  On information and belief, Bibox transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Vermont.  *Id.* § 5102(1),(3).

1472.   On information and belief, Bibox transacted business as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Bibox to Vermont and received in Vermont.

1473.   Bibox was not registered as a broker-dealer or agent in Vermont, nor was it subject to any exemption from registration.

1474.   Accordingly, Bibox has violated the Vermont Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1475.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1476.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTIETH CAUSE OF ACTION
### (VERMONT STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Individual Defendants)**

1477.   Plaintiff realleges the allegations above.

1478.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1479.   Every person who directly or indirectly controls an entity liable under the Vermont Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "an individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions," is jointly and severally liable with the entity "unless the individual sustains the burden of proof that the

individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist."  Vt. Stat. Ann. tit. 9, § 5509(g).

1480.   When issued, the Tokens were securities within the meaning of the Vermont Securities Act.  *Id.* § 5102(28).  On information and belief, Bibox offered and sold the Tokens to members of the Class in Vermont and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Vermont law.  *Id.* §§ 5309, 5401.

1481.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Bibox to Vermont and received in Vermont.

1482.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1483.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Vermont Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1484.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1485.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-FIRST CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Va. Code Ann. § 13.1-522 A**
**(Bibox)**

</div>

1486.   Plaintiff realleges the allegations above.

1487.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1488.   The Virginia Securities Act forbids the offer or sale of unregistered securities.  Va. Code Ann. § 13.1-507.  Any person who sells a security in violation of Section 13.1-507 "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1489.   When issued, the Tokens were securities within the meaning of the Virginia Securities Act.  *Id.* § 13.1-501 A.  On information and belief, Bibox sold the Tokens to members of the Class in Virginia.  The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act.  *Id.* § 13.1-514 A.

1490.   Upon information and belief, the Tokens were sold in Virginia, including without limitation through solicitations directed by Bibox to Virginia and received in Virginia.

<div align="center">277</div>

1491.   Accordingly, Bibox has violated the Virginia Securities Act through Bibox's sale of unregistered securities.

1492.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1493.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTY-SECOND CAUSE OF ACTION
### (VIRGINIA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Va. Code Ann. § 13.1-522 A
### (Bibox)

1494.   Plaintiff realleges the allegations above.

1495.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1496.   The Virginia Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Virginia law.  Va. Code Ann. § 13.1-504 A.  Any person who sells a security in violation of Section 13.1-504 A "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1497.   When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A.  On information and belief, Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Virginia. *Id.*

278

1498.   On information and belief, Bibox transacted business as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Bibox to Virginia and received in Virginia.

1499.   Bibox was not registered as a broker-dealer or agent in Virginia, nor was it subject to any exemption from registration.

1500.   Accordingly, Bibox has violated the Virginia Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1501.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1502.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<u>ONE HUNDRED AND FORTY-THIRD CAUSE OF ACTION</u>
<u>(VIRGINIA STATE LAW – ADDITIONAL LIABILITY)</u>
**Control Person Liability**
**Va. Code Ann. § 13.1-522 C**
**(Individual Defendants)**

1503.   Plaintiff realleges the allegations above.

1504.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1505.   Every person who directly or indirectly controls an entity liable under the Virginia Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known,

of the existence of the facts by reason of which liability is alleged to exist.  Va. Code Ann. § 13.1-522 C.

1506.   When issued, the Tokens were securities within the meaning of the Virginia Securities Act.  *Id.* § 13.1-501 A.  On information and belief, Bibox sold the Tokens to members of the Class in Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act, and Bibox was not registered as a broker-dealer or agent under Virginia law.  *Id.* §§ 13.1-514, 13.1-514.1.

1507.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Bibox to Virginia and received in Virginia.

1508.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1509.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Virginia Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1510.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1511.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FORTY-FOURTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Wash. Rev. Code § 21.20.430(1)**
**(Bibox)**

1512.   Plaintiff realleges the allegations above.

1513.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Washington.

1514.   The Securities Act of Washington forbids the offer or sale of unregistered securities.  Wash. Rev. Code §21.20.140.  Any person who offers or sells a security in violation of Section 21.20.140 is "liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. "  *Id.* § 21.20.430(1).

