UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
                                       :
IN RE BIBOX GROUP HOLDINGS LIMITED     :      20cv2807 (DLC)
SECURITIES LITIGATION                  :
                                       :      OPINION AND ORDER
                                       :
-------------------------------------- X

APPEARANCES:

For lead plaintiff Alexander Clifford:
Kyle William Roche
Edward John Normand
Velvel (Devin) Freedman
Alex Potter
Roche Cyrulnik Freedman LLP
99 Park Avenue, Suite 1910
New York, NY 10016

Phillipe Selendy
Jordan Goldstein
Spencer Gottlieb
Michelle Foxman
Selendy & Gay PLLC
1290 Sixth Avenue, 17th Floor
New York, NY 10104

For defendants:
Sigmund S. Wissner-Gross
Ashley L. Baynham
Brown Rudnick LLP
Seven Times Square
New York, NY 10036

DENISE COTE, District Judge:

    Alexander Clifford brings this putative class action

against defendants Bibox Group Holdings Limited, Bibox

Technology Ltd., Bibox Technology Ou, Wanlin "Aries" Wang, Ji

"Kevin" Ma, and Jeffrey Lei (collectively, "Bibox"), alleging

that Bibox violated a number of provisions of federal securities law and state Blue Sky laws in its issuance of crypto-assets and its operation of an exchange for trading in crypto-assets. Because the plaintiff lacks standing to pursue most of his claims and his remaining claims are barred by the statute of limitations, Bibox's motion to dismiss is granted.

## Background

The following facts are taken from plaintiff's amended complaint.  They are assumed to be true.

I.   The Nature and Function of Crypto-Assets

Crypto-assets, which are also called "cryptocurrency" or "tokens", are decentralized digital commodities that rely on a technology called the "blockchain."  A blockchain is a decentralized electronic ledger that allows for secure and reliable tracking of the ownership and transfer of each individual unit of the crypto-asset.  This tracking and validation process requires computer resources.  In order to secure the requisite computer resources, blockchains are often designed such that people who volunteer their computer resources to complete the required validation are rewarded with new units of the crypto-asset.  This process is known as "mining."  But creation through mining is not an inherent property of crypto-

assets, and crypto-assets can also be created centrally by a single entity.

The blockchain mechanism allows for the use of crypto-assets as secure stores of value and media of exchange that do not rely on centralized government or private control.  Bitcoin, the first and most popular crypto-asset, is an example of a crypto-asset that serves primarily as a medium of exchange.[1] Another popular crypto-asset is Ethereum, which is built on a different blockchain from Bitcoin and has some additional features but otherwise functions similarly.

Although crypto-assets originated as a medium of exchange, the continued development of blockchain technology has allowed for several other uses for crypto-assets.  One such use for blockchain technology is the so-called "smart contract," which essentially functions as an automated, secure digital escrow account.  A smart contract allows the parties to define the terms of their contract and submit the crypto-assets contemplated in the contract to a secure destination.  The smart contract then automatically distributes the crypto-assets to the appropriate party upon the satisfaction of the relevant

---

[1] Accepted practice in the crypto-asset community, which is adopted by this Opinion, is to use the term "Bitcoin" to refer to the computer protocol and software that implements the technology, and to use the term "bitcoin" to refer to the individual units of the crypto-asset.

conditions precedent defined in the smart contract.  Crypto-assets based on the Ethereum blockchain, among others, are capable of smart contract functionality.  Crypto-assets may also be used as "utility tokens," which allow the holder to use or access a certain product or service.  Finally, another use for crypto-assets is as speculative "security tokens."  Security tokens, like conventional securities, are issued by an entity seeking to raise funds to support a given project and are purchased by investors in the hope that their value will increase as their issuer develops its project.  But unlike conventional securities, they do not give the holder an ownership stake in, or a share of the revenue of, an underlying corporate entity.

II.  The ERC-20 Platform and BiBox

In 2015, the ERC-20 platform was launched.  ERC-20 is not itself a crypto-asset but rather a platform for the creation of new tokens.  ERC-20 allows for the creation of customizable tokens that operate on the Ethereum blockchain.  Various properties of ERC-20 tokens are customizable.  Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise.  But because all ERC-20 tokens

operate on the Ethereum blockchain and must comply with the ERC-20 standard, all ERC-20 tokens have certain similarities.

Responding to the increased demand for crypto-assets and the new ease of creating tokens on the ERC-20 platform, hundreds of new tokens were issued between 2016 and 2018. These new tokens were frequently listed on crypto-asset exchanges, where they could be exchanged for other crypto-assets or for traditional currency. Some issuers of crypto-assets also operated crypto-asset exchanges, while others did not.