1515.   When issued, the Tokens were securities within the meaning of the Securities Act of Washington.  *Id.* § 21.20.005(17).  On information and belief, Bibox offered or sold the Tokens to members of the Class in Washington.  The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Washington.  *Id.* § 21.20.310.

1516.   Upon information and belief, the Tokens were offered or sold in Washington, including without limitation through solicitations directed by Bibox to Washington and received in Washington.

1517.   Accordingly, Bibox has violated the Securities Act of Washington through Bibox's sale of unregistered securities.

1518.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1519.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-FIFTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Wash. Rev. Code Ann. § 21.20.430**
**(Individual Defendants)**

</div>

1520.   Plaintiff realleges the allegations above.

1521.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Washington.

1522.   Every person who directly or indirectly controls an entity liable under the Securities Act of Washington for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions . . . are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 21.20.430(3).

1523.   When issued, the Tokens were securities within the meaning of the Washington Securities Act. *Id.* § 21.20.005(17).  On information and belief, Bibox sold the Tokens to members of the Class in Washington.  The Tokens were neither registered under, nor subject to exemption from registration under the Washington Securities Act.

1524.   On information and belief, Bibox sold the Tokens in Washington, including without limitation through solicitations directed by Bibox to Washington and received in Washington.

1525.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities.

1526.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Washington Securities Act through Bibox's sale of unregistered securities.

1527.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1528.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-SIXTH CAUSE OF ACTION**
**(WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer or Sale of Securities**
**W. Va. Code Ann. § 32-4-410(a)**
**(Bibox)**

</div>

1529.   Plaintiff realleges the allegations above.

1530.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1531.   The West Virginia Uniform Securities Act forbids the offer or sale of unregistered securities.  W. Va. Code Ann. § 32-3-301.  Any person who offers or sells a security in violation of Section 32-3-301 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1532.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act.  *Id.* § 32-4-401(n).  On information and belief, Bibox offered or sold the Tokens to members of the Class in West Virginia.  The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act.  *Id.* § 32-4-402.

1533.   Upon information and belief, the Tokens were offered or sold in West Virginia, including without limitation through solicitations directed by Bibox to West Virginia and received in West Virginia.

1534.   Accordingly, Bibox has violated the West Virginia Uniform Securities Act through Bibox's sale of unregistered securities.

284

1535.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1536.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FORTY-SEVENTH CAUSE OF ACTION**
**(WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**W. Va. Code Ann. § 32-2-201**
**(Bibox)**

</div>

1537.   Plaintiff realleges the allegations above.

1538.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1539.   The West Virginia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under West Virginia law.  *Id.* § 32-2-201.  Any person who offers or sells a security in violation of Section 32-2-201 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1540.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act.  *Id.* § 32-4-401(n).  On information and belief, Bibox transacted business

as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in West Virginia. *Id.* §§ 32-4-401(b), 32-4-401(c).

1541.   On information and belief, Bibox transacted business as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Bibox to West Virginia and received in West Virginia.

1542.   Bibox was not registered as a broker-dealer or agent in West Virginia.

1543.   Accordingly, Bibox has violated the West Virginia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1544.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1545.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FORTY-EIGHTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**W. Va. Code Ann. § 32-4-410**
**(Individual Defendants)**

1546.   Plaintiff realleges the allegations above.

1547.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1548.   Every person who directly or indirectly controls an entity liable under the West Virginia Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions . . . are also liable jointly and severally with and to the same extent as the seller, unless

286

the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  *Id.* § 32-4-410(b).

1549.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act.  *Id.* § 32-4-401(n).  On information and belief, Bibox offered and sold the Tokens to members of the Class in West Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities.  The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act, and Bibox was not registered as a broker-dealer or agent under West Virginia law.  *Id.* § 32-2-201.

1550.   On information and belief, Bibox offered and sold the Tokens and acted as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Bibox to West Virginia and received in West Virginia.

1551.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1552.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the West Virginia Uniform Securities Act through Bibox's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1553.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1554.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND FORTY-NINTH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**Wis. Stat. § 551.509**
**(Bibox)**

1555.   Plaintiff realleges the allegations above.

1556.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1557.   The Wisconsin Uniform Securities Law forbids the sale of unregistered securities. Wis. Stat. § 551.301.  Any person who sells a security in violation of Section 301 is liable to the purchaser for the "consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)."  *Id.* § 551.509(2)(a).  Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court."  *Id.* § 551.509(2)(c).