Bibox was among the entrants into the crypto-asset market. In October 2017, Bibox launched a crypto-asset exchange. In order to fund the development of the exchange, Bibox also issued a token of its own, which it called the "Bibox Token" or "BIX." BIX, an ERC-20 token, could be traded for other crypto-assets on the Bibox exchange. Transactions involving BIX would be offered discounted transaction fees on the Bibox exchange. Bibox also promised to use a portion of its profits to buy back BIX tokens, thereby raising the price and creating a return for early investors. While BIX was built on blockchain technology and operates on the Ethereum blockchain, BIX's implementation of blockchain technology was different from the blockchain technology used in other crypto-assets such as Bitcoin and Ethereum. The BIX tokens that Bibox offered to the public were

created centrally, as opposed to via the decentralized mining process used for Bitcoin and Ethereum.

The BIX token was launched in October 2017, and Bibox raised approximately $19 million from its initial offering of BIX.  BIX was made available for trading on its exchange on November 24, 2017.  Bibox promoted BIX via its social media accounts and at various conferences in the United States.

In 2018, the plaintiff traded in BIX on the Bibox exchange. In two separate transactions on June 10 and October 27, 2018, the plaintiff purchased BIX using bitcoin.  On December 12, 2018, the plaintiff sold BIX in exchange for bitcoin.

III. Other Tokens Offered on Bibox

In addition to claims related to BIX, the complaint alleges various claims related to five other tokens that were based on the ERC-20 platform, operate on the Ethereum blockchain, and offered for trading on the Bibox exchange.  These five tokens -- known as EOS, TRX, OMG, LEND, and ELF -- are described below.

A.   EOS

The EOS token is a crypto-asset that was created by the issuer Block.one and initially offered for sale in June 2017. EOS has been listed for trading on the Bibox exchange since December 3, 2017.  Block.one described EOS as a technologically superior competitor to Bitcoin and Ethereum.  Like BIX, EOS was

created via a centralized process, rather than through the decentralized mining process used to create Bitcoin and Ethereum.

In 2019, the Securities and Exchange Commission ("SEC") concluded that EOS was a security under the 1933 Securities Act. The SEC further found that Block.one had violated the 1933 Securities Act by selling EOS as an unregistered security. Block.one paid a $24 million settlement to the SEC for its securities law violations related to its sale of EOS.  Block.one is not a defendant in this litigation.

B.   TRX

The TRX token is a crypto-asset created and issued by the TRON Foundation.  TRX was first offered for sale on August 31, 2017 and was listed on the Bibox exchange beginning on February 11, 2018.  Bibox promoted TRX via its website.  TRX was advertised as a secure, decentralized, and inexpensive blockchain-based mechanism for the distribution of digital content over the internet, and the TRX token was issued as a means of funding the development of the TRX system.  Like BIX, the TRX tokens were generated through a centralized process rather than the decentralized mining process.  The TRON Foundation is not a defendant in this litigation.

C.   OMG

The OMG token, also known as OmiseGO, is a crypto-asset developed and issued by Omise, a provider of e-commerce services operating primarily in Asia.  OMG was advertised as a crypto-asset designed to interface with Omise's existing e-commerce services and facilitate online transactions by customers without bank accounts.  Investors in OMG stood to profit from a successful launch of OMG and improvements to the Omise system that increased the market price of OMG.  OMG was first sold to the public on September 9, 2017 but was not listed on the Bibox exchange until July 10, 2019.  Like BIX, OMG was issued through a centralized process, rather than a decentralized mining process.  Omise is not a defendant in this litigation.

D.   LEND

The LEND token, developed and issued by a company called ETHLend, is a crypto-asset designed to facilitate secure online loan transactions.  LEND was initially issued in November 2017 and was listed on the Bibox exchange on December 10, 2017.  LEND was issued through a centralized process.  ETHLend is not a defendant in this litigation.

E.   ELF

The ELF token was developed and issued by an entity called aelf and initially offered for sale in December 2017.  According

8

to a white paper published by aelf, ELF was "envisioned as . . . a highly efficient and customizable [operating system]."  Bibox listed ELF on December 21, 2017, soon after it was offered to the public.  ELF was issued through a centralized process.  aelf is not a defendant in this litigation.