1558.   When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law.  *Id.* § 551.102(28).  On information and belief, Bibox sold the Tokens to members of the Class in the state of Wisconsin.  The Tokens were neither registered under, nor

subject to exemption from registration under the Wisconsin Uniform Securities Law. *Id.* § 551.301.

1559.   On information and belief, the Tokens were offered or sold in the state of Wisconsin, including without limitation through solicitations directed by Bibox to the state of Wisconsin and received in the state of Wisconsin.

1560.   Accordingly, Bibox has violated the Wisconsin Uniform Securities Law through Bibox's sale of unregistered securities.

1561.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1562.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE HUNDRED AND FIFTIETH CAUSE OF ACTION**
**(WISCONSIN STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Wis. Stat. § 551.509**
**(Bibox)**

</div>

1563.   Plaintiff realleges the allegations above.

1564.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1565.   The Wisconsin Uniform Securities Law forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wisconsin law.  Wis. Stat. §§ 551.401(1), 551.402(1).   Any "person acting as a broker-dealer or agent that sells . . . a security in violation" of Sections 401 or 402 is "is liable to the customer . . . [who] if a purchaser, may maintain an action for recovery of actual damages as specified in sub. (2)(a) to (c)" (*Id.* § 551.509(4)) which in turn provide that a purchaser may "recover the

<div align="center">289</div>

consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court." *Id.* 551.509(2)(c).

1566.   When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). Bibox transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in the state of Wisconsin. *Id.* § 551.102(2), (4).

1567.   On information and belief, Bibox transacted business as a broker-dealer or agent in the state of Wisconsin, including without limitation through solicitations directed by Bibox to the state of Wisconsin and received in the state of Wisconsin.

1568.   Bibox was not registered as a broker-dealer or agent in the state of Wisconsin, nor was it subject to any exemption from registration.

1569.   Accordingly, Bibox has violated the Wisconsin Uniform Securities Law by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1570.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1571.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED ANF FIFTY-FIRST CAUSE OF ACTION
## (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)
**Control Person Liability**
**Wis. Stat. Ann. § 551.509**
**(Individual Defendants)**

1572.   Plaintiff realleges the allegations above.

1573.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1574.   Every person who directly or indirectly controls an entity liable under the Wisconsin Uniform Securities Law for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable under subs. (2) to (6), including an individual having a similar status or performing similar functions," is jointly and severally liable "unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist."  Wis. Stat. Ann. § 551.509(7)(d).

1575.   When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law.  *Id.* § 551.102(28).  On information and belief, Bibox sold the Tokens to members of the Class in the state of Wisconsin and acted as the broker-dealer or agent for the sale and purchase of those securities.   The Tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Wisconsin law.  *Id.* §§ 551.301, 551.401(1), 551.402(1).

1576.   On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in the state of Wisconsin, including without limitation through solicitations directed by Bibox to the state of Wisconsin and received in the state of Wisconsin.

1577.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1578.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Wisconsin Uniform Securities Law through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1579.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1580.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FIFTY-SECOND CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
**Unregistered Sale of Securities**
**Wyo. Stat. Ann. § 17-4-509(b)**
**(Bibox)**

1581.   Plaintiff realleges the allegations above.

1582.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1583.   The Wyoming Uniform Securities Act forbids the offer or sale of unregistered securities.  Wyo. Stat. Ann. § 17-4-301.  Any person who sells a security in violation of Section 17-4-301 is liable to the purchaser, who "may maintain an action to recover the consideration paid

for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *Id.* § 17-4-509(b)(i). If the purchaser no longer owns the security, then he may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(b)(iii).

1584. When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Bibox offered or sold the Tokens to members of the Class in Wyoming. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act. *Id.* § 17-4-201 - 204.

1585. Upon information and belief, the Tokens were offered or sold in Wyoming, including without limitation through solicitations directed by Bibox to Wyoming and received in Wyoming.