IV.  The Status of Crypto-Assets as Securities and the SEC's 2019 Guidance

A complex patchwork of federal and state laws regulates the issuance and sale of securities.  These statutes include the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78a et seq.  But these regulations apply only to investment products that qualify as securities under these statutes.  For the purpose of federal law, a "security" is defined as, inter alia, an "investment contract."  15 U.S.C. § 77b(a)(1).  The Supreme Court has defined an "investment contract" as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946).  This analysis, which is commonly called the Howey test, may be applied to determine whether a given investment product qualifies as a security and is thereby subject to a number of

9

federal regulations applicable only to covered securities.
Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994).

Bibox claims that the BIX token, as well as the five other
tokens at issue in this litigation, are not securities under the
Howey test.  Similarly, the issuers of the five tokens not
issued by Bibox have each claimed that its tokens are not
securities under this legal standard.[2]  The issuers also did not
register the tokens as securities with the SEC.

On April 3, 2019, the SEC published a Framework for
Investment Contract Analysis of Digital Assets (the
"Framework"), which "provided a framework for analyzing whether
a digital asset is an investment contract and whether offers and
sales of a digital asset are securities transactions."  In this
Framework, the SEC essentially provided a gloss on the Howey
test that applied the Howey analysis to crypto-assets.  The
Framework provides a means of assessing whether purchasers of
crypto-assets invested money, participated in a common
enterprise, expected profits, and expected that those profits
would be solely derived from the managerial efforts of others,
as set forth in Howey.  With respect to the "expect[ed] profits"
and "profits solely from the efforts of [another]" elements of
Howey, the Framework sets forth lengthy non-exhaustive lists of

---

[2] As noted above, the SEC has determined that EOS is a security.

characteristics of crypto-assets that should be considered in
assessing whether a given crypto-asset satisfies those elements
of the Howey test.

V.   Procedural History

On April 3, 2020, the plaintiff initiated this action.  In
his complaint, the plaintiff principally alleges that the six
tokens at issue in this litigation qualify as securities under
federal and state securities laws, and that Bibox violated
federal and state law by selling the tokens without registering
as an exchange or broker-dealer and without a registration
statement in effect for the six tokens at issue.  The plaintiff
seeks certification of multiple subclasses: some seek to recover
on behalf of all investors who purchased the six tokens on the
Bibox exchange in the United States, some seek to recover on
behalf of all persons who purchased BIX in the United States
directly from the defendants, and some seek to recover on behalf
of all persons who purchased BIX in the United States from a
third party.[3]

On June 8, 2020, the plaintiff was appointed lead
plaintiff.  On July 31, the plaintiff moved pursuant to Rule 4,
Fed. R. Civ. P., to serve by alternative means the defendants

---

[3] The plaintiff's proposed subclasses are further divided based
on the potential applicability of an arbitration clause.

other than Bibox Group Holdings, Ltd, claiming that prior efforts to serve the remaining defendants had been unsuccessful. On August 10, the Court granted the plaintiff's motion to serve the remaining defendants via their social media accounts, via corporate and personal email, and via the registered agent of Bibox Group Holdings, Ltd.  On August 28, the plaintiff notified the Court that alternative service had been completed and filed an amended complaint.

Counsel for Bibox appeared on October 15, and Bibox moved to dismiss on December 9.  The motion to dismiss became fully submitted on February 12, 2021.

## Discussion

The complaint asserts one hundred and fifty-four causes of action.  Six of these claims arise under federal law.  The complaint asserts that Bibox violated §§ 5 and 12(a)(1) of the Securities Act by offering for sale securities, namely the six tokens for which registration statements had not been filed with the SEC.  It further alleges that Bibox violated §§ 5 and 29(b) of the Exchange Act by entering into contracts to buy and sell securities, namely the six tokens, on an unregistered exchange. The plaintiff further asserts that Bibox violated §§ 15(a)(1) and 29(b) of the Exchange Act by operating as an unregistered broker and dealer in connection with the six tokens, and that

the individual Bibox defendants are subject to control person liability under § 20 of the Exchange Act for causing the sale of the six tokens on an unregistered exchange.  The final federal claims allege that Bibox violated §§ 5 and 12(a)(2) of the Securities Act by selling BIX, a security, with false statements and omissions of material facts in its prospectus, and that the individual Bibox defendants are subject to control person liability for this violation pursuant to §§ 5, 12(a)(1), and 12(a)(2) of the Securities Act.