1586. Accordingly, Bibox has violated the Wyoming Uniform Securities Act through Bibox's sale of unregistered securities.

1587. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1588. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDRED AND FIFTY-THIRD CAUSE OF ACTION**
**(WYOMING STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Wyo. Stat. Ann. § 17-4-509(d)**
**(Bibox)**

1589.  Plaintiff realleges the allegations above.

1590.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1591.  The Wyoming Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wyoming law.  *Id.* §§ 17-4-401, 17-4-402.  Any person acting as a broker-dealer or agent who sells a security in violation of Sections 17-4-401(a) or 17-4-402(a) is liable to the customer.  *Id.* § 17-4-509(d).  The "customer, if a purchaser may maintain an action for recovery of actual damages as specified in paragraphs (b)(i) through (b)(iii) of this section."  *Id.*  Pursuant to § 17-4-509(b)(i) the purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security."  *See Id.* § 17-4-509(d) (citing to § 17-4-509(b)(i) for recovery).  If the purchaser no longer owns the security, then pursuant to § 17-4-509(b)(iii), the purchaser may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court."  *Id.* § 17-4-509(d) (citing to § 17-4-509(b)(iii) for recovery).

1592.  When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act.  *Id.* § 17-4-102(a)(xxviii).  On information and belief, Bibox transacted

business as a broker-dealer or agent when it sold the Tokens to members of the Class in Wyoming. *Id.* § 17-4-102(a)(ii) and (iv).

1593.   On information and belief, Bibox transacted business as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Bibox to Wyoming and received in Wyoming.

1594.   Bibox was not registered as a broker-dealer or agent in Wyoming, nor was it subject to any exemption from registration.

1595.   Accordingly, Bibox has violated the Wyoming Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1596.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1597.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FIFTY-FOURTH CAUSE OF ACTION
### (WYOMING STATE LAW – ADDITIONAL LIABILITY LIABILITY)
### Control Person Liability
### Wyo. Stat. Ann. § 17-4-509(g)
### (Individual Defendants)

1598.   Plaintiff realleges the allegations above.

1599.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Wyoming.

1600.   Every person who directly or indirectly controls a person liable under the Wyoming Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every managing partner, executive officer, or director of such a seller, including every person having a similar

295

status or performing similar functions . . . is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. *Id.* §§ 17-4-509(g)(i) – (iv).

1601. When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Bibox sold the Tokens to members of the Class in Wyoming and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act, and Bibox was not registered or exempt from registration as a broker-dealer or agent under Wyoming law. *Id.* §§ 17-4-401(a), 17-4-402(a).

1602. On information and belief, Bibox sold the Tokens and acted as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Bibox to Wyoming and received in Wyoming.

1603. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Bibox and its employees, and to cause Bibox to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1604.   Accordingly, the Individual Defendants, who directly or indirectly controlled Bibox, have violated the Wyoming Uniform Securities Act through Bibox's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1605.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1606.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## **PRAYER FOR RELIEF**

1607.   On behalf of themselves and the Class, Plaintiff requests relief as follows:

1608.   That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

1609.   That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

1610.   That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

1611.   That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled, including a declaration that the purchase agreements between each member of the Class and Bibox are void;

1612.   That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under state law);

1613.   That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

1614.   That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

1615.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a

trial by jury for all claims.

Dated:      August 28, 2020
            New York, New York

                                        Respectfully submitted,


<u>/s/ Philippe Z. Selendy</u>               <u>/s/ Kyle W. Roche</u>
Philippe Z. Selendy                      Kyle W. Roche
Jordan A. Goldstein                      Edward Normand
Spencer Gottlieb                         Velvel (Devin) Freedman
Michelle Foxman                          Alex Potter
SELENDY & GAY, PLLC                      ROCHE CYRULNIK
1290 Sixth Avenue, 17th Floor               FREEDMAN LLP
New York, NY 10104                       99 Park Avenue, 19th Floor
pselendy@selendygay.com                  New York, NY 10016
jgoldstein@selendygay.com                kyle@rcfllp.com
sgottlieb@selendygay.com                 tnormand@rcfllp.com
mfoxman@selendygay.com                   vel@rcfllp.com
                                         apotter@rcfllp.com