The remaining one hundred and forty-eight claims are brought under the Blue Sky laws of all fifty states and the District of Columbia.  The sole named plaintiff in this action resides in Illinois.  The parties' submissions on Bibox's motion to dismiss address solely the viability of the Illinois Blue Sky claims and do not address the other Blue Sky claims alleged in this complaint.  Where, as here, a named class action plaintiff brings state law claims that may not be brought by the named plaintiff, but may be brought by putative class members, courts typically address only the state law claims of the named plaintiff at the motion to dismiss stage and do not address the standing and merits arguments with respect to the additional state law claims unless and until the motion to dismiss is denied and a motion for class certification is granted pursuant

to Rule 23, Fed. R. Civ. P.  See, e.g., In re Buspirone Patent Litigation, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002) (collecting cases).  Since, for the reasons stated in this Opinion, Bibox's motion to dismiss must be granted, the additional state law claims alleged in the complaint are not addressed.

Bibox has moved to dismiss on several jurisdictional and merits grounds.  This Opinion holds that the plaintiff lacks standing to pursue claims related to the tokens other than BIX, thereby granting Bibox's motion to dismiss those claims for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P.  Plaintiff's claims regarding BIX are dismissed as barred by the statute of limitations.

I.   Standing

The plaintiff brings claims related to the sale of six tokens but alleges that he purchased only the BIX token.  For the following reasons, the plaintiff lacks standing to bring suit regarding tokens that he did not purchase, and his claims arising from the existence of those tokens must be dismissed.

Under Article III of the United States Constitution, federal courts solely have jurisdiction in "cases" and "controversies."  U.S. Const. art. III, § 2.  "The case-or-controversy requirement of Article III encompasses . . . the requirement that the plaintiff establish standing to sue."

Stagg, P.C. v. U.S. Dep't of State, 983 F.3d 589, 601 (2d Cir.
2020).  In order to establish standing, a plaintiff must show
that it has "(1) suffered an injury in fact, (2) that is fairly
traceable to the challenged conduct of the defendant, and (3)
that is likely to be redressed by a favorable judicial
decision."  Grand River Enterprises Six Nations, Ltd. v.
Boughton, 988 F.3d 114, 120 (2d Cir. 2021) (citation omitted).
The "injury in fact" must be "concrete and particularized" and
"actual or imminent, not conjectural or hypothetical."  Liberian
Cmty. Ass'n of Connecticut v. Lamont, 970 F.3d 174, 184 (2d Cir.
2020) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560
(1992)).  Further, "with respect to each asserted claim, a
plaintiff must always have suffered a distinct and palpable
injury to herself."  Mahon v. Ticor Title Ins. Co., 683 F.3d 59,
64 (2d Cir. 2012) (quoting Gladstone Realtors v. Vill. of
Bellwood, 441 U.S. 91, 100 (1979)) (emphasis in original).

These standing requirements are "no less true with respect
to class actions than with respect to other suits."  Lewis v.
Casey, 518 U.S. 343, 357 (1996).  In a putative class action
such as this one, "named plaintiffs who [purport to] represent a
class must allege and show that they personally have been
injured"; it is not sufficient to show that "injury has been
suffered by other, unidentified members of the class to which

15

they belong and which they purport to represent." Id. (citation omitted).

With this instruction from the Supreme Court in mind, the Second Circuit has set forth a two-part test to assess standing in putative class actions.  A named plaintiff has so-called "class standing"

> if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon, 775 F.3d 154, 161 (2d Cir. 2014) (citation omitted).  Conduct "implicates the same set of concerns" when the conduct that injured the named plaintiff and the conduct that injured the absent class members can be proven in a similar way.  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 163 (2d Cir. 2012).

The proper procedural route for bringing a standing challenge is a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  Lamont, 970 F.3d at 184.  The plaintiffs bear the burden of alleging sufficient facts demonstrating that they have standing to sue, and "[a]ll allegations made in the complaint are accepted as true and construed in favor of the plaintiffs."  Id.

The defendants argue that the plaintiff lacks standing to pursue claims for a class arising from the five tokens described in the complaint that he did not purchase.  They are correct. The plaintiff has not alleged that he suffered any actual injury from the conduct of the defendants regarding the five tokens he did not purchase.  Moreover, he has not sufficiently alleged that any injury to class members from the defendants' conduct regarding these five tokens implicates the same set of concerns as the injury he has alleged that he suffered from the purchase and sale of a BIX token.

The core features of the five other tokens do not suggest that a purchaser of a BIX token can properly represent a class composed of purchasers of one or more of the five tokens.  None of the five tokens was developed or issued by the defendants; each of the tokens was developed and issued by a separate entity.  Each has its own set of characteristics and advertising history.  Each was first offered on the Bibox exchange on a different date.  These differences, among others, indicate that claims regarding each of the tokens must be proven in a different way, which forecloses a conclusion that claims regarding each of the tokens implicate the same set of concerns.

The plaintiff chiefly points to the fact that the five tokens share a technological feature with the BIX token -- their

compliance with ERC-20 application standards.  He emphasizes as
well that BIX and each of the other five tokens were described
by the defendants as fully functional technologies similar to
Bitcoin.  This shared feature and the defendants' promotional
statements are insufficient to permit a finding that the
plaintiff has standing to represent a class composed not just of
purchasers of BIX but also of purchasers of the other five
tokens.  That feature and those statement do not show that the
trading in each of the five tokens raises the same set of
concerns as trading in BIX.

Additionally, the issue of whether a particular token is in
fact a security has significant consequences for each of the
claims alleged in the complaint, and that determination involves
an application of the Supreme Court's Howey test.  That test is
a fact intensive inquiry and will reach a result that depends on
the unique characteristics of each token.  Thus, even for the
five tokens built on the ERC-20 platform and sold on the Bibox
exchange, some may be covered securities and others not.

It is true that each of the five tokens is alleged to have
been offered for trading on the exchange operated by the
defendants, which is where the plaintiff purchased the BIX
tokens.  Sharing a trading platform, however, does not create a
common set of concerns among all investors who purchased any

alleged security on that exchange.  Using established securities exchanges for the trading of stocks and options as an analogy, no one would suggest that the purchaser of one security on an exchange could seek damages for a class of purchasers of other securities from different issuers simply because they were traded on the same exchange, and this would hold true even if those securities shared some structural features.

This is true even for a claim that focuses on the legality of the defendants' operation of the Bibox exchange.  The plaintiff's claims regarding the legality of the Bibox exchange are premised on § 5 of the Exchange Act, which creates liability for "using any facility of an exchange . . . to effect any transaction in a <u>security</u>" unless the exchange is registered with the SEC.  15 U.S.C. § 78(e) (emphasis supplied).  Under this provision, Bibox faces liability for offering a financial product on an unregistered exchange only if the product it offered is a security.  While the plaintiff has standing to pursue this claim in connection with the sale of BIX, which he purchased, he does not have standing with respect to his § 5 claims connected to the sale of the other five tokens on the BIX exchange.  Each § 5 claim requires a threshold showing that the product underlying it is a security, and for the reasons

discussed above, that showing requires token-by-token proof and implicates different sets of concerns for each token.

While the plaintiff argues that the Second Circuit's decision in the securities action NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012), supports his standing to represent a class composed of purchasers of the five other tokens as well as BIX, it does not. The Court of Appeals engaged in a careful analysis in NECA-IBEW of whether the injuries alleged on behalf of the putative class have "the potential to be very different -- and could turn on very different proof." Id. at 163.  The court drilled down into the nature of the claims and the proof required to sustain those claims.  That same level of scrutiny undermines the plaintiff's assertion here that he has standing to represent purchasers of the five tokens he did not purchase.

In NECA-IBEW, the plaintiff sought to recover damages on behalf of a class of purchasers of mortgage-backed certificates issued pursuant to a single shelf registration statement.  Id. at 149.  There were, however, 17 separate offerings using 17 separate Prospectus Supplements, and the lead plaintiff had only participated in two of those offerings.  Id.  In addition, six different entities originated the mortgages that backed those certificates, but mortgages from only three of those originators

appeared in the two offerings in which the plaintiff

participated.  Id. at 164.  Because the securities claims rested

on the assertion that the originators of the mortgages had

abandoned their own underwriting guidelines, id. at 163, the

Court of Appeals held that, where certificates had the same

originators, the claims raised "a sufficiently similar set of

concerns to permit" the plaintiff to represent certificate-

holders in other offerings.  Id. at 164.  This was true even

with respect to claims brought on behalf of holders of

certificates from the same originators who held certificates at

a different level of payment priority from the named plaintiff,

because the issue of payment priority implicated only the amount

of available damages and the named plaintiff had the "same

'necessary stake in litigating' whether those [originators] in

fact abandoned their underwriting guidelines."  Id. (quoting

Blum v. Yaretsky, 457 U.S. 991, 999 (1982)).

By contrast, the named plaintiff in NECA-IBEW lacked

standing to assert claims on behalf of purchasers of

certificates in 10 of the 17 offerings.  Id. at 163.  Those 10

offerings were backed by mortgages originated by three entities

whose mortgages did not support the certificates purchased by

NECA-IBEW.  Id.  Because the core question in the litigation

involved whether the originators of the mortgages in the

21

mortgage-backed securities at issue had abandoned their underwriting guidelines, the named plaintiff would have to rely on different proof.  Id.  The factual question of whether a mortgage lender had violated its underwriting guidelines could not be answered by looking to whether another, unrelated mortgage lender had violated its own underwriting guidelines. Id.

Here, there is far less to tie claims from the six tokens together than was asserted in NECA-IBEW.  There is nothing here equivalent to the single shelf registration statement cited by the plaintiffs as a basis for class standing in that case. Other than being offered on the same exchange and sharing an underlying application standard, there is no factual or legal relationship between the six tokens.  Even if there were some legal or factual relationship between the tokens equivalent to the single shelf registration statement cited in NECA-IBEW, the Second Circuit held in that case that the shelf registration statement alone was not sufficient to support standing for claims from all the certificates issued under that statement. Beyond that, the required token-by-token proof here is analogous to the divergent proof required in NECA-IBEW to address certificates backed by mortgages from different originators. This individualized inquiry also prevents a finding that the

plaintiff has standing to represent a class of purchasers of
tokens he did not also purchase.

II.  Statute of Limitations

The defendants have moved to dismiss the remaining claims,
each of which arises from the plaintiff's purchase of BIX, on
the ground that the claims are barred by the statute of
limitations.  The plaintiff's final purchase of BIX occurred on
October 27, 2018, and his final sale of BIX occurred on December
11, 2018.  The plaintiff filed this action on April 3, 2020,
roughly sixteen months after that final transaction.  The
defendants argue that the plaintiff's claims must be filed
within at most one year of their accrual and therefore fall
outside of the relevant limitations period.  For the following
reasons, the motion to dismiss is granted.

"Although the statute of limitations is ordinarily an
affirmative defense that must be raised in the answer, a statute
of limitations defense may be decided on" a motion to dismiss
for failure to state a claim pursuant to Rule 12(b)(6), Fed. R.
Civ. P., "if the defense appears on the face of the complaint."
Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc., 988
F.3d 127, 132 (2d Cir. 2021) (citation omitted).  On a motion to
dismiss, a court may also evaluate whether a statute of
limitations may be equitably tolled where the factual basis for

equitable tolling is apparent from the face of the complaint and other documents properly considered on a motion to dismiss. See, e.g., DeSuze v. Ammon, 990 F.3d 264, 271-72 (2d Cir. 2021) (affirming a district court's refusal to equitably toll the statute of limitations and grant of a motion to dismiss on statute of limitations grounds); Koch v. Christie's Intern. PLC, 699 F.3d 141, 156-57 (2d Cir. 2012) (same).

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[ ] all factual allegations as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Coal. for Competitive Elec., Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). In deciding a motion to dismiss, a court may consider facts alleged in the complaint, "any written instrument attached to [the complaint] as an exhibit, materials incorporated in [the complaint] by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018).

A.    Section 12(a)(1)

Section 12(a)(1) creates liability for selling securities without, inter alia, filing the required registration statement. 15 U.S.C. §§ 77e, 77l(a)(1).  Section 12(a)(1) claims must be brought "within one year after the violation upon which it is based".  15 U.S.C. § 77m.  Under the plain text of the statute, the last day for the plaintiff to file suit was October 27, 2019.  The plaintiff argues that his § 12(a)(1) claims are nonetheless timely because either the discovery rule or the doctrine of equitable tolling applies here.[4]  The plaintiff's arguments do not succeed in overcoming the statute of limitations bar.

1.    Discovery Rule

The plaintiff first argues that, despite the statutory text, a discovery rule applies to his § 12(a)(1) claim.  When a discovery rule applies to a given claim, "discovery of the injury, not discovery of the other elements of a claim, is what starts the [statute of limitations] clock."  Koch, 699 F.3d at 148 (quoting Rotella v. Wood, 528 U.S. 549, 555 (2000)).  The

---

[4] The plaintiff brings § 12(a)(1) claims against the Bibox entity defendants and claims for control person liability under § 12(a)(1) against the individual Bibox defendants pursuant to 15 U.S.C. § 77o.  The same statutes of limitations that apply to primary claims under the 1933 and 1934 Acts also apply to control person claims.  Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 n.1 (2d Cir. 1993).

plaintiff reasons that he did not know that BIX was an unregistered security until April 3, 2019, when the SEC published its Framework for assessing whether a crypto-asset qualifies as a security.  If a discovery rule applies to his § 12(a)(1) claims, he contends the statute of limitations runs from that date instead of October 27, 2018 and renders the April 3, 2020 filing of this action timely.

Plaintiff's argument for the application of a discovery rule to his § 12(a)(1) claim fails.  The statutory text does not authorize a discovery rule, and the Supreme Court has held that an "[a]textual judicial supplementation" of statutory text with a discovery rule is "particularly inappropriate" because "Congress has shown that it knows how to adopt" a discovery rule when it chooses to do so.  Rotkiske v. Klemm, 140 S.Ct. 355, 361 (2019) (rejecting discovery rule for FDCPA claim).[5]  Therefore, it is not the role of courts "to second-guess Congress' decision to include a 'violation occurs' provision, rather than a discovery provision."  Id.  This analysis applies with particular force in the context of § 12(a)(1) claims since, in the same statutory provision that sets forth the limitations

---

[5] The limitations provision at issue in Rotkiske is phrased similarly to the limitations provision applicable to § 12(a)(1) claims.  Under the FDCPA, an action "may be brought . . . within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).

period for § 12(a)(1) claims, Congress explicitly included a
discovery rule applicable only to other securities law
violations.  See 15 U.S.C. § 77m (claims stemming from false
statements or omissions in a registration statement, prospectus,
or oral communication must be "brought within one year after the
discovery of the untrue statement or the omission") (emphasis
supplied).

Moreover, even if the plaintiff could invoke a discovery
rule, it would not assist him.  Under a discovery rule, the
claim accrues when the plaintiff learns of "the critical facts
that he has been hurt and who has inflicted the injury."  Wood,
528 U.S. at 556 (quoting United States v. Kubrick, 444 U.S. 111,
122 (1979)) (emphasis supplied).  By contrast, a "plaintiff's
ignorance of his legal rights" does not "receive identical
treatment."  Id. at 555-56.

Here, the plaintiff does not allege that he only learned on
April 3, 2019 of "critical facts" regarding BIX.  Rather, he
claims that he did not learn of his potential legal rights under
§ 12(a)(1) until the SEC released the Framework on April 3,
2019.  Ignorance of legal rights does not delay the accrual of a
claim under a discovery rule.  In any event, the Framework is
merely a non-binding agency interpretation of the longstanding
Howey test and did not create new rights.

2.   The Fraudulent Concealment Doctrine

The plaintiff argues in the alternative that his claim was equitably tolled due to Bibox's fraudulent concealment of facts regarding BIX.  The plaintiff has alleged in his complaint that "as a result of [Bibox's] fraudulent statements and omissions, [he] did not realize that [he was] in a position to bring claims under federal or state law regulating securities" until the SEC issued the Framework.  Section 12(a)(1) claims are subject to equitable tolling.  See Katz v. Amos Treat & Co., 411 F.2d 1046, 1054-55 (2d Cir. 1969).

Equitable tolling on the grounds of fraudulent concealment is permitted only if

> (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.

Ellul v. Congregation of Christian Bros., 774 F.3d 791, 801 (2d Cir. 2014) (citation omitted).

Where a plaintiff pleads fraudulent concealment, those allegations "are subject to the particular pleading requirements set forth in Federal Rule of Civil Procedure 9(b)."  Zirvi v. Flatley, 433 F. Supp. 3d 448, 462 (S.D.N.Y. 2020) (citation omitted), aff'd, 838 F. App'x 582 (2d Cir. 2020).  Accordingly,

28

the complaint "must state with particularity the circumstances constituting" fraudulent concealment.  Fed. R. Civ. P. 9(b).  See also Ellul, 774 F.3d at 801 (where a defendant has moved to dismiss for failure to comply with the statute of limitations, a "plaintiff must show" that equitable tolling applies to survive a motion to dismiss); A.Q.C. ex rel Castillo v. U.S., 656 F.3d 135, 144 (2d Cir. 2011) (holding that a district court properly rejected a plaintiff's argument for fraudulent concealment and granted a motion to dismiss on statute of limitations grounds where the plaintiff failed to show that the doctrine applied).

The plaintiff argues that, applying the Framework, BIX is a security, and that Bibox engaged in fraudulent concealment when it failed to inform him that BIX was a security.  He claims that he did not learn of this failure until the SEC issued the Framework on April 3, 2019.  But as addressed above, the plaintiff's assertion that BIX is a security under the Howey test is a legal conclusion, not a fact, and the plaintiff otherwise fails to describe any material facts that Bibox concealed or how he failed to discover those facts despite the exercise of diligence.  Therefore, equitable tolling is unavailable here.

B.   Sections 12(a)(2) and 29(b)

The plaintiff's other two federal claims also contain a one-year statute of limitations.  But, unlike § 12(a)(1), they incorporate a discovery rule.

The plaintiff brings a claim against the Bibox corporate entity defendants for sale of securities by means of a prospectus containing untrue statements and omissions of material facts under § 12(a)(2) of the 1933 Act.  15 U.S.C. § 77l(a)(2).  The plaintiff also brings a claim for control person liability against the individual Bibox defendants for the same conduct.  A § 12(a)(2) claim must be "brought within one year after the discovery of the untrue statement or the omission" upon which it is based.  15 U.S.C. § 77m.  The plaintiff also brings claims for entity and control person liability for sale of securities via an unregistered exchange under § 29(b) of the 1934 Act.  15 U.S.C. §§ 78e; 78cc.  A claim under § 29(b) must be "brought within one year after the discovery that [a] sale or purchase involves [a] violation."  15 U.S.C. § 78cc.

The plaintiff's claims under §§ 12(a)(2) and 29(b) are also barred by the statute of limitations.  For the reasons discussed above, even the application of a discovery rule does not extend the one-year bar.  The plaintiff did not learn of any "critical facts" regarding his injury when the SEC issued the Framework on

30

April 3, 2019, <u>Wood</u>, 528 U.S. at 556, but rather learned only of the SEC's nonbinding interpretation of <u>Howey</u>.  While that interpretation may assist the plaintiff in crafting a legal argument that BIX is indeed a security and subject to regulation under federal securities law, that guidance did not extend the statute of limitations period for his claims.

Moreover, equitable tolling is also inappropriate here because the plaintiff does not allege that Bibox concealed any material facts regarding BIX; he simply alleges that Bibox did not disclose BIX was a security under the relevant legal standard.  Bibox's failure to adopt the plaintiff's preferred legal conclusion in its materials does not amount to a concealment of material fact.

C.   Illinois Law

Finally, the plaintiff pleads Illinois Blue Sky claims against the Bibox entity defendants for the unregistered sale of securities and for transacting business as an unregistered dealer, and against the individual defendants for control person liability for the same. Ill. Comp. Stat. Ann. §§ 5/5, 5/8, 5/15(A).  He seeks to void his purchase of BIX pursuant to the civil remedy provision of the Illinois Blue Sky law.[6]  815 Ill.

---

[6] Rescission of the sale is the sole civil remedy provided by the Illinois Blue Sky law.  <u>National Credit Union Admin. Bd. v.</u>

Comp. Stat. Ann. 5/13.  In order to proceed with his claims
under Illinois law, the plaintiff must have provided "notice" to
"each person from whom recovery will be sought" within 6 months
of acquiring "knowledge that the sale of the securities to him
or her is voidable."  815 Ill. Comp. Stat. Ann 5/13(B).

Here, the plaintiff did not provide notice of his intent to
rescind his purchase of BIX until April 1, 2020.  This notice
was provided nearly twelve months after the SEC Framework was
published, which the plaintiff alleges was the first date on
which he "[was] in a position to appreciate [his] ability to
bring claims based on Defendants' misconduct."  Therefore, even
if it could be assumed that the Framework provided the plaintiff
with knowledge that his purchase of BIX was voidable, the
publication of the Framework would not preserve this claim.

The plaintiff provides almost no detail as to when he, in
fact, learned that the sale was voidable, alleging only that he
"learned that the sale was voidable under Illinois law within
six months prior to the filing of the original Complaint."  The
complaint therefore amounts to an attempt to satisfy the notice
element of the Illinois Blue Sky civil remedy provision with a
"threadbare recital of the elements of [the] cause of action,

_____

Morgan Stanley & Co., Inc., No. 13cv6705(DLC), 2014 WL 241739,
at *8 (S.D.N.Y. Jan. 22, 2014).

supported by mere conclusory statements." <u>Dane v.</u>
<u>UnitedHealthcare Insurance Company</u>, 974 F.3d 183, 189 (2d Cir.
2020) (quoting <u>Iqbal</u>, 556 U.S. at 678).  These allegations "do
not suffice" to survive Bibox's motion to dismiss.  <u>Id</u>.

### Conclusion

Bibox's December 9, 2020 motion to dismiss is granted.  The
Clerk of Court is directed to enter judgment for the defendants
and close this case.

Dated:     New York, New York
           April 16, 2021

                                    _____
                                    DENISE COTE
                            United States District Judge